**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

GERO MEYERSIEK,
Plaintiff

v.

JEAN PAUL RICHARD, FRONTENAC COMPANY and H-E PARTS, INTERNATIONAL, INC.
Defendants

No. CA 06 335

**COMPLAINT**

PARTIES AND JURISDICTION

1. The Plaintiff Gero Meyersiek ("Meyersiek") is a citizen and resident of the Town of East Greenwich, Rhode Island.

2. The Defendant Jean Paul Richard ("Richard") is a citizen and resident of the State of Georgia. He has sufficient contacts with the State of Rhode Island to be subject to the jurisdiction of this Court.

3. The Defendant H-E Parts International, LLC ("H-E Parts") is a business entity organized under the laws of and having its principal place of business outside of Rhode Island, which has sufficient contacts with the State of Rhode Island to be subject to the jurisdiction of this Court.

4. The Defendant Frontenac Company ("Frontenac") is a business entity organized under the laws of and having its principal place of business outside of Rhode Island, which has sufficient contacts with the State of Rhode Island to be subject to the jurisdiction of this Court.

5. The amount in controversy exceeds Seventy Five Thousand Dollars. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, by virtue of diversity of citizenship of the parties.

FACTS

6. The business of Frontenac is to accumulate private equity funds from investors and to make equity investments in businesses for the purpose of accumulating and merging several individual businesses in an industry to form a single, significantly larger business entity, which Frontenac will then sell at a significant profit. In carrying out its business, Frontenac will form individual entities for the purpose of effecting a particular campaign for the acquisition, merger, and ultimate sale of a group of businesses in an industry. Defendant H-E Parts is a subsidiary of Frontenac.

7. Meyersiek is a business executive with extensive experience in, among other things, the analysis of industries, and investigation and analysis of individual businesses in those industries. Meyersiek is skilled in evaluating businesses for the purpose of analyzing an acquisition of the business, obtaining financing for such acquisition, and performing the steps necessary to effect an acquisition. Meyersiek also has experience and is skilled in the management of business entities.

8. Richard is also a business executive, who has experience in evaluating businesses, and in acting as a facilitator of the financing of the acquisition of businesses. Richard has a long-standing relationship with Frontenac, for which he has acted as chief executive officer of one or more business entities.

9. In 2003, while he was employed as an executive of a business entity owned and controlled by Frontenac, Richard, on behalf of Frontenac, worked with Meyersiek to

attempt to consummate a business venture by which Frontenac would make a significant equity investment in and acquire control of a business of which Meyersiek was then an officer and owner, known as "Parts-Zone." Parts-Zone was a manufacturer of replacement parts for heavy equipment that was no longer in production by its original manufacturer. The specific project was to have Frontenac invest, and acquire an equity interest in, Parts-Zone, for the purpose of facilitating the acquisition by Parts-Zone of another firm engaged in a business similar to that of Parts-Zone.

10. Meyersiek, Richard, and Frontenac engaged in extended discussions, negotiations, and exchanges of information over the course of several months in 2003 in their efforts to conclude a deal with Parts-Zone. Their communications took the form of electronic mail, telephone conversations, postal mail, and two meetings, one with Frontenac in Chicago, and one with Richard in Atlanta. Other than the two meetings, Meyersiek remained in East Greenwich, Rhode Island during the entire period of these communications. Meyersiek engaged in significant efforts of research and analysis as his part of the effort to conclude a deal with Richard and Frontenac, all from his home and office in Rhode Island. Richard and Frontenac anticipated and expected that Meyersiek would conduct his efforts within the State of Rhode Island to work toward concluding a deal by which Frontenac would make its investment in Parts-Zone.

11. The efforts of Meyersiek, Richard, and Frontenac to conclude a deal for an equity investment by Frontenac in Parts-Zone were unsuccessful, and ceased in 2004, with Richard stating to Meyersiek that they should stay in communication to pursue possible new, other ventures with Frontenac.

