UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GERO MEYERSIEK, Plaintiff | : | |
| v. | : | C.A. No. 06-335T |
| JEAN PAUL RICHARD, FRONTENAC COMPANY and H-E PARTS INTERNATIONAL, INC., Defendants | : | |

**PLAINTIFF GERO MEYERSIEK'S DEPOSITION TRANSCRIPTS TO MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FRONTENAC COMPANY'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

1. Deposition Transcript of David Katz
2. Deposition Transcript of Laura Pearl
3. Deposition Transcript or J.P. Richard

# DEPOSITION TRANSCRIPT – DAVID KATZ

# In The Matter Of:

*Gero Meyersiek v.*
*Jean Paul Richard, et al.*

---

*David Katz*
*January 3, 2007*

---

*McCorkle Court Reporters, Inc.*
*200 North LaSalle Street*
*Suite 300*
*Chicago, IL U.S.A. 60601*
*(312) 263-0052 FAX: (312) 263-7494*

*Original File 010307AM.TXT, 89 Pages*
*Min-U-Script® File ID: 3328827410*

**Word Index included with this Min-U-Script®**

For that reason, I'll ask you if at anytime during the course of our session here you don't understand what it is I'm asking, just say so and I will do my best to rephrase the question so that you do understand it, all right?
A: Yes.
Q: Thank you. Which leads to the next rule, which is, please always give a verbal response to a question in a word that can be transcribed as a word on the transcript, so, again, we have no ambiguity as to what the answers are.
And with that, anything else, if you have a question at anytime during the course of how the procedure is to go, take a break, take a break any time you want, okay?
A: Okay.
Q: Could you state your name for the record?
A: David Katz.
Q: Where are you employed?
A: GTCR Golder Rauner, R-a-u-n-e-r.
Q: What is that?

Page 5

A: A private equity investment firm.
Q: Where do you live?
A: In Chicago.
Q: What's your address?
A: 2244 North Dayton Street, Chicago, 60614.
Q: What is your business address?
A: Sears Tower in Chicago.
Q: Can you give a brief review of your post-secondary education?
A: Post-secondary, meaning post-high school?
Q: Correct.
A: Four years of college at Yale University in New Haven; three years at the Boston Consulting Groups, two of which were in Boston, one of which was here in Chicago; two years at the Harvard Business School in Boston; one year at the Clipper Group, a private equity investment firm based in New York; and then 12 years at Frontenac Company; and then nearly a year at GTCR.
Q: What is Frontenac Company?
A: Also a private equity investment firm.

Page 6

Q: Can you describe what that means, private equity investment firm?
A: We, a private equity investment firm, typically raises institutional capital every four or five years from large institutions and uses that money to invest in or acquire companies with the hopes that those companies can be sold or taken public down the road, and the capital and most of the profits can be returned to the institutional shareholders.
Q: What year was it that you began with Frontenac?
A: 1994.
Q: Is Frontenac Company, which is the defendant in this case, I think the formal name is Frontenac Company?
A: Correct.
Q: Is that a — that is a corporation?
A: Frontenac is a partnership. It probably is an LLC at this point.
Q: Okay.
A: But I urge you to get in touch with them for the exact structural.
Q: I understand.

Page 7

At anytime in these questions, if you don't have a direct answer, just say so. I may ask you to give me the best of your belief. And if you have any equivocation about the certainty of your knowledge, just say so.
A: Okay.
Q: Frontenac Company had persons who were known as partners, regardless of what the actual legal form, there were partners in the firm; is that true?
A: Correct.
Q: How many partners?
A: That number varied over my 12 years there — that number varied over my 12 years.
Q: What was the role of the partners in the management of the company?
A: Really, three roles. One was to raise capital, two was to deploy that capital, and three was to work with the portfolio companies post-acquisition.
Q: When you say portfolio company, what does that mean?
A: Portfolio company is a company that Frontenac has already invested in or acquired.

Page 8

a development project that leads to the acquisition of a portfolio company?
A: Yes.
Q: During the development phase leading up to that culminating step, in the case of one of your projects, you would be the designated person for Frontenac to oversee the development of this project?
A: Yes.
Q: Was this largely an investigatory effort on behalf of Frontenac leading up to the decision whether or not to deploy the capital?
A: The whole process was investigative up and until the final commitment decision by the partnership, as it was in all cases.
Q: Is that what is known as due diligence?
A: No, the partnership discussion process is not known as due diligence.
Q: I was confused in my question. The investigatory process leading up to a culminating step, is that the due diligence process?
A: Yes, I think that's a fair characterization.



Q: Did Frontenac, a partner such as you, work with people outside of Frontenac during the development phase?
A: Yes.
Q: And was there a typical structure or relationship that would exist for that?
A: No, because there were a number of different types of people outside of Frontenac that we worked with.
Q: You're familiar with the phrase CEO First?
A: I am.
Q: What is that?
A: CEO First is a branded, trademarked, I believe, term or phrase that Frontenac uses to communicate its investment approach to the outside world.
Q: Can you describe the CEO First investment approach?
A: No, because it doesn't mean just one thing.
Q: Can you give a generic description? CEO First is a trademark, a registered trademark of Frontenac Company, correct?



A: Yes.
Q: What is it that Frontenac Company is looking to communicate to the public by the use of its trademark phrase CEO First investing?
MR. PRIGNANO: Objection. You can answer. You can answer.
THE WITNESS: I believe that the trademark phrase is used to communicate that choice of executive or choice of executive team is — ranks as one of the highest and most important criteria we consider when evaluating the merits of a potential investment.

BY MR. PRENTISS:

Q: Mr. Katz, did you review any materials in preparation for coming here for this deposition?
A: I did.
Q: What did you review?
A: I reviewed the written testimony that J.P. gave at his deposition in December; I reviewed the affidavit that J.P. swore to or made; and I reviewed a couple of other miscellaneous documents.
Q: Are you aware that there is a Frontenac



file that has to do with H-E Parts International?
A: It doesn't surprise me, but I'm not aware of it nor have I seen it.
Q: So you did not have a chance to review Frontenac files?
A: No, I don't have access to the Frontenac files.
Q: I'm going to, over the course of our questioning session today, refer to documents periodically.
I'm going to hand over to you first a looseleaf binder that includes Exhibits 1 through 31 from the deposition of Mr. Richard.
And for the record, Mr. Prignano and I have agreed that we're just going to have this as a traveling exhibit binder for all of the depositions to try to simplify the task a little bit. And I will periodically be marking additional documents, and we will number those sequentially from 32. And I will start with this document and ask that that be marked as Exhibit 32.

(Whereupon, Plaintiff's Deposition Exhibit No. 32 was marked for identification.)

BY MR. PRENTISS:

Q: Which, of course, is the one I can't seem to find a duplicate of.

I'm showing you Exhibit 32, which I'll represent to you was provided to me as part of the discovery in this case. And just ask you, are you familiar, do you know what that document is? It is a one-page document with a Bates number of FRN — Steve, could you help me out with that?

**MR. PRIGNANO:** 000768.

**MR. PRENTISS:** Thank you.

**THE WITNESS:** Can you repeat the question, please?

BY MR. PRENTISS:

Q: Yes.

Do you know what that page is?

A: I think so.

Q: What's your belief as to what it is?

A: I think it is a page from an internal investment memorandum that we would have written



for internal use.

Q: Internal use meaning?

A: Frontenac internal use.

Q: All right. Thank you.

Mr. Katz, do you know Gero Meyersiek?

A: I have met Gero.

Q: What was your first acquaintance with Mr. Meyersiek?

A: He contacted me, at the suggestion of my former partner at Frontenac, Jim Crawford, whom he had found his way to through a mutual McKenzie alumni network connection, I believe. And I think that was some time in late 2003 or early 2004.

**MR. PRENTISS:** I'll ask that this be marked as 33.

(Whereupon, Plaintiff's Deposition Exhibit No. 33 was marked for identification.)

BY MR. PRENTISS:

Q: Do you recognize Exhibit 33 as an e-mail that you sent to J.P. Richard, according to this, August 18th, 2003?

A: Yes.



Q: So would that help you affix the date that you were earlier talking about?

A: Yes.

Q: Now, at the time that you sent this e-mail, J.P. Richard had what position?

A: In August of 2003, J.P. was Chairman and CEO of Pro Mach, Inc.

Q: Pro Mach, P-r-o M-a-c-h?

A: Two words, correct.

Q: Two words, okay.

What was Pro Mach, Inc.?

A: Pro Mach, Inc. was a Frontenac portfolio company, and Pro Mach's business was packaging machinery.

Q: Was Pro Mach, Inc. a portfolio company for which you were the lead partner in the development as we've earlier described that?

A: Yes, it was. Although we initiated Pro Mach, the efforts that eventually became Pro Mach in 1998. I did not become a partner until 2000. I was the lead the whole time.

Q: Okay. Fine.

The Pro Mach business, the business that became Pro Mach and a portfolio company of



Frontenac, who initiated the idea for that business? Was it internal to Frontenac, or did somebody come to Frontenac with the idea?

A: I believe the idea really was initiated by J.P.

Q: And once J.P. was put in touch with Frontenac as a potential equity investor, you took the lead for Frontenac in working with J.P. to develop this idea?

A: Yes.

Q: The idea came to fruition, it culminated in a decision by Frontenac to fund; is that true?

A: Yes.

Q: And J.P. became the Chairman and CEO of this portfolio company?

A: J.P. became the Chairman and CEO of Pro Mach, correct.

Q: And that was around 1998?

A: Correct.

Q: Now, what was the structural relationship between Frontenac and Pro Mach? And if you don't understand the question, I'll clarify it for you.

