# EXHIBIT B

THE WITNESS: I wouldn't say there were times when it appeared that we wouldn't be interested. I would say, though, that there were a number of times where it wasn't clear we would be interested, in that we had a lot of work to do to get comfortable with the industry, to get comfortable with the company, to get comfortable with the management team.

And it was a bit of a circular process. We learned about the industry through our exploration of the company. We learned about the company through exploration of the industry.

So there were a number of times where our comfort with a potential transaction was — in fact, throughout the process, our comfort with the transaction was nowhere as near as advanced as J.P.'s was.

And that caused me, in my capacity as a representative of the firm and the fund, to want to do more work and to want to slow down the process. That slowness caused frustration in J.P. and there were — as you've showed me in some of the e-mail exchanges, there were a number of times where J.P. tried to bring the

Page 81

decision to a head throughout the summer and into the fall, the August meeting, the LEK study, various discussions throughout October and November when we as a partnership weren't ready to commit.

Q: And the reason for that was because?

A: We hadn't completed our work and we hadn't convinced ourselves on the relative risk return merits of a potential investment.

Q: Now, throughout the course of Frontenac's investigation of this opportunity, did you or Frontenac ever direct or control the activities of J.P. Richard?

MR. PRENTISS: Objection.

BY MR. PRIGNANO:

Q: You can answer.

A: Never.

Q: Was J.P. Richard free to investigate this opportunity and present it to Frontenac as he deemed fit; is that fair?

MR. PRENTISS: Objection.

THE WITNESS: Yes, he was free to do that. He was free to go down other paths if he felt that was more appropriate.

Page 82

We communicated with one another, given our long history of working together and our sense of mutual trust, we communicated regularly while he worked on his path and while we worked on our path. But we did not control him or his actions or his decisions in any way, shape or form.

BY MR. PRIGNANO:

Q: Now, earlier in your testimony, Mr. Prentiss referred you to an exhibit that had been marked at Mr. Richard's deposition and you were shown FRN 000380 in particular. That page, it appears to be a slide from a presentation; is that correct?

A: That is correct.

Q: I think you testified earlier your belief was it was given to a bank; is that true?

A: I believe that is right.

Q: At the time this presentation was made — first of all, do you have any idea when the presentation was made?

A: I think these would have been made in the early to mid-fall of 2005. Probably September, October 2005.

Page 83

Q: And this particular slide starts off at the top a partnership. Do you see that?

A: I see.

Q: And it references J.P. Richard and Frontenac Company. Do you see that?

A: I do.

Q: At this time, early to late fall of 2005, was there any form of formal partnership between Mr. Richard and Frontenac Company?

A: None whatsoever.

Q: What was this slide intended to communicate?

A: It was to communicate — it intended to communicate to potential lenders that in the event that we, Frontenac, and J.P. and Dave Ellefson and that potential lender agreed upon a deal and agreed upon a transaction and closed the deal, that the partnership underlying that closing transaction would turn out to be one between J.P. as the CEO and Frontenac as the private equity sponsor.

Q: Which would occur some time in the future?

A: It would occur when the deal was

Page 84