# EXHIBIT C

Q. Yes?
A. Yes.
Q. And would you agree with me that you sent out literally dozens of letters in this final form to target companies all over the United States and Canada?
A. Correct.
Q. Would you agree with me that you provided Frontenac with copies of at least some of these letters?
A. It's possible.
Q. Well, it's more than possible. It's probable, isn't it?
MR. PRIGNANO: Objection.
Answer, if you know.
THE WITNESS: I don't know. I would say it's possible, yes, that I sent that. This is part of the process -- I mean, they have nothing to do with this. It is up to the person looking for financing to come up with the evidence to convince the private equity source that there's a well business to be made out there. And this is strictly my -- whether I sent them a copy of it, I really don't know.
Q. (By Mr. Prentiss) I'm going to show you



what we are marking now as Exhibit 6.
MR. PRENTISS: Do you have a little thing where you're keeping track for me?
THE COURT REPORTER: Yes.
(Plaintiff's Exhibit 6 was marked for identification.)
Q. (By Mr. Prentiss) Exhibit 6 is an e-mail, multiple pages, which is dated May 28, 2005, from Bernadine to David Katz. Do you see that?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Who's that?
A. She's my wife.
Q. Okay.
A. I used her computer to send the e-mail. She has nothing to do with that.
Q. Is this an e-mail that you sent to David Katz on or about May 28, 2005?
A. I'm sure it is.
Q. It's a lengthy e-mail. Could you take a few minutes to go through it, because I'd like to ask you --
A. Okay.
Q. -- some detailed questions about it?



A. (Witness complies with request of counsel.)
Okay.
Q. What was your intention in sending this e-mail to David Katz in May 2005?
A. I would say, you know, it's in my nature to be -- not to be too patient. And I felt that by then, I started thinking of a better idea of what the business would be -- H-E Parts would be. I had a clear vision of what it would be. And we had at least, at that time, a couple of targets which seemed interested in pursuing discussion.
But, you know, unless I felt that there was a clear indication from Frontenac that they're really serious about it, you know, I was hesitant to go much further. And I -- you know, and I was asking David for some help in telling me what really -- where the step -- as I said before, they had changed since 1998. They were much more cautious about investing until they had much more information about the subject. So I was really asking for, you know, what should we do so that I can become convinced before I go much further that you guys are really behind.
And really I didn't get a satisfactory



answer from them until -- well, really a satisfactory answer until this August meeting. I mean, it was very, very mutual. They were interested. But, you know, I was paying for everything, for the travel, for the expenses, for everything, including some of the -- Gero did the type of travel, and I paid for the travel. I mean, I was on my own knowing that the whole thing might just, you know, fall apart.
My next step was to go find another private equity group if that didn't work. Again, I was attached to Frontenac because, you know, that's what you know. And I knew several other names that I thought might be also possibly interested, but I didn't have experience with them, as was the case with Frontenac. Again, I'm speaking too much probably.
Q. Could you turn to page 2 of this e-mail or memorandum?
A. (Witness complies with request of counsel.)
Q. At the bottom third of that page, you describe a corporate management structure.
A. Uh-huh.
Q. Was one of the managers identified there to be Gero?