UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GERO MEYERSIEK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-335-T |
| | ) | |
| JEAN PAUL RICHARD, FRONTENAC COMPANY and H-E PARTS INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT FRONTENAC COMPANY'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Defendant Frontenac Company ("Frontenac") hereby submits the within Reply Memorandum in support of its motion to dismiss the Complaint of Plaintiff Gero Meyersiek ("Plaintiff") for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## Introduction

In an attempt to impute Jean Paul Richard's ("Richard") contacts to Frontenac under the holding of Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42 (1st Cir. 2002), [1] Plaintiff portrays the business relationship between Frontenac and Richard in a manner that reflects a fundamental misunderstanding of the due diligence

[1] In his Opposition, Plaintiff refers the Court on several occasions to unspecified contacts Frontenac allegedly directed towards Rhode Island relating to the H-E Parts venture. (See, e.g., Plaintiff's Opposition at 2). As with the allegations asserted in his Complaint, however, Plaintiff fails to support these references with any direct contacts that Frontenac made with the State of Rhode Island generally, let alone any contacts that actually relate to the H-E Parts venture. Accordingly, to the extent that Plaintiff continues to seek to establish specific personal jurisdiction over Frontenac relating to its alleged direct contacts with the State of Rhode Island, that argument fails. Accordingly, the sole remaining basis for Plaintiff to attempt to establish specific personal jurisdiction over Frontenac is through an imputed contacts argument.

process of a private equity firm, and those business executives, like Richard, who present business models for funding. Although omitted from discussion in Plaintiff's Opposition, the factual record developed during jurisdictional discovery is replete with evidence of the arms-length relationship between Richard and Frontenac with respect to the development of H-E Parts. Moreover, Plaintiff's Opposition conflates the independent actions of Richard and Frontenac to create the misperception that Frontenac somehow "controlled" Richard, or that Richard otherwise served as Frontenac's agent. To the contrary, when all of the jurisdictional evidence is considered, and not just the evidence selectively presented by Plaintiff, it is apparent that no agency, joint venture or other relationship existed between the defendants from which to "impute" jurisdictional contacts to any Frontenac entity.

## I. Frontenac Company Was Not Involved in the Development of H-E Parts, and Jurisdictional Contacts Cannot, Therefore, Be Imputed to That Defendant.

Even prior to reaching the failings of Plaintiff's imputed contacts argument, it is clear that the exercise of personal jurisdiction over the named defendant, Frontenac Company, would not be appropriate. Laura Pearl, a former partner of Frontenac Company VIII, LLC testified that this company was the entity with the interest in the ultimate development of H-E Parts, not the Frontenac Company. (Deposition Transcript of Laura Pearl at 15: 8 – 12). David Katz, another former partner of Frontenac Company VIII, LLC, likewise testified that he as acting on behalf of this company, not the Frontenac Company, in his dealings with Richard. Accordingly, Richard never interacted with anyone at

Frontenac Company regarding the H-E Parts venture, and therefore the named defendant, Frontenac Company should be dismissed from this case.[2]

## II. The Factual Record Developed During Jurisdictional Discovery Clearly Shows That Frontenac and Richard Were Acting Independently And Pursuant To An Arms-Length Relationship.

Even if Frontenac Company was the entity that interacted with Richard, there would be no basis for asserting personal jurisdiction based on imputed contacts in this case. Plaintiff's attempt to create the impression that Frontenac was "controlling" the activities of Richard, or had otherwise appointed Richard as Frontenac's "agent", betrays a fundamental misunderstanding of the due diligence process of a private equity firm. Contrary to Plaintiff's assertions, Frontenac's investigations and involvement in the exploratory phase of H-E Parts does not reflect an effort to "control" Richard. Rather, the evidence elicited during jurisdictional discovery clearly shows that the parties were each engaged in an arms-length exploration of the H-E Parts opportunity.