12. In December, 2004, Richard telephoned Meyersiek at his home office in Rhode Island, to inform Meyersiek that Frontenac had sold the business entity at which Richard had been an executive, and that he and Frontenac were interested in pursuing a new acquisition with Meyersiek's assistance. Specifically, Richard stated that he and Frontenac were now interested in making an outright acquisition of Parts-Zone, and using Parts-Zone, with Frontenac equity funds, to accumulate several other firms in the same or similar business as Parts-Zone, to form a significantly larger company that could then be sold at a substantial profit. This was identical to the strategy pursued by Meyersiek for Parts-Zone.

13. After initial discussions with Meyersiek regarding acquisition of Parts-Zone, Richard informed Meyersiek that Frontenac's interest had expanded to include acquisition of a business in an industry that was related to that of Parts-Zone, but with a somewhat different market: manufacturers of replacement parts for heavy equipment machinery that was still in production. Meyersiek agreed with Richard that this was a market that offered potential lucrative acquisition targets, and presented an opportunity for application of the Frontenac business plan of making an initial acquisition of a business in the industry, and then using that business as the vehicle for making many further acquisitions to roll up several manufacturers into a single business.

14. Richard proposed to Meyersiek that Meyersiek begin immediately to use his skills in industry analysis to conduct research on the heavy equipment parts replacement manufacturers industry to analyze the businesses in that industry, and review and analyze their finances, for the purpose of identifying targets for acquisition, and then participate in further analysis and negotiation for the acquisition of such a target business.

15. In describing the proposed business venture, Richard stated that Frontenac would likely use one or more business entities, to be formed for this purpose, to make the acquisitions on its behalf. He stated that the business plan called for the creation of a new entity that would be the owner of the business, and through which all acquisitions were to be made. He stated that the majority owner of the business entity would be Frontenac, and that Frontenac and Richard would form H-E Parts to be the new business entity that would serve as the vehicle for acquisitions.

16. As consideration for Meyersiek's efforts, Frontenac and Richard offered to grant to Meyersiek a four percent equity interest in H-E Parts (or any other business entity to be formed with Frontenac investments to acquire the target business, if other than H-E Parts) if the joint efforts of Meyersiek, Richard, and Frontenac were successful in Frontenac making an equity investment in a target business. In addition, Richard and Frontenac offered that upon the execution of a letter of intent for acquisition of an equity interest in a target business, Meyersiek would become a paid officer of H-E Parts (or other entity, if not H-E Parts), at a salary of $175,000 per year, plus bonus if certain performance parameters were met.

17. At all times in his dealings with Meyersiek, Richard was acting in a capacity as the authorized agent for Frontenac and H-E Parts, within the scope of his agency. Richard stated to Meyersiek that his offer of equity interest, and of employment, were subject to the approval of Frontenac, and further stated that those offers had indeed been approved by Frontenac.

18. Meyersiek accepted Richard's offer, thereby forming a contract between Meyersiek and Richard and Frontenac. The terms of the contract were that in exchange for Meyersiek's

application of his talents and skills in industry and financial analysis toward the acquisition by Frontenac, or by entities owned and/or controlled by Frontenac, of an interest in a business in the heavy equipment replacement parts manufacturing industry, Meyersiek was to be compensated with a conveyance of a four percent equity interest in the overall business enterprise to be created by Frontenac in the replacement parts manufacturing industry, be appointed an officer and employee of that entity, and receive a salary of $175,000 from that entity.

19. In making his business proposals to Meyersiek, and in making the offer of equity interest and employment and compensation to Meyersiek, Richard was acting as an agent, and within the scope of his agency, for Frontenac, H-E Parts, and any and all entities that Frontenac would form for the purpose of this business venture.

20. The discussions and negotiations between Meyersiek and Richard, some of which included communications with Frontenac, that led to and became the contract with Meyersiek, took the form of electronic mail and telephone calls to and from Meyersiek at his home and office in the State of Rhode Island.

21. Richard and Frontenac expected and intended that Meyersiek would perform his duties under the contract from his home and office in Rhode Island.