A: Please do.
Q: Was Frontenac an equity investor in Pro Mach?
A: Together with J.P., Frontenac created Pro Mach as a legal entity I believe in July of 1998. At that time, Frontenac was a majority shareholder and the ultimate controlling entity of Pro Mach.
Q: What was the ultimate controlling entity of Pro Mach?
A: Pro Mach, LLC, one of the Pro Mach entities. It was a portfolio company.
Q: There was some sort of a corporate structure for whatever purposes?
A: Correct, correct. That entity did not acquire its first target for about six months, five months.
Q: So Pro Mach was formed as a Frontenac entity in July of 1998 and, some months thereafter, actually made its first acquisition?
A: Correct. And capitalized in July 1998 with approximately $500,000.
Q: Did Frontenac then go to market and raise additional equity funds for the

Page 21

acquisition?
A: When Frontenac — I'm sorry. When Pro Mach made its first acquisition in late November of 1998, it acquired a company called Wexar, and Frontenac contributed all of the required equity to complete that transaction.
Q: What relationship, if any, did J.P. have with Frontenac for the period 1998 up through 2003?
A: He was Chairman and CEO of a company of which Frontenac was an investor and the controlling shareholder.
Q: So no formal relationship between J.P. and Frontenac?
A: I don't know what you mean by formal. I think J.P.'s formal relationship was with Pro Mach.
Q: According to this e-mail, which is Exhibit 33, the third-to-the-last sentence reads, "I shared with Gero the fact that you and we have been discussing how we might get into the replacement parts and service industry through acquisition and have been evaluating

Page 22

together potential entry strategies."
Do you see that sentence?
A: I do.
Q: When you said that to J.P., you shared the fact that you and we have been discussing, who was the "we" that you were referring to?
A: Frontenac.
Q: So while J.P. was employed at Pro Mach, you and J.P. were discussing essentially the next development project that he might work on with Frontenac; is that true?
A: That is true.
Q: So as of August of 2003, was J.P. one of Frontenac's CEO First executives?
A: In his capacity as Chairman and CEO of Pro Mach, I would consider that he would have been, in August of 2003, one of Frontenac's CEO First executives.
Q: In what capacity of J.P. were you discussing with him the next Frontenac project?
A: No formal capacity. We were putting our heads together to ascertain whether or not it might be feasible over the ensuing several years to create a new effort.

Page 23

Q: Is this true, that the — I think you said this in one of your earlier answers, that the overall business plan of Frontenac as a private equity investor is to obtain a portfolio company, develop the portfolio company and ultimately exit?
A: That is correct.
Q: So is this true: That as of 2003, you contemplated that in the foreseeable future, there would be an exit strategy from Pro Mach and J.P. would be available for the next project?
A: We contemplated in 2003 that there would be an exit strategy for Pro Mach in the foreseeable future, and we considered the possibility of an ensuing project together with J.P.
Q: And this is something that you were in discussion with him as of August of 2003, even before the contact with Gero?
A: Yes.
Q: Was it just a coincidence, then, that Gero appeared to be coming to you, to Frontenac with an idea having to do with the parts

Page 24

industry when this is an area that you already had been discussing with J.P.?
A: It was coincidental, yes.
Q: Did J.P., to your understanding, pursue discussions with Gero about this possibility?
A: I know they had a conversation as a follow-up to this e-mail. I wasn't part of that conversation, so I don't know how that conversation went.
Q: Didn't Gero — or excuse me. Didn't J.P. report back to you to tell you at some point whether he thought it was a go, a no-go?
A: Whether what was a go?
Q: The business prospect that Gero was coming to Frontenac for.
A: I'm sure he did. But J.P. was Chairman and CEO of Pro Mach at that time. We were still — in August of 2003, we were still 16 months away from exiting Pro Mach and hadn't begun any type of formal sale process.
So J.P. — if I recall, J.P. thought that some of Gero's parts ideas, parts strategy ideas had some — were similar to some of J.P.'s

Page 25

ideas and some of Frontenac's ideas; but beyond that, I can't comment.
Q: Do you recall whether J.P. came back to you with, for example, a recommendation that this should be pursued further with Gero?
A: He may have. I don't know. I don't remember.
Q: At any rate, at least as of this time, the particular plan that Gero had was not pursued, is that —
A: Again, if I recall, Gero came in to meet me with a partner of his at a company called Parts Zone. There were a number of reasons why that was not something we were in a position to pursue, why Parts Zone was not a company that we were in a position to pursue.
Q: Pro Mach ultimately was sold, there was an exit strategy which was executed?
A: Correct.
Q: Roughly when?
A: December of 2004.
Q: That would be the date on which Frontenac sold its position?
A: Correct.

Page 26

Q: To Odyssey Partners?
A: Correct.
Q: Did you at about that time begin discussions with J.P. about a next project?
A: Yes, in an informal way, because J.P. was still employed by Pro Mach.
Q: Do you recall when those discussions began?
A: As I think I indicated earlier, those discussions had been in process for at least 18 months.
Q: Okay. Could you turn in your notebook there the three-ring binder to Exhibit 2?
And ask you just to take a moment to review that e-mail. Just tell me when you're ready.
A: I'm ready.
Q: Do you recall receiving this from J.P. back in February of 2005?
A: I don't recall, but it looks like I did.
Q: Do you recall the general subject matter of what —
A: I do.

Page 27

Q: — J.P. was communicating to you?
A: I do.
Q: What was your understanding of what J.P. was intending in this communication to you?
MR. PRIGNANO: Objection. You can answer if you know.
THE WITNESS: I don't know what J.P. was intending other than what he wrote in his e-mail which is right in front of us.
BY MR. PRENTISS:
Q: Well, is this an accurate statement? He wrote you to describe his assessment of Gero as a potential executive and gave you the background, Gero's background as an executive. That was part of the e-mail, correct?
MR. PRIGNANO: Objection. You can answer.
THE WITNESS: It looks like that's part of the e-mail. I didn't need Gero's background. I had met Gero before J.P. met Gero, so that was not new to me.
BY MR. PRENTISS:
Q: The last sentence in the standalone paragraph of this e-mail is, "please call me to discuss (before Friday noon if possible) what

Page 28

you would like to do with Gero." Do you see that?
A: I see it.
Q: Did you call J.P. as requested?
A: I suspect so.
Q: What did you understand he was asking you when he asked you what you would like to do with Gero?
MR. PRIGNANO: Objection. You can answer.
THE WITNESS: I suspect he was seeking my input and feedback about whether or not Gero might be a valuable addition to our effort should one ever materialize.

BY MR. PRENTISS:

Q: As of this time, do you have a recollection of this concept that J.P. referred to as Project Crawl?
A: I do.
Q: What's your recollection of what Project Crawl was as of February of '05?
A: Project Crawl was an idea to build a company up through acquisition of after market — industrial after-market parts and service companies.

Page 29

Q: Parts and service companies?
A: Correct.
Q: Is this a — just a further development of the concept that you had been discussing with J.P. back in August of 2003?
A: I believe so.
Q: Did J.P. need your approval to include Gero on a team that would be working on Project Crawl?
A: No, because we hadn't fronted anything.
Q: Do you have any knowledge why then he was asking you in February of what you would like to do with Gero?
MR. PRIGNANO: Objection. Calls for speculation. You can answer if you know.
THE WITNESS: Can you please repeat the question?

BY MR. PRENTISS:

Q: Sure.
You testified that J.P. did not need your approval for anybody he was going to be joining with him as a team in developing Project Crawl; do I have that right?
A: I believe that is right.

Page 30

Q: So why, then, would J.P. be asking in February of 2005, giving you a summary of Gero's experience, telling you that he would get much more mileage out of working with Gero than Harvey, and then asking you what you would like to do with Gero?
MR. PRIGNANO: Objection, calls for speculation. Answer if you know.
THE WITNESS: I think he was soliciting my feedback so that he could understand where I stood in the event that he continued to want to partner with or work with Gero, and he and Frontenac came to agreement down the road about a way to formalize a working relationship.

BY MR. PRENTISS:

Q: Well, at some point, as this thing, this development process goes on, did Frontenac have a — maintain a right to determine who the persons would be that J.P. would work with in this project?
A: We had an ability to decide whether or not we were going to fund a project or make an acquisition. That determination — we would make that determination after considering a

Page 31

number of factors related to the company: The prospects, the strategy, the management team, the CEO, the direct reports of the CEO.
So that would have been one factor and an important factor we would have considered in deciding whether or not to ultimately fund a project or make an acquisition.
Q: You don't have any recollection of whether you gave a positive, negative, neutral response to the inquiry that J.P. made in February of 2005 about what you would like to do with Gero?
A: Are you asking a question?
Q: Yes. Do you have a recollection of whether it was affirmative, negative, neutral, anything?
A: I do.
Q: What is your recollection?
A: Neutral to negative.
Q: And what is your — let's say your best recollection of, if not the exact words, the meaning or intention that you communicated to J.P. in February 2005?
A: I don't know that it was in February.

Page 32

Q: Okay.
A: But I can tell you that my initial reactions to Gero that I would have communicated to J.P. at some point between the first time Gero and I met and some time shortly after this February 2005 e-mail would have included the following observations.
Gero had an interesting and solid career track record as a staff executive, not a line executive. He enjoyed some relevant experience in and around the parts, after-market parts market, and he certainly was enthusiastic.
My initial reaction, however, was that it was hard to envision how Gero could play a meaningful role post-closing of an acquisition should we and J.P. ever get to that point.
Q: And your testimony is that that is a — those thoughts, you communicated those thoughts to J.P. in the relatively near period after February 17th, 2005?
A: Either before or after.
Q: Either before or after February 17th?
A: Correct, correct.
Q: But certainly, we're not talking about

Page 33

May, June, July of 2005, you're talking about around the first quarter of 2005; is that accurate?
A: My initial communication of those concerns, those thoughts, which included the concerns I mentioned, I would have communicated to J.P. prior to or shortly after February of 2005.
Q: Did J.P. respond to you in any way?
A: I don't recall.
Q: Did you understand that notwithstanding your communications to J.P., Gero remained involved in the investigation, development process for Project Crawl?
A: I knew that J.P. was using Gero to help him with some administrative tasks, yes.
Q: Did you have any knowledge as to what relationship agreement, understanding existed between — let me start that over.
Do you have any knowledge of whether there was any understanding between Gero and J.P. as to what Gero's role would be going forward?
MR. PRIGNANO: Objection.