Richard testified that in early 2005 he began to develop the H-E Parts concept after a previous business venture that he had been involved with, ProMach, Inc., was sold to Odyssey Partners. (Deposition Transcript of Jean Paul Richard ("Richard Dep.") at 39: 19 – 21) (Relevant portions of the transcript, as well as deposition *errata* sheets, are attached hereto as Exhibit A). According to Richard, the ultimate goal for the H-E Parts venture was for him to convince "a private equity firm to endorse the detailed business plan, and a management team to implement it." (Id. at 55: 4 – 7). It was not until February 2006,

[2] On January 26, 2007, Frontenac moved to supplement its principal Memorandum of Law on the grounds that the testimony elicited during jurisdictional discovery revealed that no Frontenac employees were involved in the funding of H-E Parts, and as a result there is no basis for specific personal jurisdiction. Frontenac also incorporates those are arguments into this Reply Memorandum, and further represents that the arguments asserted in this Reply Memorandum apply with equal force to the other Frontenac entities identified by the Plaintiff in his Motion to Amend the Complaint.

following an extensive exploratory phase during which numerous adjustments were made to the H-E Parts business model, that Richard was able to convince a private equity firm to fund the venture when he entered into a letter of intent with Frontenac and Dom-Ex, Inc. ("Letter of Intent"), the entity to be acquired. (Id. at 55: 13).[3]

During this "exploratory phase," Richard testified that "the business plan was in permanent formation as we explored and tried to better understand the marketplace, . . . and every time you do that, obviously, your business model is refined, is changed and sometimes dramatically adjusted." (Richard Dep. at 57: 19 – 58: 3). The purpose of this exploratory phase was to develop a successful business model for which a private equity company would agree to provide funding. (Id. at 55: 4 – 7). During this exploratory phase, Richard was responsible for his own costs and expenses, including travel. (Id. at 76: 4 – 7). Importantly, Richard testified that prior to the execution of the Letter of Intent in February 2006, he was not contractually bound to anyone, including Frontenac. (Id. at 123: 17). Indeed, as Richard testified, during the exploratory phase "I was taking the risk of all my costs, a hundred percent, not a single cost paid by Frontenac during all that time . . . and until February 16, 2006, was when I finally got a contract. That's part of – playing this game." (Id. at 123: 14 – 19).

Because the goal was to convince a private equity firm to fund his project, Richard testified that he was in contact with Frontenac "to keep [it] informed of the progress of the exploration work that I was doing. It makes total sense when you are trying to get financed by a private equity group." (Richard Dep. at 58: 13 – 14, 86: 1 – 4). According to Richard, "it is up to the person looking for financing to come up with the evidence to

[3] Richard testified that it was during the exploratory phase, before the February 2006 Letter of Intent with Frontenac, that he informed Plaintiff that Frontenac would not accept Plaintiff as part of the management team. (Richard Dep. at 146-147).

convince the private equity source that there is a good business to be made out there." (Id. at 73: 19 – 22).

While Richard was conducting the exploratory work regarding H-E Parts, and attempting to convince Frontenac to fund the venture, David Katz and Laura Pearl were independently engaged in their own investigation to determine whether Frontenac was in fact interested in providing the funding. (Deposition of Laura Pearl ("Pearl Dep.") at 16: 13 – 14) (Relevant portions of the transcript are attached hereto as Exhibit B). The evidence shows that Frontenac's investigation was part of a normal due diligence process designed to evaluate Richard's H-E Parts concept in order to make a funding decision. Thus, as part of the investigation it performed of H-E Parts, Frontenac hired its own outside consulting firm to obtain an independent evaluation of the market. (Richard Dep. at 58: 22 – 25). Richard testified that Frontenac's use of an outside, independent consultant was a routine part of the exploratory process. "The [independent investigation] was . . . part of Frontenac's process to investigate whether or not they should be investing with me in this market. It's part of their process to get a third-party consultant to give an independent opinion, independent of the person like me who is trying to get financed. And they do that routinely for every business venture they decide to fund." (Id. at 109: 13 - 20) (emphasis added). In fact, Richard testified that this independent evaluation and the report generated by it, referred to as the "LEK Report," was highly critical of the H-E Parts business model and questioned Richard's approach to the H-E Parts venture. (Id. at 133: 8 – 9). "[T]he LEK Report was damaging to my view of the thing, which shows to you how fragile the thing was at the time." Richard explained that "the LEK report was not good. I had to really fight to reverse the conclusion of this report . . . ." As a result, Richard was