22. Pursuant to the contract that was formed by Meyersiek's acceptance of Richard's offer on behalf himself and Frontenac, Meyersiek at once began application of his full time efforts to pursuit of the business plan of acquisition of a business in the replacement parts manufacturing industry. With the knowledge of Richard and Frontenac, Meyersiek performed all of his work under the contract from his Rhode Island home office.

23. Meyersiek's research and analysis led to the identification of several businesses that were potentially good targets for acquisition by Frontenac. Meyersiek prepared non-disclosure agreements to be executed with potential targets, and prepared drafts of a letter of intent to be executed with the target ultimately selected.

24. One of the targets identified by Meyersiek, and analyzed by Meyersiek as having good potential for acquisition was an entity known as Dom-Ex, Inc., in Hibbing, Minnesota ("Dom-Ex").

25. Meyersiek prepared the non-disclosure agreement to be signed by Dom-Ex, and sent it to Dom-Ex from his Rhode Island office. Meyersiek performed his analysis on Dom-Ex at his Rhode Island office.

26. Meyersiek, Richard, and Dom-Ex executed the non-disclosure agreement sent to Dom-Ex by Meyersiek. Without informing Meyersiek, Richard then accepted a letter of intent prepared by Frontenac for execution by Dom-Ex, which omitted any mention of Meyersiek. Richard proceeded to complete the execution of a letter of intent between Dom-Ex and a group comprising himself and Frontenac, and/or newly-formed Frontenac entities, including H-E Parts.

27. Frontenac and Richard executed on the letter of intent with Dom-Ex, and made an acquisition of Dom-Ex, or an interest in Dom-Ex, as contemplated under the contract between Meyersiek, Richard, and Frontenac, and formed H-E Parts to be the vehicle for ownership of an interest in Dom-Ex, and additional firms in the same or similar industry as Dom-Ex.

28. Meyersiek has fully performed all of the duties and activities required of him under the contract with Richard and Frontenac. His efforts led directly and proximately to the acquisition by H-E Parts of an equity interest in Dom-Ex.

29. Richard and Frontenac have refused Meyersiek's request that they honor their contract with him. They have refused to provide him with employment and compensation as agreed to, and have refused to provide him with his four percent share in the equity of H-E Parts.

COUNT I

30. The plaintiff realleges each and every allegation contained in paragraphs 1 through 31 as if separately set forth herein.

31. Defendants Richard and Frontenac have breached their contract with Meyersiek.

32. As a direct and proximate result of the defendants' breach of contract, Meyersiek has suffered damages in an amount in excess of One Million Dollars.

COUNT II

33. The plaintiff realleges each and every allegation contained in paragraphs 1 through 34 as if separately set forth herein.

34. The defendants Richard and Frontenac intentionally misrepresented to Meyersiek that they intended to compensate him for his work in researching and analyzing businesses in the heavy equipment replacement parts industry, with the intention that their misrepresentations would induce him to perform his services for their benefit.

35. In reasonable reliance on the misrepresentations of Richard and Frontenac that they would provide him with an equity interest of four percent in H-E Parts, or such other entity that they might use for the purpose of acquisition of businesses in the heavy

equipment replacement parts industry, and provide him with a position at a salary of $175,000 per year, Meyersiek performed his research and analytical work for Richard and Frontenac, directly and proximately resulting in the acquisition by H-E Parts of an equity interest in Dom-Ex.

36. Meyersiek suffered damages as a result of his reasonable reliance on the intentional misrepresentations of Richard and Frontenac, in an amount in excess of One Million Dollars.

WHEREFORE, Plaintiff Gero Meyersiek demands judgment against defendants in an amount in excess of One Million Dollars, plus interest and costs.

PLAINTIFF DEMANDS A TRIAL BY JURY

GERO MEYERSIEK

By his attorneys

**R. DANIEL PRENTISS, P.C.**

R. Daniel Prentiss (#0783)
One Financial Plaza, Suite 1800
Providence, RI 02903
Tel: 401-824-5150
Fax: 401-824-5123

Dated: July 21, 2006