Page 34

THE WITNESS: I don't.
MR. PRIGNANO: Answer if you know.
THE WITNESS: I don't know what their understanding was or even if there was an understanding. I just know that he was helping J.P., as I mentioned, with some of the administrative work that was required in the early stages of an effort that ultimately led to a formal relationship.

BY MR. PRENTISS:

Q: As you described Gero's role, you described it as helping in the administrative aspects of this work.
By that, are you intending to imply that Gero's work was at a relatively lower level?
A: I'm not meaning to imply anything. I'm meaning to communicate that my understanding through J.P., through my discussions with J.P. was that Gero was helping him prepare and mail and maybe even type some of the letters that J.P. used to communicate with potential acquisition targets.
Q: Did you have any knowledge whether Gero

Page 35

was doing more than that, including the actual research as to what targets should be approached and then evaluation of those targets once the approach was made?
A: I know that J.P. and Gero discussed targets, pros and cons, positives and negatives; but I don't know what the level of research or primary work or independent thinking Gero was or was not doing in his work for and with J.P.
Q: As of February of 2005, was it your understanding from discussing with J.P. that J.P. was, either as of that time or shortly afterward, going to be going out into the market to make exploratory approaches to companies?
A: That was my understanding.
Q: Was it your understanding that in making those approaches, he was going to represent that he was partnered with Frontenac in this effort?
A: That was my understanding.
Q: Was he authorized to say that?
A: He was authorized to say that.
Q: And are you the specific individual who authorized J.P. to approach potential targets

Page 36

for acquisition and say, I have partnered with Frontenac Company in a potential strategic buildup and so forth?
A: Yes.
Q: Could you turn in your volume, Mr. Katz, to Exhibit 6? It is a somewhat lengthy e-mail to you from J.P.
A: Yes.
Q: Could you take a minute to review it so that you can answer a couple questions?
A: Okay.
Q: Do you recall the general context of this e-mail?
A: I do.
Q: Turn, if you could, to page 3 of 6. And he's got a numbered paragraph numbered 2.
This relates to an entity called D-o-m hyphen E-x. What was Dom-Ex?
A: Dom-Ex is, was a company based in Minnesota that was in the used mining equipment and mining equipment parts business.
Q: This was a potential target for acquisition?
A: It was.

Page 37

Q: To what extent as of May of 2005 had you or anybody else at Frontenac analyzed the financials, other information about Dom-Ex?
A: I believe that I joined J.P. on a trip up to Minnesota to meet Dom-Ex right about this time, either right before Memorial Day of 2005 or right after Memorial Day. So that visit would have been my first introduction in person to the situation.
If I remember correctly, an evaluation of the company's financials ensued, came after that meeting.
Q: Were you the individual at Frontenac who did the evaluation of financials of Dom-Ex?
A: I would have led the team at Frontenac.
Q: Who else?
A: Chad Bern. One of my former colleagues, Chad Bern, B-e-r-n. And I don't remember whether Laura Pearl had joined us in this effort yet. She certainly had by later in the summer. I don't remember whether she had by May of 2005 or not. That would have been the team, the two or three of us.
Q: Identify who — as of May of 2005, what

Page 38

position was Laura Pearl?
A: Laura Pearl, like I was, Laura Pearl was a managing director and partner of Frontenac. Chad Berns was an associate.
Q: Managing director, is that just a term that is interchangeable with partner, or does that mean something else?
A: I'm not sure it is interchangeable legally. It certainly meant the same thing to us.
Q: Okay. So she was a peer of yours as of 2005 within the Frontenac governing entity, whatever that is?
A: I'm not sure what you mean by peer, but she was a partner of mine.
Q: Okay. Did you select her to be on this team?
A: Yes, I saw the value that I thought she could bring to the team, and we found a way to include this on her list of things.
Q: This was not the only thing that she was working on?
A: No, nor was it for me.
Q: What values or what assets did she

Page 39

bring to the team that you were looking to use?
A: 20 years of investment judgment, a great analytical mind, and some time as well to help all of us with the work, and a good relationship with J.P.
Q: Was there a great deal of work that was required at Frontenac around this period of time in evaluating these things?
A: What do you mean by great deal?
Q: That is a good question. I guess, can you just describe the level or intensity of involvement at Frontenac in this analytical phase of the project?
A: At this point, we would have been working to understand the company's financials, both historical and projected, and to understand the company's — by company I mean Dom-Ex — the company's strategic and competitive position in its industry and general future prospects.
Q: That analysis ultimately is leading up to formation of a number that would be the value that you'd be willing to acquire the company, right?
A: It is leading up to a point of view on

Page 40

recollection?
A: Probably in early 2005. But it is similar to other letters we've used in the past.
Q: When you say similar to other letters that you've used in the past, describe what you mean by that.
A: Other letters in other efforts unrelated to J.P. or H-E Parts.
Q: And who typically in the other instances where you've used letters like this in the past, who would actually send such a letter?
A: These letters can come from us, Frontenac. These letters can come from the executive. I've seen it done both ways.
Q: The letter begins with the sentence, "I have partnered with the Frontenac Company, a Chicago-based private equity group with revenues in excess of $5 billion, to execute a major buildup in the industrial parts distribution sector."
J.P. was authorized to make that statement in sending out cold call letters to potential targets?
**MR. PRIGNANO:** Objection. Go ahead.

Page 45

**THE WITNESS:** I was comfortable with J.P. making that statement.

**BY MR. PRENTISS:**

Q: Could you turn to Exhibit 5, which appears to me to be the same or essentially the same letter but now in actual final form with an actual addressee, target addressee. Do you see that?
A: I do.
Q: Was it your understanding that this is — is it your understanding this is a copy of a letter that actually was sent to a target?
A: It looks to be.
Q: What did you intend in authorizing J.P. to say, "I have partnered with Frontenac Company," what did you intend that the receiver of that letter would understand as to the relationship between J.P. and Frontenac?
A: I intended that by phrasing — by using the language that J.P. uses in the first paragraph, that he would enhance his credibility with in this case, Mr. John Groholski, or any other target to whom he sent a similar letter. He would enhance his credibility by making it —

Page 46

by making it appear that he had capital that he could access if and when it made sense to proceed with any of these targets.
Q: And was that accurate?
A: Yes, it was accurate, subject to all the work that he would have to do, that we would have to do to conclude that either one of us or both of us wanted to proceed. It was a marketing effort.
Q: In other words, J.P. Richard, without any ability to tie himself to equity funding, would have a much harder time having a conversation with the owner of a company than he would if he can say that he is working in consort with a significant private equity company such as Frontenac; is that true?
A: I don't know if it is true. I would suspect that would be the case.
Q: But it was because of that suspicion that you authorized J.P. to use this terminology to enhance his access to target companies?
A: Not enhance his access, enhance his credibility.
Q: Okay.

Page 47

A: Other than that, yes, that is true.
**MR. PRENTISS:** Can I take a break?
**MR. PRIGNANO:** Yes, sir.
(Whereupon, a short break was taken.)

**BY MR. PRENTISS:**

Q: Over the course of the development of the H-E Parts idea, did Frontenac work with J.P. in the process of selection of executives for who would staff this company?
A: We did.
Q: Did Frontenac consider that it had the final say as to who were going to be the top executives?
A: You asked me a similar question earlier. We had the say about whether or not to ultimately make an investment decision around a company and a management team.
If we got to the point that we funded something, we would have had input and J.P. would have expected our input on the members of his team. But prior to that, no, that was his choice.
Q: When you say "input", what do you mean

Page 48

by input?
A: Just that. We don't typically — we at Frontenac don't tell our CEOs whom they may or may not or should or should not hire.
Having said that, however, we expect to interact post-closing of an acquisition with the CEO and his or her direct reports on a reasonably frequent basis. And we communicate our thoughts and reactions to members of that CEO's team or potential members of that CEO's team in a very — try to do so in a very clear and constructive way.
Q: Did J.P. ever communicate to you that he, in his initial discussions with Gero, told him — told Gero that the role he envisioned for him would include a four percent equity position?
A: I don't remember. I've seen that in some of the documents; but I don't remember him communicating that to me at the time one way or the other.
Q: Is that question of what J.P. suggested to Gero as to where he might end up and what kind of a position he might end up with in the



company, is that something over which Frontenac had a concern or would care?
A: We would care if we decided to fund a project, we would care about who the equity owners were and what amounts they owned, which was why he would have shared that or other types of information about Gero or other members of the team, for that matter, with me.
Because he wanted to make sure — I suspect he wanted to make sure that if he got there in terms of wanting to do a transaction, that there was as high a chance, as high a likelihood as possible that we would also want to do that transaction.
Q: Okay. Just assume for the purpose of this question that Mr. Richard testified at his deposition that he did, in fact, mention that number, four percent, to Gero in their initial conversations as this is where I can see you ending up in the company.
You had a conversation with J.P. at or around February of 2005 in which you communicated to J.P. your feeling that Gero didn't really have a place in the organization,



right?
A: I think so.
Q: When you say "you think so", what do you mean?
A: I don't know the exact dates.
Q: Okay.
A: I don't know the exact dates. But I do know, as I told you earlier, that I was neutral to negatively inclined towards Gero's participation in an effort should we and J.P. together decide to do something.
Q: That being so, do you believe that J.P. should have informed Gero back at that time, Gero, Frontenac, specifically David Katz, is not real high on your being a part of this venture?
MR. PRIGNANO: Objection. You can answer if you know.
THE WITNESS: I don't have a point of view on what J.P. should or shouldn't have told Gero because I wasn't privy to the many conversations that they had.
Remember, I only met Gero twice, I think. There may have been a third time, but I only remember two. We may have had a couple of



e-mail or phone exchanges as well, but it was a very limited dialogue.
So it would have been very hard for me to express a point of view about what J.P. should or shouldn't have communicated to Gero.
The second issue is that there was very realistically a scenario where J.P. went off and did what became H-E Parts with some other equity group.
And if that were the case or if that turned out to be the case, we would have had no right to have an opinion on whether Gero was a part of the team or not part of the team.
BY MR. PRENTISS:
Q: Do you recall a meeting that took place in August at Frontenac where a presentation was made?
A: We had a lot of meetings, I'm sure, in August.
Q: I'm sorry.
A: So maybe you can give me a little more detail.
Q: J.P. and Gero came to Chicago to make a presentation to Frontenac on the H-E Parts

venture.
A: I do remember that.
Q: Were you surprised to see that Gero was still there?
A: No. J.P. had told me that he would be attending the meeting.
Q: Did you have any knowledge or understanding as to whether J.P. had reached some other kind of an agreement with Gero given that you've expressed that Frontenac is not high on him being a part of the team?
A: No, I didn't know what J.P. and Gero had or had not agreed to in any way. All I knew was that J.P. was there to make the case that what would later become H-E Parts was a potential investment that merited real focus and eventually dollars.
Q: What is your recollection of how that August 2005 meeting proceeded, what happened?
A: My memory is sketchy, but I recall J.P. making a presentation to Laura and to me and to Chad about the — about where they were in their process to understand the industry, to line up potential targets and to specifically proceed