forced to write a memorandum to Katz and Pearl in an effort to explain why he thought the LEK Report's analysis of the market was incorrect. (Id. at 133: 23 – 25; see October 3, 2005 Memorandum to Katz and Pearl, attached as Exhibit C).[4]

The independence of Frontenac and Richard during the exploratory period leading up to February 15, 2006, is further evidenced by the testimony elicited during jurisdictional discovery that Frontenac and Richard both could have parted ways at any time.

> Q: [H-E Parts] was going to be another Frontenac Venture, right?
>
> A: At that time – when I first talked to him, I was employed by Odyssey Partners. Frontenac was obviously a company I was going to contact if I could put enough meat on the bone and get to the point where I had something to present to somebody, because I knew them. We had a good relationship together and [was] successful with them, **but there was absolutely no guarantee to be with Frontenac or guarantee to be with anybody.**
>
> . . . .
>
> Q: Up until August, did you consider that you were essentially a free-[broker], as far as this enterprise was concerned? You could go any place?
>
> A: **Absolutely.** And even after that. I mean, this is a – the financial world is not a cuddly world. Okay. I mean these are pure financial people. **And there is absolutely – until something is signed, there's absolutely no – no commitment on both parties.** In fact, after the August meeting, I mean, on several occasions, I thought of dropping it and saying, you know, I'm – because it almost went down the drain late in the year. . . . **But – and so on several**

[4] Indeed, as evidence of the need for Frontenac to undertake such research, at the time that Richard approached Frontenac regarding the venture in February 2005, H-E Parts's business focus was "off-strategy" for Frontenac. (Deposition of Laura Pearl ("Pearl Dep.") at 16: 20 – 22). Laura Pearl testified that, at the time Richard approached Frontenac regarding the H-E Parts venture, Frontenac was no longer investing in companies in the parts-area. (Id. at 16: 20 – 22).

> **occasions even after August, I considered trying to sell my idea to other [private equity] groups.**

(Richard Dep. at 47: 1 – 11, 48: 12 – 25) (emphasis added).

Richard's testimony regarding the arms-length nature of his dealing with Frontenac is substantiated by Richard's growing frustration regarding whether Frontenac would agree to fund the venture. Richard testified that, in the summer of 2005, he was becoming frustrated that Frontenac was dragging its feet in deciding whether to provide funding. Richard expressed concern to the Plaintiff regarding whether he should seek equity funding elsewhere. "And I talked with Gero in the summer of 2005. If I was not getting more of a positive feedback from Frontenac, I had no alternative than trying to start contacting other people. And I had other people in mind . . . I was very frustrated." (Id. at 87: 4 – 11).

Indeed, by this time, Richard had already complained to Frontenac that he had provided enough information for Frontenac to make a funding decision, but no such decision had been forthcoming. In an e-mail that Richard sent to Frontenac on May 28, 2005, Richard relayed his concerns regarding the amount of time it was taking Frontenac to determine whether it would fund H-E Parts:

> But with three active/large potential acquisition candidates on my plate right now it makes no sense for me to actively pursue any other targets . . . **without a clear indication (beyond just a genuine expression of interest) that Frontenac is ready to fund this project. Can you tell me what are the steps necessary to get there.** I imagine a signed LOI (Dom-Ex?), a business plan with an indication of the required equity commitment . . . and a presentation to Frontenac partners. . . . Am I going too fast? (I must stay you scared me when you hinted to me we might have to wait for Frontenac IX to get this project funded). **If you think so please let me know because it would be difficult for me to wait that long.**



PRV_864758_5

(See May 28, 2005 e-mail at 5 – 6, attached hereto at Exhibit D) (emphasis added).