Page 53

with Dom-Ex and walk us through their assessment of the investment merits of so doing.
Q: Did you and your team make any decision at that meeting or after that meeting?
A: No. As I think I mentioned earlier, it is very typical in our business to not ultimately make a decision until we have to make a decision.
And I don't believe — I don't believe any formal decision on anything was made until mid-February of 2006, when the deal was consummated. There were no decisions made that were binding in any way, shape or form at any point up until then.
Q: So whatever relationship J.P. had with Frontenac relative to H-E Parts before August of 2005, it didn't change as of that meeting; is that true?
A: Yes, that is true. There is no — there was no change in any relationship dynamics between Frontenac and J.P.
Q: In follow up to the August meeting, did you have further conversations with J.P. regarding Gero?

Page 54

A: I believe I did.
Q: What's your best recollection?
A: My best recollection is that I communicated to J.P. after that meeting that while I had kept my mind open to the possibility of Gero being a part of the team in the six months that J.P. and Gero off and on had had some conversations, that at that meeting, I had come to the decision that if we were going to be his partner here and we were going to close a transaction with him, that it was — it would be — it would continue to be very difficult for me to envision Gero being a compensated member of the team, and that if J.P. wanted to continue to sell us on the merits of this investment — potential investment, that I would view it as a positive that Gero not be a part of team going forward.
Q: When you say "part of the team going forward", are you defining the team that you were concerned with as a certain part of the executive structure, or are you saying — well, let me just ask you that.
When you say "part of the team going

Page 55

forward", what do you mean?
A: I mean that when we — that as of August of 2005, I envisioned a number of things having to come together over the ensuing several months to justify our reaching a decision that we wanted to partner with J.P. down the road to buy Dom-Ex or any other company, for that matter.
We would, at that point, still have to complete our view and complete a positive view on the attractiveness of the industry. We would have to complete our due diligence on the company, Dom-Ex in this case. And we would have to get comfortable that J.P. had formed a management team that we would entrust with the leadership of that portfolio company were it to get there.
And at that time, and I communicated this to J.P., I envisioned J.P. as the Chairman and CEO, I envisioned our needing a CFO, and that was it. And I didn't — I knew that Gero wasn't the CEO, and I had a strong view that Gero wouldn't be the appropriate — wouldn't bring the appropriate skills to bear to enable

Page 56

for the deal.

BY MR. PRENTISS:

Q: Let's take individual decisions. The selection of the CFO for the company, was that a decision that was a mutual decision to be made by J.P. and Frontenac leading up to the decision whether to go or no-go?

A: I think you're asking two questions.

Q: Okay.

A: Was it a mutual decision? I don't know what a mutual decision is. Did J.P. have to be comfortable in this choice of a CFO? Yes. Did Frontenac want to be comfortable in the choice of a CFO? Yes. Did that decision have to be made prior to a closing? No. And I don't believe it was. I don't remember, but I don't believe that it did get made prior to the closing of the transaction.

Q: The ultimate decision as to an offer price, the terms of an acquisition of Dom-Ex, was that a decision in which J.P. and Frontenac had equal rights to control?

A: No, I don't think it was equal or unequal. I think J.P. had to come to the

Page 77

decision for himself on whether or not he wanted to try to close a deal with us as with Frontenac as a financing partner or someone else as a financing partner.

Then Frontenac had to come to a decision, assuming J.P. wanted to do the deal and wanted to bring it to us, then Frontenac had to decide yes or no. And if he and then we decided yes, that would constitute both parties wanting to do a transaction.

If he had decided yes and we had decided no, he likely would have gone out and tried to find another equity partner to help him finance this transaction. And he and I had discussions about the possibility of that happening as late as December of 2005.

Q: I think we're about done. Let me just take a look.

MR. PRENTISS: That's all I have. Thank you very much.

MR. PRIGNANO: I may have a question or two.

EXAMINATION

BY MR. PRIGNANO:

Q: Mr. Katz, in your last answer, you

Page 78

referenced some discussions taking place late in December or as late as December of 2005 regarding the possibility of J.P. Richard perhaps going elsewhere for funding; is that correct?

A: Yes.

Q: How did those discussions come about?

A: When I communicated to J.P. in mid-December of 2005 that I would be leaving the firm in January, and given the fact that Laura had already communicated that she would be leaving the firm shortly, he realized that he would need to get the Frontenac partnership's approval for a deal without the assistance of a lead partner with whom he had been working for seven years in the case of me, or at least a year in the case of anybody else who had been working on this deal with him. And that put him in a difficult spot.

And he and I discussed the possibility that — he and I discussed two potential scenarios. Scenario one is he would work hard and I would help him in any way I could, as would Laura, to get the partnership up to speed

Page 79

with the details of this transaction and create an advocate within the partnership for doing this deal. That was clearly the preferred path on his part and on Frontenac's part, and that's what happened.

However, in December of 2005, the other possibility was that Frontenac decided not to do the transaction or couldn't get comfortable with the transaction after the two partners who had been leading the effort were leaving the firm.

And at that time, I laid out that possibility for him very clearly and told him that I would be — that if it came to that down the road, I would do whatever I could to help him find another equity partner to help him close the transaction.

Q: Other than the discussions that you just referenced in December of 2005, were there other times during the course of Frontenac's investigation of this opportunity where it appeared as though perhaps Frontenac would not be interested in the opportunity that J.P. had presented?

MR. PRENTISS: Objection. You can answer.

Page 80

# DEPOSITION TRANSCRIPT – LAURA PEARL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ORIGINAL

GERO MEYERSIEK, )
Plaintiff, )
-vs- ) C.A. No. 06-335T
JEAN PAUL RICHARD, et al., )
Defendants. )

The deposition of LAURA PEARL, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Gina Callahan, a notary public within and for the County of Iroquois and State of Illinois, at 131 South Dearborn Street, Suite 3100, Chicago, Illinois, on the 3rd day of January, 2007, at the hour of 2:00 p.m.

REPORTED BY: Gina Callahan, CSR
LICENSE NO.: 084-003623





Frontenac Company and some of the entities that are known as Frontenac entities. And I'd like to just explore that with you for a bit.
First, Frontenac Company that you identified as a private equity company, is that the company of which you were a partner?
A. Frontenac Company was a partnership but converted to an LLC status some number of years ago. So I became a member/managing director of Frontenac Company, LLC at that time. I have had an ownership interest in Frontenac Company since 1987.
Q. So is it fair to characterize Frontenac Company as being a parent organization of which there are multiple Frontenac entities?
A. I don't know that I would call it the parent organization. It is the management company. It performs the administrative functions. It employs the secretaries and the accounting personnel. It signs lease to the building. It has the health insurance policy.
Q. And as formerly a partner, then an equity owner, you were an equity owner member of Frontenac Company, LLC, that management company





that you've just described?
A. Yes.
Q. Does that management company then provide management administrative services to individual Frontenac entities separate from Frontenac Company, LLC?
A. Subsequent to Frontenac VI, the structure in Frontenac VII and Frontenac VIII was to set up a separate general partner entity. And the management company was retained in place largely because it was a pain to move it, employee withholdings and all that sort of stuff. So that was really left in place there. It did continue to employ the employees and serve all the administrative functions.
But for Frontenacs VII and VIII, there was actually a separate entity that was the general partner of the fund, and that would have had the -- shall we say the management authority. And I had equity ownership interests in both of those general partnership entities.
Q. I'm going to refer periodically during this deposition to exhibits, many of which have already been marked. I want to pass over to you





What or who are the members of Frontenac Company VIII, LLC?
A. At the time this letter was written?
Q. Yes.
A. Rodney Goldstein, James Kowi, James Crawford, Laura Pearl, David Katz, Patrick Blanford, Troy Noard, Walter Florence, Paul Carbery, Jeremy Silverman.
Q. And are those individuals the persons who were partners at that time in Frontenac Company, LLC?
A. I believe so, but I'm not positive.
Q. Then I guess I'll ask it in a different way. How did one come to be a member of Frontenac Company VIII, LLC?
A. By formal admission to that entity. For instance, some of those people were younger people. They were not partners at the inception, so they were admitted later.
I just cannot recollect if they were admitted as members to Frontenac Company, LLC as well. I just don't recall. They may have been.
Q. So you have this group of individuals who formed Frontenac Company VIII, LLC?