The arms-length nature of the relationship between Richard and Frontenac with regard to the formation of H-E Parts is further underscored by additional deposition testimony omitted from discussion by Plaintiff in his Opposition. Specifically, with regard to the ultimate funding of the venture, Katz specifically testified that, during the exploratory phase, both Richard and Frontenac made decisions in accordance with their own interests.

> Q: And is it true on the decision-making even going forward ultimately to a final purchase price, each of you has the decision-making authority?
>
> A: J.P. has the ability to decide on his behalf and Frontenac had the ability to decide on its behalf.

(Deposition of David Katz ("Katz Dep.") at 44: 10 – 16) (Relevant portions of the transcript are attached hereto as Exhibit E).

Additionally, with respect to the research performed regarding Dom-Ex, Inc. (the company ultimately acquired by H-E Parts pursuant to the Letter of Intent), Laura Pearl testified that Frontenac had no control over the actions of Richard.

> Q: Did you direct J.P. [Richard] as to the research to be done concerning [Dom-Ex]?
>
> A: No, I did the research, really. I mean J.P. did his own investigation and we did ours. And they were different.

(Pearl Dep. at 20: 1 – 5).

David Katz likewise emphasized that Frontenac had no ability to control who Richard associated with regarding the H-E Parts venture or who he decided to include in his management team.

Q: Did J.P. need your approval to include Gero on a team that would be working on [H-E Parts]?

A: No, because we hadn't fronted anything.

. . . .

Q: Well, at some point, as this thing, this development process goes on, did Frontenac have a – maintain a right to determine who the persons would be that J.P. would work with in this project?

A: We had an ability to decide whether or not we were going to fund a project or make an acquisition. That determination – we would make that determination after considering a number of factors related to the company: The prospects, the strategy, the management team, the CEO, the direct reports of the CEO. So that would have been one factor and an important factor we would have considered in deciding whether or not to ultimately fund a project or make an acquisition.

(Katz Dep. at 30: 7 – 10, 31: 16 – 32: 7).

Indeed, Richard confirmed during his deposition that he maintained contact with Katz and Pearl, as well as updated them on his progress in the development of H-E Parts, in order to keep them informed as to the status of his efforts. Richard testified without contradiction, however, that he was in no way obligated to seek the "approval" of Katz or Pearl with regard to his development of the venture. Richard testified:

Q: Is this true, Mr. Richard, that as you pursued your exploration of potential targets for the strategic build-up of H-E Parts you were in contact with regular partners at Frontenac to get the Frontenac partners' view of the facts and figures that you were developing from these targets?

A: I was in contact, occasionally, mostly with David Katz, to keep him informed of the progress of the exploration work that I was doing. Nothing more makes sense when you are trying to get financed by a private equity group. You try to keep them

> informed of the progress you are making, and you try to keep in touch.
>
> Q: **Wasn't Frontenac, through its partners, directing you as to information to find and questions to answer?**
>
> A: **None whatsoever.** I mean, they were – I would suggest to them, as I did in the memo that you just reviewed with me, where I was standing now in terms of a business plan. They may have come back to me and asked me questions over the phone . . . . But they had absolutely nothing to do with the formulation of the business model other than, again, you know, acting as a sounding board sometimes when I was making a proposal.

(Richard Dep. at 85: 16 – 86: 22) (emphasis added). Accordingly, the jurisdictional evidence developed in discovery simply does not support the assertion that Frontenac exercised "control" over Richard in its investigation of H-E Parts.

Nor does the evidence support Plaintiff's assertion that Richard was somehow the agent or partner of Frontenac in the investigation phase of H-E Parts. First, Richard testified that, at the time he approached Frontenac in early 2005 regarding the H-E Parts venture, he was not one of Frontenac's "stable of executives." In fact, Richard testified that he was under contract with another company, Odyssey Partners, at the time he began to focus on H-E Parts.