A. Yes.
Q. That was formed for the purpose of being the general partner of Frontenac VIII Partners, LP?
A. Yes.
Q. What were the other limited partners of Frontenac VIII Partners, LP?
A. They would have included, I believe, the same people who were in Frontenac Company VIII, LLC and possibly some former partners. So you could have had people who are no longer active that still had an ownership interest in that middle-tiered entity. I just don't recall.
Q. And then going up the chain, Frontenac VIII Limited Partnership was, as you described it, the actual fund?
A. Correct.
Q. And the limited partners of that fund were independent persons and entities who made investments into this fund for the purpose of having that money managed by the Frontenac entities?
A. Yes.
Q. So outside investors entered at that





Q. When was Frontenac Company VIII, LLC formed?
A. 2000.
Q. Okay. So it was in existence prior to any activity going on that came into the H-E Parts International entity?
A. Correct.
Q. And that is the entity, Frontenac Company VIII, LLC which was really the Frontenac entity that had an interest in the ultimate development of this business?
A. Correct.
Q. Mr. Katz was right. You had all the answers.
What was your first introduction to this business plan that became H-E Parts?
A. Sometime in early 2005, I'm going to guess March, I was asked by David Katz to sit in with him and Troy Noard on a meeting with J.P., and J.P. was there and Gero.
Q. Gero Meyersiek?
A. Gero was there as well.
Q. And what is your recollection of what took place at that meeting?





easy thing to think about.
Q. How did the meeting conclude?
A. My recollection is that it concluded that we'd talk again.
Q. What did -- did J.P. make any introduction as to who Gero was?
A. He introduced him in the course of the meeting. I don't remember the specifics.
Q. Did you, at the end of the meeting, have any understanding as to what Gero's role was in this venture?
A. No, not really.
Q. Following that meeting, what was the next interaction you had with anybody having to do with this venture?
A. I don't think anything else happened until early June. And at that point in time, I became more involved. I don't know if there were intervening conversations between David and J.P., but David had been on J.P.'s board. He really had the relationship with J.P.
But I began to take a look at the market in early June. And again, that was a huge issue for us, if we'd even be willing to





Q. Did you direct J.P. as to the research to be done concerning this company?
A. No, I did the research, really. I mean J.P. did his own investigation and we did ours. And they were different.
MR. PRENTISS: Can you mark this as 37?
(Whereupon, Deposition Exhibit No. 37 was marked for identification.)
MR. PRENTISS:
Q. Do you recognize what I've marked as Exhibit 37?
A. Uh-huh.
Q. What is that?
A. These would be transcripts of calls that I made to various people in my attempt to learn more about this industry.
Q. This was a part of your research just to get to the bottom of whether this was an industry in which Frontenac might be interested in getting engaged?
A. Correct.
Q. Is this information that you shared with J.P.?

A. Yes, I believe so. I can't swear to that, but I believe so.
Q. Could you turn to Exhibit 9 in the looseleaf binder? Actually, let's go back to Exhibit 7 first.
A. Oh, yes.
Q. This is with a Bates number FRN 000085 down in the lower right-hand corner?
A. Yes, correct.
Q. Just take a look at that for a minute to familiarize yourself, and then I'll ask you a few questions.
A. Yes.
Q. Can you just describe what's going on here? What is your -- this is a string of e-mails in which you are a recipient and a sender?
A. Yes.
Q. What are you and J.P. -- what activity are you engaged in at this point?
A. Well, David has asked me to spend some time on this. And the information that J.P. had given me, I mean we need to look at a financial model, at least a preliminary one, to see if we



think -- it is a separate issue than checking the market out. Does this work financially?
And it was sort of a mess. So I had to take this disparate information, and it was all over the place, and try and put it in some sort of a format so I could understand it and make sense of it.
So I had incomplete information. So I couldn't really get anywhere with what I had. I think you can tell that from the text here.
So what I did to try and get the responses I need for J.P. was to send him stuff and tell him to fill in the blanks.
Q. When you say that you had a lot of "disparate information", are you talking about a particular company or several companies?
A. Several companies. There were several companies.
Q. So is this true, J.P. was bringing to you potential target companies and presenting them to you for your review?
A. Presenting them would be overstating what was happening. There were handwritten notes. David had a lot of stuff, I hadn't. It



A. Yeah, I'm trying to basically organize this stuff. J.P. is interested in having further discussions with these company owners and, you know, wants to get a little feedback from us. And I'm just trying to pull information together to see what's there.
Q. And then to Exhibit 9. And this appears to have spreadsheet --
A. Right, right.
Q. -- exhibits?
A. So here on, I'm making some more progress, I'm getting some more information from J.P. But really, at this point in time, I am solely -- from a numbers perspective, I am solely organizing information that he is putting together and giving to me. This is not really what I would call independent work.
Q. What was the purpose of doing this, to assist J.P. in his analysis, to assist you in your analysis, or both?
A. Really, I guess, both. J.P. didn't have anybody doing this. So he was a bit at a loss. I mean we couldn't form any view on what was going on here unless we went through this



exercise.
Q. The spreadsheets that follow within Exhibit 9, this is just your plugging the numbers that were provided to you by J.P. into your model?
A. Yes.
Q. And this is still all in the very preliminary evaluation mode?
A. Oh, yeah. Just trying to look for some logic flaws. Again, normally when you'd sit down with a management team, they've already done this. So you'd have something to look at.
Q. Turn now to Exhibit 10. Are the spreadsheets that are appended here, is this just a further development of the same process?
A. Yes.
Q. Now turn, please, to Exhibit 11 which is three pages.
A. Uh-huh.
Q. Which starts -- I guess the original e-mail is from J.P. to a Craig Parsons at Palmer Johnson.
A. Uh-huh.
Q. And it goes back up the string to a

question being posed by J.P. -- excuse me, a question being posed to J.P. by Craig. This is a potential target, right?
A. Correct.
Q. And J.P. then forwards it to you for your guidance on how to respond to that inquiry; is that accurate?
A. Yes.
Q. Do you have a recollection of what was at issue here?
A. This was -- of all the companies, this was the one that I was least familiar with. There was -- I think these folks wanted to get paid essentially for their working capital in addition to getting paid for their business.
I was responding sort of generally. We only pay extra for assets if there is some sort of -- if we're getting something out of it. In general, we're buying businesses based on a multiple of operating cash flow, and we're not going to pay extra for the working capital. We're going to want the working capital that is necessary to run the business.
I'm giving him a response off the top





of my head about what we generally do and how we generally view this.
Q. The nondisclosure agreement. A nondisclosure agreement is one of the first stages in actually entering into discussions with a target company; is that correct?
A. I would say in established companies, nondisclosure or confidentiality agreements are very often signed. I would not say they are always signed. And in early stage of venture capital practices, they're rarely signed.
Q. Were there nondisclosure agreements that were signed as a part of the H-E Parts investigation?
A. I don't recall.
Q. Could you turn to Exhibit 15? This is a string of e-mails that appears to relate to an NDA, nondisclosure agreement, at least a form of one. Do you see that?
A. Uh-huh.
Q. Yes? You have to say yes.
A. Yes.
Q. Thank you.
Is this true: That Frontenac provided





If there is a signed contract with Eton Partners, it would exist somewhere in Frontenac's files, I presume?
A. Presumably.
Q. Was J.P. authorized to sign such a document?
MR. PRIGNANO: Objection, calls for a legal conclusion. You can answer if you know.
THE WITNESS: J.P. would not have been allowed to sign on behalf of Frontenac. I don't know if H-E Parts -- whatever entity that was formed that signed a letter of intent. He could have signed on behalf of that organization.
(Whereupon, a discussion was had off the record.)
BY MR. PRENTISS:
Q. Did Frontenac pay the fees of the headhunter, Eton?
A. Yes.
Q. Did you participate in presentations to lenders, potential lenders concerning H-E Parts?
A. Yes, I did.
Q. Was Fifth Third Bank one of those?
A. Yes, it was.





Frontenac.
Q. And you're saying it could have been recorded, booked as against the H-E Parts entity so that it would show up ultimately as an H-E Parts expenditure?
A. My recollection is that we didn't do that. I think we paid him directly. I think we wrote him checks.
Q. Is it true that the ultimate decision on the lender in this case was Frontenac's?
A. That's really -- I guess that's really hard to say. I mean my recollection is that we all sat down and we reached a consensus.
Q. But no borrowing is going to take place unless Frontenac says we're okay with that?
A. Well, certainly, yes. If we weren't on board -- I mean we wouldn't finance it if we didn't like the lending arrangements.
Q. That's what I thought.
MR. PRENTISS: Could you mark that, please, 41.
(Whereupon, Deposition Exhibit No. 41 was marked for identification.)

A. No. Yes.

Q. Do you remember ever having a discussion with David Katz on the topic, what his opinion was?

A. No.

Q. As between the two of you, David Katz and you, Laura Pearl, what were your relative roles within Frontenac on this project?

A. We were sort of divide and conquering. I was -- I had more time available, so I was doing the market work, I was doing the financial work. I really did the banks.

Because David had the relationship with J.P., I sort of stayed out of discussions relating to J.P.'s compensation, that sort of thing.

Q. Who at Frontenac ultimately makes a decision on such things as J.P.'s compensation?

A. J.P.'s compensation would be approved by -- in early stages, the deal team. In later stages, the people who are on the board of directors of the company.

However, that's not to say -- I mean if there is something that's outrageous, because





the deal has to be presented to the ultimate partnership for approval, and people -- if people are unhappy or think that a deal is too rich, I mean deals have got voted down because of that single issue. So the partnership as a whole retains authority, you know.

Q. You just used the phrase "ultimate partnership". You're referring there to the general partner of --

A. Correct.

Q. -- the --

A. Frontenac Company VIII, LLC.

Q. You also talked about the deal team. The deal team in this case was you, David Katz, and anybody else?

A. And Chad Bern.

Q. Chad Bern was an associate?

A. Correct.

Q. You and David were the partners on this?

A. Correct.

Q. Did David have any -- let's say greater say? Was he the leader of the team?

A. David had the relationship with J.P.,

# DEPOSITION TRANSCRIPT – J.P. RICHARD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GERO MEYERSIEK,
Plaintiff,
vs.
JEAN PAUL RICHARD, FRONTENAC COMPANY and H-E PARTS INTERNATIONAL, INC.,
Defendants.