> Q: You've been on the CEO First team of Frontenac since your association with ProMach. Isn't that true?
>
> A: . . . . I was then. I dropped from the CEO team in December 2004 when ProMach was sold and I actually had a new agreement with Odyssey Partners. **I was totally out of Frontenac. I mean, I had nothing to do with Frontenac after December 2004, not a thing.**

(Id. at 36: 7 – 18, 22 – 25) (emphasis added). Accordingly, as Richard testified, he was not even a "CEO1st executive" at the time he began work on H-E Parts and initiated contact with the Plaintiff. David Katz testified, moreover, that the phrase "CEO1st" is a trademarked term that Frontenac utilizes to convey the significance that Frontenac places on the executive when it is evaluating a potential company for an investment.

> Q: What is it that Frontenac Company is looking to communicate to the public by the use of its trademark phrase CEO First investing?
>
> A: I believe that the trademark phrase is used to communicate that choice of executive or choice of executive team is – ranks as one of the highest and most important criteria we consider **when evaluating the merits of a potential investment**.

(Katz Dep. at 15: 2 – 12) (emphasis added).

Indeed, Richard testified during his deposition that the "CEO1st" phrase was merely a marketing concept utilized by Frontenac to represent its executive-focused approach to evaluating a business plan. Richard testified:

> Q: What does CEO First stand for, as you understand it, as a marketing tool of Frontenac?
>
> . . . .
>
> A: Okay. I think that what people like Frontenac do is, they are seeking executives who have a business plan in mind and a management team in mind to come to them with an idea that, if they like the idea, if they like the team, they are going to invest [in] it with the idea of creating value for the investors. And – but what they do is, they focus on seasoned executives who have you know – [as] part of the industry have shown experience and success in a given industry.

(Richard Dep. at 35: 13 – 36: 3).

In sum, the foregoing evidence clearly reveals that no contractual or other legal relationship existed between Richard and any Frontenac entity prior to the execution of the letter of intent in February 2006.

## III. The Evidence Elicited During Discovery Does Not Support Plaintiff's Attempt to Impute Jurisdictional Contacts to Frontenac.

Based on the foregoing evidence of arms-length dealings between Frontenac and Richard relating to the H-E Parts venture, as well as the dual paths on which the parties proceeded during the exploratory phase of the venture, Frontenac submits that it would be unreasonable for this Court to impute Richard's contacts with the State of Rhode Island to it for purposes of personal jurisdiction. In order to permit imputed contacts, the First Circuit in Daynard specifically relied upon the numerous evidentiary proffers unearthed during jurisdictional discovery to support the existence of a joint venture amongst the defendants. Indeed, in Daynard, some of the same evidence showing a joint venture relationship also established jurisdictional contacts with the Plaintiff. Thus, a partner with the Motley defendants in that case actually represented that he was working for the Scruggs defendants when he hired the plaintiff. 290 F.3d at 56. Other evidence in that case – not present here – was held by the Court to demonstrate a joint venture relationship between the defendants. Thus, the plaintiff in Daynard actually cited a "joint venture agreement" produced during discovery that contained the names of both the Scruggs and Motley defendants. Id. at 57. Plaintiff had also produced evidence that he had conversations with both firms in which he was promised a share of the fees of both firms. Id. at 58. The Court also noted the publication of a popular book as evidence that the two law firms were engaged in a well-documented joint venture. Id. Additionally, documents were produced during jurisdictional discovery which indicated that checks had been

written to "Ness Motley/Scruggs." Finally, in Daynard, there was evidence of direct assurances to plaintiff by the Motley firm which were held to be ratifications of the alleged promises made by the Scruggs firm. Id. at 59.