CIVIL ACTION
FILE NO. 06-335T

DEPOSITION OF
JEAN PAUL RICHARD

December 21, 2006
10:15 a.m.

Marriott Courtyard
3399 International Boulevard
Hapeville, Georgia

Kimberly A. Kelsey, RPR, CCR-2592

BROWN Reporting INC.
1740 Peachtree St, N.W.
Atlanta, GA 30309
404-876-8979



professional career following finishing up of university education?
A. I started in management consulting in Paris. Then I was the president of a company which was by acquired by Combustion Engineering, and I became a group executive for Combustion Engineering. Combustion Engineering was acquired in 1990 by Asea Brown Boveri, ABB. And I was an executive VP for ABB North America. Do you really want the details?
Q. No.
A. No. Okay. Anyway, I -- after that I became the CEO of Massey Ferguson, the farm equipment company. And after AGCO to -- which is another bigger farm equipment company. I left AGCO in 1997, and I started in 1998 my own company. My own company, I say. It's a private equity-funded company called ProMach, Inc., P-r-o-m-a-c-h, Inc., which was sold in 2004, in December 2004. And on February 15, 2006, I started the present company of which I'm the chairman and CEO.
Q. Okay.
A. Also with the help of private equity funding.
Q. You were CEO of Massey Ferguson for what years?



A. That was -- I get -- I kind of skipped things a little bit, but it was from 1991 to 1993. From 1993 to 1995, I was the CEO of a company called Insituform Technology, which is a NASDAQ company involved in translistic technology. Insituform comes from the Latin, "in situ" form, Insituform Technology.
And after that, I was asked by the board of AGCO Corporation to which I had sold the distribution -- the model, make, and distribution of Massey Ferguson to become the CEO. So I moved to Atlanta in 1996, leaving Insituform Technology to take over as CEO of AGCO Corporation until late '97.
Q. What was the reason that you left AGCO in late 1997?
A. We had -- I had commenced as president and CEO, the founder of AGCO. And the chairman of AGCO informed me after -- shortly after I had joined the company that he was an executive chairman, a well-known executive chairman. And it was, let's say, a difficult relationship, so we decided to separate.
Q. Insituform, what was your position with that company?
A. I was the CEO.



Q. And that was from 1994 to 1995?
A. No. 1994 to -- well, you know, I may --
Q. Roughly --
A. 1993 to 19 -- I think it's 1993 to 1995. Three years.
Q. And what was the business of Insituform?
A. It is an engineering business of replacing underground -- defective underground pipeline by new pipeline without digging any trenches. In other words, working from the manholes.
Q. Okay. What was the reason that you left Insituform?
A. Because I was asked by the board of AGCO, which is a large company, to become the CEO.
Q. Now, I'd like to talk to you about the formation of your company ProMach, Inc. You said in 1998 you started your own company with equity investors?
A. ProMach, Inc., uh-huh.
Q. The equity investor in that case was Frontenac Company?
A. Yeah. I talked to a few, and it ended to be Frontenac, yes.
Q. When you began the process of forming your own company, what was the business plan that you had

that ended up as ProMach?
A. The idea was to -- my background in everything, machinery and parts, was to consolidate a very fragmented packaging machine -- machinery industry of North America. I'm talking about the people who are designing and manufacturing the machines which I used to package everything that you see in the supermarket.
And I -- the idea was to acquire a large number of such small, privately-owned company and consolidate them into the powerhouse of packaging and machinery company dealing with the big -- the big consumer products company, like PHGM or Kraft or things like that. And that's what I did.
Q. When you started the process of this enterprise that ended up as ProMach, Inc., did you have any others who were working with you?
A. Yes.
Q. Who?
A. I had Bruce Bentley. Oh, boy. There was Bruce Bentley, Ray Toth.
Q. Say it again.
A. Ray Toth.
Q. Can you spell his last name?
A. T-o-t-h. That's the two who were with me



at the start.
Q. Was there a person named Harvey?
A. Oh, that's on something else. Harvey was a broker. Harvey -- when I left, I quit, there was an article in the Forrester Journal. And what people like Harvey do, they essentially read the business literature, and they essentially call people like me with the idea of trying to match people like me with private equity groups who are always looking for executives with whom they could eventually partner down the road.
And, yes, it is Harvey which made the first introduction, not just by way to Frontenac, but several companies, and I picked Frontenac. After they called me, following this article, they were aware that I had become free, and they put me in contact with Frontenac.
Q. What is Harvey's last name?
A. Oh, wait a minute. That's Harvey. That's his last name.
Q. Oh.
A. Harvey is his last name. I forgot his first name now. But he created this company called Harvey & Company in L.A.
Q. Is it still in existence --



think of new business models, new things I could do that could create value as a business entity. And from that standpoint, yes, this was exactly like ProMach. I started on my own thinking about what I could do and which I was pretty familiar with, which was a parts business for large equipment.
Q. In your answer at the beginning, you said that the private equity group had changed between 1998 and 2000.
A. The private equity industry, I mean.
Q. So you weren't talking specifically about Frontenac?
A. No. No. No.
Q. But did that description of the change apply to Frontenac?
A. Yeah. Yeah. I believe so, yes.
Q. Did you first have any communication with Gero Meyersiek?
A. This was while I was still employed by -- I was still the chairman and CEO of ProMach in 2003, 2004. I'm not sure.
Q. How did the contact come about?
A. Through Frontenac.
Q. Who made the first communication to you relative to Meyersiek? Did you get a call from



Frontenac?
A. Yes. I got a call from -- I believe it's David Katz.
Q. And what did David Katz say to you?
A. He said, "We have met these guys who have a small company that they are trying to finance called Parts Zone," which was introduced to Frontenac through, I think, a connection of Gero with a former, I guess, colleague of his who happened to be a partner of Frontenac.
So he made a presentation there. Before his presentation, David asked me -- they were already involved in the service side. I was one of the only industrial-type guys that they knew. So he asked me to -- if I could take the time to listen to what they had to say. And if I think there could be an interest for Frontenac, could they give me their -- could I give them my opinion about whether or not that's something that Frontenac should be looking at.
Q. I want to go back and make sure I'm clear on your answer. When David Katz made this call to you, he explained that Gero Meyersiek had made a presentation to Frontenac regarding Parts Zone?
A. Gero and whoever other colleagues were with him.

Q. And Katz said --
A. They were a company called Parts Zone, a very tiny company.
Q. And so Katz called you up to tell you that these people had made a presentation to Frontenac, and so --
A. They were looking for financing and whether or not, you know, that's something which -- that they should be concerned with. They wanted my opinion. That's all.
Q. Did Katz say that he was going to have Gero Meyersiek call you directly to explain to you what this project was?
A. No. I mean, yes and no. How did that happen? Anyway, he warned me -- David warned me that Gero will call me and try to organize a meeting with me. That's my recollection.
Q. You said he warned you?
A. He warned me, yes. I mean, he alerted me that Gero, who was his colleague, made a presentation to Frontenac who would be, if I didn't mind taking the call, calling and to listen to what he would have to say, because they were curious to my opinion on that matter.
Q. And so you had a conversation --



A. With Gero at that time, yeah. I mean, following that meeting. I have no idea when that was. Obviously, '94 or whatever.
Q. Did you then pursue additional communications with Meyersiek about this Parts Zone business venture?
A. We had -- he came with his colleague -- what is his name? They separated later on, an Indian guy. I forgot his name. They came to my office, I remember, at ProMach, and they made a presentation, and I gave them my opinion about it. And I said, really, you know, I mean, that if they had any chance to be funded, that we should make more of a business plan.
And I think I remember that Gero then -- or his colleague, I forgot his name -- sent me another business plan. And that was -- and things kind of dragged. Nothing really happened until I got an e-mail from Gero saying that they found a source of funding, and that was the end of it. And that was in 2004 sometime.
Q. So is it your testimony that you didn't personally engage in investigation of this possible opportunity with Parts Zone?
A. No. That's not what I said.



A. Right.
Q. -- and then sell. Right?
A. Right. Of course. That's what they -- sell or have an IPO or have an exit strategy. Yes, that's what they do. That's what they do for a living.
Q. So from that standpoint, in 2003, you'd been with ProMach for five years. Correct?
A. I started late '98, so it was -- I don't know when it was in 1998. We talked about that. It was four or five years, yeah.
Q. And you had already accomplished a good deal --
A. Yeah.
Q. -- of the strategic build-up?
A. Yeah.
Q. So you were sort of looking at the exit strategy at that point. Right?
A. You always are looking for an exit strategy when you are in that business.
Q. So Parts Zone --
A. It can last ten years. It can last sometimes two years.
Q. So from Frontenac's viewpoint, it could well be the next venture -- next strategic build-up



promote him as part of the team and -- you know, since he would be doing some work for me. And I indicated to him the kind of compensation I believe I could get for him.
Q. What was that?
A. The kind of -- oh, you have all that. I think it was 175, I think. I think it was 175K. And at the end, I mentioned it could be as much as 4 percent of equity that he could get if I were successful in getting Frontenac, or anybody else for that matter, to support the deal, not just to fund the deal, to agree with, you know, the combination of the business model and the management team that they're willing to finance.
I mean, they own the purse. There's nothing I can do. There's no -- I mean, I can't cover any of these people for them. I have absolutely no authority to do that. I'm a total person, and I couldn't believe that Gero -- I couldn't understand that. And at that time, I was under contract with other people. And I told -- and I mentioned that to Gero, I was under contract with Odyssey Partners.
Q. Did you tell Gero that you were under contract with Odyssey Partners?