Unlike the joint venture relationship between the Motley and Scruggs defendants, this case, when the factual record is reviewed as whole, does not present the same indicia of joint activity that would be sufficient to attribute jurisdictional contacts to Frontenac. In this case, as shown *supra*, the record is replete with evidence of the parties' arms-length dealings with regard to the exploratory phase of H-E Parts. Moreover, there is no evidence, as there was in Daynard, that Frontenac and Richard shared any financial benefit or risk during the exploratory phase. In fact, Richard testified that prior to February 15, 2006, he bore 100% of the risk of the venture, and never received any compensation from Frontenac. Additionally, unlike the Scruggs and Motley defendants who were together actively engaged in the tobacco litigation, both Katz and Richard testified on numerous occasions that the parties were proceeding on their own paths, each researching their portion of the opportunity – Richard in an attempt to obtain funding and establish a management team, while Frontenac was determining whether to make a funding decision. Further, unlike Daynard, none of the alleged "joint venture" evidence here relates specifically to the alleged agreement formed with the Plaintiff, there is no evidence of joint venture communications by Frontenac to Meyersiek, nor is there any evidence of communications by Frontenac to Meyersiek ratifying Richard's alleged promises. Therefore, because the factual record in this case is markedly different from the facts in Daynard, this Court should not permit the Plaintiff to impute Richard's contacts with Rhode Island to Frontenac for purposes of a personal jurisdiction analysis.

**IV. Even If This Court Were To Find There Is A Sufficient Basis To Impute Richard's Contacts To Frontenac, It Would Be Unreasonable For This Court To Exercise Personal Jurisdiction.**

Frontenac submits that, even if this Court were to determine that there is a sufficient basis to attribute some of Richard's contacts with the State of Rhode Island to it, this Court should decline to exercise personal jurisdiction over Frontenac because it would be unreasonable under the facts developed during jurisdictional discovery. See Daynard, 290 F.3d at 60 (holding that a court, even after finding a basis to impute contacts for purposes of a minimum contacts analysis, must still proceed with the remaining constitutional analysis). In order for this Court to exercise personal jurisdiction over Frontenac, the exercise of jurisdiction must be reasonable. Id. at 62.

Here, it would be unreasonable for this Court to exercise personal jurisdiction over Frontenac given the substantial evidence of arms-length dealings between Frontenac and Richard during the exploratory phase of the H-E Parts venture. As noted above, Frontenac is a private equity firm based in Chicago, Illinois, which has absolutely no contacts of its own with the State of Rhode Island. (Affidavit of Paul Carbery at ¶¶ 4 – 8). In order for a private equity firm to evaluate proposals for funding brought before it, the firm must -- of necessity -- interact with the party who applies for funding. If this Court were to conclude that a lender's relationship with an applicant is sufficient to establish personal jurisdiction over Frontenac, then arguably a plaintiff would be able to sue a private equity firm or other lender in virtually any forum where the applicant for funding has contact. This would occur, moreover, despite the fact that the private equity firm has no ability to control the activities of the applicant, or indeed has any contractual relationship with the applicant whatsoever. Under the facts of this case, given the substantial evidence of arms-length

dealing with Richard as part of the normal due diligence process of a private equity firm, Frontenac submits that the exercise of personal jurisdiction based on imputed contacts would be unreasonable.

## Conclusion

For the foregoing reasons, and those set forth in its principal memorandum of law, Frontenac's Motion to Dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure should be granted.

FRONTENAC COMPANY

By its Attorneys,

/s/ Stephen M. Prignano
/s/ Raymond M. Ripple
Stephen M. Prignano (#3649)
Raymond M. Ripple (#6489)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)
sprignano@eapdlaw.com
rripple@eapdlaw.com

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that this document has been filed electronically on this 16th day of February, 2007 and is available for viewing and downloading to the ECF registered counsel of record:

R. Daniel Prentiss, Esq.
R. Daniel Prentiss, P.C.
One Turks Head Place, Suite 380
Providence, RI 02903
dan@prentisslaw.com

/s/ Raymond M. Ripple
Raymond M. Ripple