A. Absolutely.
Q. Detailed analysis of an existing business and even factors that are outside the financial statements. Is that all part of due diligence?
A. Right. And that's done typically after a letter of intent has been signed with the potential seller, only at that time. Before that, it's actually not due diligence, in my understanding of the word.
Q. Is there any investigation that takes place up to the point of signing of the letter of intent?
A. Of course.
Q. What do you call that?
A. Exploration.
Q. Was there a great deal of exploration that took place from early 2005 up to late 2005 regarding this business plan?
A. Yes. The business plan was in permanent formation as we explored and tried to better understand the marketplace and who were their players and what were their sides and who should we write to and who shouldn't we write to to try to see if there's interest out there. And I'll find it was this part of the market versus this other part of the



market. That's exploratory. And every time you do that, obviously, your business model is refined, is changed, and sometimes dramatically adjusted. But it has very little to do with any due diligence work.
Q. Were you and Gero both directly involved in that exploratory work during the period from early 2005 up through August of 2005?
A. Correct.
Q. Was Frontenac equally involved with you in that exploratory work from early 2005 through August?
MR. PRIGNANO: Objection.
You can answer.
THE WITNESS: They were occasionally involved.
Q. (By Mr. Prentiss) What was the nature of Frontenac's involvement up through August 2005?
A. I think they came to a couple of visits of potential acquisition targets. They allowed us to use their D&B, Dun & Bradstreet, database, which is a key we search through for this kind of exploration work. They also -- I don't know about that time or not, but they also, I think, had a third party do a new evaluation of the market. I forgot the name of the consulting firm that they -- they got an independent evaluation of the market.



They -- I think that's the main thing that they did during this period. So there was some degree of involvement, but that's part of the job. I mean, that's what they do. They do that on -- I don't know how many at the same time every day. They are becoming very, very difficult spending the money because they got burned in early 2000.
MR. PRENTISS: Could you mark that?
(Off the record.)
(Plaintiff's Exhibit 1 was marked for identification.)
Q. (By Mr. Prentiss) Mr. Richard, I'm showing you what's been marked as Exhibit 1. Do you recognize that as an affidavit that you signed in this case?
A. Sure. Yes.
Q. Could you turn to page 3 of the affidavit, paragraph 9?
A. (Witness complies with request of counsel.)
Okay.
Q. The sentence begins, "In August 2005, I presented a business plan for H-E Parts to Frontenac at its offices in Chicago, Illinois." Is that the August meeting that you've referred to in some of



be making reference to the fact that Frontenac was going to be the private equity company that you were looking to bring into the deal. Right?
A. Yes.
Q. In fact --
A. Obviously, I cannot confuse the people by saying it could be somebody else. I mean, you have to be --
Q. Right.
A. And from a marketing standpoint, you have to be -- you cannot sound wobbly about it. Okay. So you do that with a total understanding between somebody like Frontenac and you that it is just a marketing ploy and nothing more. Nobody gets hurt by doing that. And it's very common practice, the way it's done.
(Plaintiff's Exhibit 5 was marked for identification.)
Q. (By Mr. Prentiss) I'm going to show you what we've marked as Exhibit 5, Mr. Richard, which is three pages. And would you agree with me that this appears to be a copy of a final actual letter that went out to a target company; in this case, Midwest Industrial Sales, in July 2005?
A. Uh-huh.

Q. Yes?
A. Yes.
Q. And would you agree with me that you sent out literally dozens of letters in this final form to target companies all over the United States and Canada?
A. Correct.
Q. Would you agree with me that you provided Frontenac with copies of at least some of these letters?
A. It's possible.
Q. Well, it's more than possible. It's probable, isn't it?
MR. PRIGNANO: Objection.
Answer, if you know.
THE WITNESS: I don't know. I would say it's possible, yes, that I sent that. This is part of the process -- I mean, they have nothing to do with this. It is up to the person looking for financing to come up with the evidence to convince the private equity source that there's a well business to be made out there. And this is strictly my -- whether I sent them a copy of it, I really don't know.
Q. (By Mr. Prentiss) I'm going to show you



questions to you. Right?
A. Yeah. I was asking her to run my assumptions into their standard financial model. So she was asking me to give an answer to questions so that she could run the model for me. And that's -- when I said before, I used the D&B, that's another thing that I use. I use the financial model -- even if -- I mean, if I was going to try to do something with them, I just wouldn't try to use the format, the data, they wouldn't want me to use.
Q. So the first part of this e-mail is her directing questions to you, and the next e-mail --
A. Concerning the financial mattering, yes.
Q. The next e-mail in the string is --
A. It had nothing to do with the strategy, is what I'm saying. Nothing to do with the strategy. I repeat, nothing to do with the strategy.
MR. PRIGNANO: Wait. Wait for the question.
Q. (By Mr. Prentiss) The second e-mail in the string is, you're providing her the answers to the questions. Right?
A. The top one? Yeah. Yeah. Yeah. So that she can run the model, yes.
Q. "Laura" -- quoting your e-mail, "Laura,



here are the answers, to the best of my ability, to questions 1 and 2"?
A. Right.
Q. So you're responding to her request for information?
A. So she could run the financial model I wanted her to run, yes.
Q. I'm showing you what we'll mark as Exhibit 8, which is FRM document 83.
(Plaintiff's Exhibit 8 was marked for identification.)
MR. PRENTISS: And for the record, when I say -- I'm only going to identify these by the last digits other than zero.
Q. (By Mr. Prentiss) This is other e-mail in June of 2005 e-mail string?
A. Uh-huh.
Q. Mr. Richard, yes?
A. Uh-huh. Uh-huh.
Q. You have to say, "Yes."
A. Yes.
Q. The original e-mail here is one from Monroe Wright to you?
A. Yes.
Q. Monroe Wright was a person employed at



Jackson Iron, which was one of your target companies. Right?
A. On heavy equipment, which was one of my target companies, correct.
Q. So the beginning of this e-mail string is Monroe Wright of Jackson Iron providing information to you that was part of your exploration?
A. Right.
Q. And the next e-mail in this string is -- you're forwarding this information that you got from Jackson Iron directly to Frontenac?
A. Right.
Q. And the last e-mail in the string is Laura Pearl's statement that she will circulate an updated summary. Right?
A. Wait a second. Let me read my e-mail first.
Yes. That's still to do with the financial model, yes.
Q. Okay. When she says, "I'll circulate an updated summary," you understood her to mean that she would be circulating that among the Frontenac partners. Right?
A. No.
Q. No?

e-mail to Craig Parsons in June of 2005.

A. Uh-huh.

Q. Yes?

A. Yes.

Q. That was a proposal you sent to Craig Parsons at Palmer Johnson suggesting a possible acquisition structure. Is that true?

A. True.

Q. Parsons responded with an e-mail, June 13th, asking a question of you about the structure of this buyout. That's the second e-mail in this string. Right?

A. Uh-huh.

Q. Yes?

A. Let me see. Yes.

Q. And you, in turn, forwarded this inquiry to Parsons, the potential target, to Laura Pearl and David Katz at Frontenac with the request, "Please help me explain this to Craig in the simplest possible way." Correct?

A. No. But it had to do -- it had to do with structure of any deals that we make and how we come to evaluation. So, I mean, it was -- it had nothing to do with the strategy, the thing of the deal. It was -- you know, these are pure financial people that



are more qualified than I am. Remember, I had no CFO or nothing at the time. I was by myself. I just wanted to get clarification from them of how this would be properly handled. So I'm totally consistent.

As I told you before, that's -- most of the work that Laura Pearl did was in the financial model, but occasionally, it was asking a question concerning, you know, the evaluation process of companies because she's more capable than I am to do that. That's all.

Q. And her answer to your question includes a sentence, "Normally, we only pay extra for assets if they provide us with an enhanced ability to borrow," and so forth. Do you see that answer?

A. Right.

Q. Who did you understand she was referring to when she said "we"?

A. I mean, whoever are the companies which, you know, Frontenac invests in businesses. So as investors in business and sometimes controlling investors and sometimes monetary investors. What she's referring to is whatever businesses that are making an acquisition out there.

Q. When she says, "Normally, we only pay



A. I mean, obviously, if down the road I'm going to try to get financing from Frontenac, I first make circumstance -- you'd do the same thing -- to check with them whether or not, you know, they feel that there's a valuation which would make sense. But in no way did that imply for me to be an investor in H-E Parts. That's part of the process.

Q. I'm trying to --

A. I see.

Q. -- single step --

A. I mean, the way you ask me the question, you imply things that are taken out of the context, and I'm trying to remind you of the context.

Q. But the question is this: You mentioned a number as an acquisition price --

A. Right.

Q. -- to Clay Crystal at Heavyquip?

A. Uh-huh.

Q. That's true?

A. Yes. Uh-huh.

Q. You have to say, "Yes."

A. Yes.

Q. You had to get Frontenac's approval of that number before you mentioned it to Heavyquip. Isn't that true?



A. I do not like the word "approval." I'll say I tried to get their agreement that sounds like a reasonable number.

Q. You wouldn't mention a number to Heavyquip unless Laura Pearl or David Katz had indicated to you they felt that was the right number to say. Isn't that true?

A. Yeah. That's true.

Q. The Barry Cannada, who is copied on this e-mail to you from Clay Crystal, he was Heavyquip's lawyer?

A. Correct.

Q. The responsive e-mail from Clay Crystal to you dated July 8, the last sentence there -- or excuse me, the last paragraph in that e-mail to you says, "J-P, Barry will be speaking with Laura at Frontenac again," et cetera. Do you see that?

A. Yes.

Q. He's telling you that Barry, his lawyer, will be speaking to Laura at Frontenac about any further steps in the process?

A. Uh-huh.

Q. Is that the way you understood that e-mail?

A. Yes. It didn't go anywhere, but the

the market that I was considering.

(Plaintiff's Exhibit 14 was marked for identification.)

Q. (By Mr. Prentiss) I'll show you Exhibit 14, which is FRN 092. It begins with an e-mail from Laura Pearl dated July 29, '05, to you and references a mining market overview. Do you see that?

A. Yeah. Yes.

Q. Do you recall her providing you with -- one, two, three, four, five, six separate analyses for consultants for your assistance in analyzing this business plan?

A. Yes. And it was for both, you know, as part of Frontenac's process to investigate whether or not they should be investing with me in this market. It's part of their process to get a third-party consultant to give an independent opinion, independent of the person like me who's trying to get financed. And they do that routinely for every business venture they decide to fund.

Yes. So the answer is yes, they did that. And they communicated to me, obviously, the result. Some were even conference calls that we made with some of these people. It's part of the exploration process. It takes a year before you get a business



Q. (By Mr. Prentiss) Now I'll show you what we'll mark as Exhibit 16, which is one page, FRN 15, an e-mail that begins with Gero Meyersiek's communication to ITT New York regarding the confidentiality agreement.

(Plaintiff's Exhibit 16 was marked for identification.)

Q. (By Mr. Prentiss) Do you see that?

A. Yes.

Q. Now, you have forwarded this e-mail to Michelle Reitz?

A. Correct.

Q. Michelle Reitz is somebody at Frontenac?

A. She's a subsidiary of David Katz.

Q. And you've asked her to adapt the attached confidentiality agreement?

A. Correct.

Q. What were you --

A. The confidentiality agreement is always the same, but you have to insert a new name for the company and a new name for the other person it's addressed to. So I was asking her to help me remember. And actually, it was really no secret. So I asked Michelle to help me on the side, without even asking David, you know, "Can you just do that for



me?"

Q. Did Frontenac have to approve the nondisclosure agreement that you used for the targets in this --

A. No. Because this is a confidentiality agreement that we've been using since -- in my previous life. It was ProMach, and I know it has been drafted by K&E. And it will be approved --

Q. K&E is Kirkland --

A. Kirkland & Ellis.

Q. -- & Ellis?

A. Yes.

Q. Which is Frontenac's Chicago's law firm?

A. Correct.

Q. K&E had drafted this confidentiality agreement or nondisclosure agreement as a part of your process of investigating companies during the strategic build-up that became ProMach. Is that correct?

A. Correct. And I can say, as of today, I'm still using the same one.

Q. Did you enter into a letter of intent with Dom-Ex?

A. Yes.

Q. Who drafted the letter of intent?



A. Yes. It's my belief she was referring to Dom-Ex, yes.

Q. Now I'm going to show you what I'm marking as Exhibit 20, which is FRN 274.

(Plaintiff's Exhibit 20 was marked for identification.)

Q. (By Mr. Prentiss) This e-mail string refers to a letter of intent for an entity called Pro-Ex?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Pro-Ex is another one of the target companies in the H-E enterprise?

A. Which fell through, yes.

Q. It fell through. In this case, would you agree with me that the beginning part of this e-mail is Laura Pearl's communication to Frontenac's law firm and you, enclosing markup of the letter of intent that was going to be submitted to Pro-Ex?

MR. PRIGNANO: Objection.

If you know.

THE WITNESS: That's what it appears be, yes.

Q. (By Mr. Prentiss) Who was paying

Kirkland & Ellis for its work on working on letters of intent in the H-E Parts enterprise?

A. Well, the way it works is --

THE WITNESS: I'm sorry. Can I explain?

MR. PRIGNANO: If you know the answer to that question, you can answer it.

THE WITNESS: Yeah. I believe I know. The way it works is, that's all part of their business development. Okay. If this ever leads to anything, and there is, indeed, ever an H-E Parts constituent down the road, it will be part of the start-up cost of H-E Parts. It will be allocated to H-E Parts.

But meanwhile, I was taking the risk of all my costs, a hundred percent, not a single cost paid by Frontenac during all that time. And until February 15, 2006, was when I finally got a contract. That's part of -- of playing this game.

Q. (By Mr. Prentiss) Did Frontenac commission Winston Young to perform a financial due diligence process of the Dom-Ex acquisition?

A. For any acquisition, as part of the procedures, Frontenac -- and I'm assuming at most privately equity firms -- after the letter of intent



is signed, the first step is to do a final check of due diligence by one of the big firms recognized by the banking community to ensure Frontenac and whoever they're working with that the numbers, as presented to us, are, indeed, correct. So I guess your answer is yes.

Q. I'm going to turn now to -- I'll mark as Exhibit 21, FRN 134.

(Plaintiff's Exhibit 21 was marked for identification.)

Q. (By Mr. Prentiss) Starting at the e-mail at the end from John Kokotovich, who we've already identified as the CFO of Dom-Ex --

A. Uh-huh.

Q. Can you describe, in summary form, what was the topic that was being communicated about there?

A. When you sign the letter of intent, typically it takes three to four months before you sign off. In many cases, it never comes to fruition. And, you know, you try to establish early in the game a target for working capital a time of closing so that, you know, there is not -- so that the seller doesn't take advantage of this period to essentially deplete the working capital. So I'm assuming that's



THE WITNESS: 28 was for the benefit of the Frontenac partners.

Q. (By Mr. Prentiss) Looking at Number 29 --

A. Excuse me. Before you go to the partners, you know, it was November, you have already had contact with these potential lenders. That's the sequence.

Q. Okay. 29 is covered with an e-mail from Laura Pearl to you dated Tuesday, September 20th, 2005.

A. Uh-huh.

Q. The question I have to you is, who originated this slide show, this PowerPoint slide presentation? Was it Laura Pearl and then modified by you or --

A. I did it a hundred percent. It was obviously tested by them, and they would type it. That was typed somewhere, by Michelle or someone, an administrative person at Frontenac.

Q. Okay. So look at Exhibit 29, dated September 20th, 2005.

A. (Witness complies with request of counsel.)

Right.

Q. The origin of this PowerPoint presentation



name. There were at least three or four.

Q. And the presentations to these banks, who were the individuals who made the presentation along with this PowerPoint show?

A. I did the entire presentation.

Q. Was Laura Pearl with you?

A. Yes. She would typically be present.

Q. Was David Katz present?

A. At least at some of them.

Q. Who answered questions?

A. I did. It was -- you know, the lenders have to be sure that the guy who is going to run their business and committing money with knows what he's talking about and can also answer questions.

Q. What entity was going to be the borrower?

A. H-E Parts International.

Q. Was the lending going to be guaranteed by Frontenac?

A. No. By whatever -- what happened is that the private entity is going to -- I'm an investor, too, by the way. You know, the lenders don't want to lend you anything unless there's a satisfactory amount of equity put into the business. So nothing is happening until this agreement was committed. And this was not done until February 15th, 2006. But

intention of giving him in a position in H-E Parts. I believe David Katz knew that. But I also believe that David Katz was totally clear that that was my intention, but he had never ever -- and that's the truth -- ever made any kind of commitment to that.

Q. (By Mr. Prentiss) But my question is -- I'm looking at not what he knew, but what you said to him. Did you make a stand to him and say, "I'm committed to Gero, and I really want Gero a part of this project"?

A. No, I didn't. If he tells me he doesn't want Gero, he's not going to fund it, I don't have a choice. He knew Gero by then. He was there at the final presentation. I made clear at the presentation that that was Gero. I would not have brought Gero into the meeting if I had already written him off, would I have -- wouldn't have I -- would I have? Whatever. And that's exactly the way it happened.

All I can tell you is that I knew David pretty well. We worked together closely. And to a large extent, I think he was successful at ProMach together, and that made him successful within -- I'm not saying only that. He's a very bright guy. But I knew him enough to know that -- I was a little



surprised, to tell you the truth -- I was surprised at how -- normally these people are -- they take a long time to take a clear position because they always want more information. It was black and white. It really was. And I was -- yes, I was a little embarrassed for Gero because I felt bad and I had to give him the news. He's not going to like it.

Q. Did you give him the news?

A. I gave him the news, yes.

Q. How?

A. I believe -- I believe that I sent him an -- I don't think I got him right away. I left him a voicemail, and then he called me -- I already kind of warned him about what had happened, and that was very shortly after this meeting. It's not like it dragged forever. As soon as I knew that, I let Gero know. I left a message, and he called me back, and yeah, he got very -- very upset about it. And I told him -- I was apologetic about it. But I said, you know, "There's not much I can do. They control the game. If they don't want to finance you, they don't want to do that, there's not much I can do."

Q. Did you tell him you were going to try to get him paid in the telephone message you left him?

A. Yes, I did tell him that. And it was my



honest intention to give him at least some kind of compensation for the work he had done during this period. And what he asked me actually was not for compensation. He wanted to the meet with David Katz. So I tried to arrange that on several occasions. And unfortunately, it was unsuccessful to make this happen.

Q. Did you ask anybody at Frontenac to agree to make a payment to Gero?

A. I may have hinted when I asked David Katz to meet with Gero. I've hinted to David that it would be appropriate to at least make a good will, a gesture in the form of a check to Gero, especially for the administrative work he gave me during the four or five months if -- again, if the that thing was ever to go to fruition.

Q. Okay. Did --

A. Remember, we were all working without a net, no safety net, until February 15. In fact, everything almost collapsed at the end of January. So, you know, that's the nature of the game. David, as you know, left the company at that time, and I didn't know that. And I didn't know the circumstances at the time.

MR. PRIGNANO: Have you finished your



answer?

THE WITNESS: Yes.

Q. (By Mr. Prentiss) When you called and left a voicemail with Gero, you acknowledged that you said, "I'm going to get you something" -- "get you paid for your work at Frontenac," didn't you?

A. Yes. I believe so. Not the kind of million that he's talking about. That was about three months of administrative work, which, you know, was realistic to me. So it would have been a nice gesture, yes.

Q. The question was not whether you hinted. The question was, did you make a request, articulate a request to anybody at Frontenac to pay Gero for his efforts?

A. You must understand that I cannot articulate a request to somebody with whom I have absolutely no contract or relationship or no partnership or -- what's the beautiful word? Agency. I didn't have such a thing. So I could only be in the begging mode to be really nice. That's the way I presented it. It's not my style to dictate anything. There was no obligation whatsoever by Frontenac to do anything. I did -- I repeat, I did -- I felt a moral obligation for Gero to try to get him something, and