# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GERO MEYERSIEK, )
Plaintiff, )
) CIVIL ACTION
vs. )
) FILE NO. 06-335T
JEAN PAUL RICHARD, )
FRONTENAC COMPANY and H-E )
PARTS INTERNATIONAL, INC., )
Defendants. )

DEPOSITION OF
JEAN PAUL RICHARD

December 21, 2006
10:15 a.m.

Marriott Courtyard
3399 International Boulevard
Hapeville, Georgia

Kimberly A. Kelsey, RPR, CCR-2592



APPEARANCES OF COUNSEL

On behalf of the Plaintiff:
R. DANIEL PRENTISS, Esq.
Prentiss Law Firm
One Financial Plaza
Suite 1800
Providence, RI 02903

On behalf of the Defendants:

STEPHEN M. PRIGNANO, Esq.
Edwards, Angell, Palmer & Dodge
2800 Financial Plaza
Providence, RI 02903

- - -



(Reporter disclosure made pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

JEAN PAUL RICHARD,

having been first duly sworn, was examined and testified as follows:

**Q.** State your name, please.
**A.** Jean Paul Richard, Richard being the last name.

(An interruption occurred, and an off-the-record discussion took place.)

**Q.** (By Mr. Prentiss) This proceeding is a deposition that is being taken in connection with a lawsuit what was brought by my client, Gero Meyersiek, against you, Frontenac Company, and H-E Parts International.

Are you familiar with what a deposition is?
**A.** Yes.
**Q.** Have you ever had your deposition taken before?
**A.** Once.
**Q.** You understand, then, that the purpose of this proceeding is for me to have an opportunity to



ask you questions regarding facts that may be relevant to the lawsuit that I referred to before. And you understand that the stenographer here is making a transcript of my questions and your answers --
**A.** Yes.
**Q.** -- do you understand that?

And so that the transcript of this deposition will be used at the trial of this case and preliminary proceedings leading up to trial. You understand that?
**A.** Yes.
**Q.** If at any time over the course of the deposition, if you don't understand what I've asked you, please tell me. All right?
**A.** Yes.
**Q.** If you tell me that you don't understand a question, I'll do what I can do to rephrase it so that we're working on a common understanding. All right?
**A.** Yes.
**Q.** What is your current occupation?
**A.** I'm the chairman and CEO of H-E Parts International.
**Q.** Can you give a brief description of your

Q. And Katz said --
A. They were a company called Parts Zone, a very tiny company.
Q. And so Katz called you up to tell you that these people had made a presentation to Frontenac, and so --
A. They were looking for financing and whether or not, you know, that's something which -- that they should be concerned with. They wanted my opinion. That's all.
Q. Did Katz say that he was going to have Gero Meyersiek call you directly to explain to you what this project was?
A. No. I mean, yes and no. How did that happen? Anyway, he warned me -- David warned me that Gero will call me and try to organize a meeting with me. That's my recollection.
Q. You said he warned you?
A. He warned me, yes. I mean, he alerted me that Gero, who was his colleague, made a presentation to Frontenac who would be, if I didn't mind taking the call, calling and to listen to what he would have to say, because they were curious to my opinion on that matter.
Q. And so you had a conversation --



A. With Gero at that time, yeah. I mean, following that meeting. I have no idea when that was. Obviously, '94 or whatever.
Q. Did you then pursue additional communications with Meyersiek about this Parts Zone business venture?
A. We had -- he came with his colleague -- what is his name? They separated later on, an Indian guy. I forgot his name. They came to my office, I remember, at ProMach, and they made a presentation, and I gave them my opinion about it. And I said, really, you know, I mean, that if they had any chance to be funded, that we should make more of a business plan.

And I think I remember that Gero then -- or his colleague, I forgot his name -- sent me another business plan. And that was -- and things kind of dragged. Nothing really happened until I got an e-mail from Gero saying that they found a source of funding, and that was the end of it. And that was in 2004 sometime.
Q. So is it your testimony that you didn't personally engage in investigation of this possible opportunity with Parts Zone?
A. No. That's not what I said.



Q. Okay. Tell me to what extent did you become engaged in --
A. You mean the number of hours I spent talking about Parts Zone? What are you asking me?
Q. The activities that you undertook to investigate the possible opportunity around Parts Zone.
A. I asked questions to Parts Zone. They came to see me, and I obviously asked questions. I'm always interested in business models. I pointed to them some of the deficiency and the limitation of the model. I was not really excited about it. And then I sent them an e-mail about my thoughts on the subject, what would have to be done, what kind of meat would have to be put on the bone for that thing to become more -- a potentially financeable deal, and also what -- what kind of business plan would have to be prepared.

So, yes, I had a couple of communications by -- but this was totally, I'll say, you know, on the sideline. I was running ProMach, and I was very busy. I mean, it was just -- I was trying to essentially do a favor to Frontenac to try to give them an honest opinion of whether or not that's something they should get involved with.



Q. Well, was it your expectation that if you were able to put something together with Parts Zone, that you would work with this new enterprise, including getting Frontenac equity to back it and possibly take a position in this new entity?
A. No. That was unreality. What could have happened is that if -- you know, they always tried to get directors to come on the board. Could there be a director maybe of this if Frontenac had decided to finance that thing? But it was extremely pertinent with the tiny things and the pretty loser concept at the time. So I didn't spend a lot of time on that.

But, yes, it could have been possible for me definitely not to be an active participant. Remember, the investors of private equity groups don't want their CEO to start getting diluted into other things. They want their CEO to maximize the very equation for their investment. So it's part of the -- of the rules of -- the activity of any CEO. But they will use the expertise of some CEO that they are in contact with to get opinions. That's a different --
Q. But the business plan of Frontenac with the strategic build-up of ProMach was to accomplish a strategic build-up --

Page 33

A. Right.
Q. -- and then sell. Right?
A. Right. Of course. That's what they -- sell or have an IPO or have an exit strategy. Yes, that's what they do. That's what they do for a living.
Q. So from that standpoint, in 2003, you'd been with ProMach for five years. Correct?
A. I started late '98, so it was -- I don't know when it was in 1998. We talked about that. It was four or five years, yeah.
Q. And you had already accomplished a good deal --
A. Yeah.
Q. -- of the strategic build-up?
A. Yeah.
Q. So you were sort of looking at the exit strategy at that point. Right?
A. You always are looking for an exit strategy when you are in that business.
Q. So Parts Zone --
A. It can last ten years. It can last sometimes two years.
Q. So from Frontenac's viewpoint, it could well be the next venture -- next strategic build-up

Page 34

following the exit from ProMach. Right?
MR. PRIGNANO: Objection.
You can answer.
THE WITNESS: I would say that you should ask Frontenac how many business ventures they looked at per day. I mean, there is a constant -- these guys, that's what they do for a living. They are looking every day for a business model after people want to get financing. I mean, this is a high-volume production.
Q. (By Mr. Prentiss) I understand that. But your understanding, when David Katz called you and said, "There's a guy here who's got this idea of a strategic build-up" --
A. Yeah.
Q. Let me finish my sentence. Okay?
A. Okay.
Q. Your understanding there was, well, this is something that could be the next deal after we get out of ProMach. Right?
A. I think that's pretty much your formula. I was pretty much up right to my neck. I was not thinking at that time it would be an exit for me to be involved. Because if Frontenac was to do anything

Page 35

with this venture, they would not have waited two or three years, you know. I mean, it would be now, or it would be forgotten. I mean, that's -- you know, they move pretty quickly in processing these things.
Q. Give her the phrase "CEO First."
A. Yes.
Q. Is that a trademark of --
A. Yeah. That's a marketing tool of Frontenac.
Q. It's a trademark of Frontenac, isn't it?
A. I don't know if it's a trademark. If you say so, it might be.
Q. What does CEO First stand for, as you understand it, as a marketing tool of Frontenac?
A. Well, I think you can just look at the website, and it will explain it. I mean ...
Q. Well, I'd like you to explain it on the record.
A. Okay. I think that what people like Frontenac do is, they are seeking executives who have a business plan in mind and a management team in mind to come to them with an idea that, if they like the idea, if they like the team, they are going to invest it with the idea of creating value for the investors.
And -- but what they do is, they focus on

Page 36

seasoned executives who have, you know -- part of the industry have shown experience and success in the productive industry.
Q. You are on the CEO First team of Frontenac?
A. Right. That's correct.
Q. You've been on the CEO First team of Frontenac since your association with ProMach. Isn't that true?
A. That's correct. I mean -- wait. Wait. Wait a minute. I was then. I dropped from the CEO team in December 2004 when Frontenac -- when ProMach was sold and actually had an agreement -- a certain agreement with Odyssey Partners. I was totally out of Frontenac. I mean, I had nothing to do with Frontenac after December 2004, not a thing.
Q. What was the agreement you signed with Odyssey Partners?
THE WITNESS: I think I sent that to him.
MR. PRIGNANO: I'm here. Why don't you answer.
THE WITNESS: Yeah. I mean, it's the same -- the same kind of thing that I had with Frontenac. They wanted me to stay on as chairman of ProMach. They would agree on the

Page 37

deal. They'd agree on the compensation. And
they'd agree on -- I forgot the language of the
employment contract -- and certain piece of
equity. I had to agreed to making a certain
investment. And so totally similar, not the
same numbers, but the same concept, the same
kind of agreement.
**Q.** (By Mr. Prentiss) Odyssey Partners bought
ProMach in December 2004?
**A.** Right.
**Q.** And how long did you -- were you under
contract to Odyssey Partners?
**A.** I honestly forget how long the contract
was, but I left after three months.
**Q.** Why?
**A.** Because I had this other venture I wanted
to start. It was not right for me to start getting
heavily involved and double up in the venture while
contractually I was employed by Odyssey Partners.
And I wanted -- you cannot -- you cannot put together
the kind of business plan with the kind of detail
that is needed which is going to result to financing
by a private equity group by just working at night,
you know, after hours. You know, you had to do it,
or you don't do it. You might say it's a full-time

Page 38

effort.
**Q.** And --
**A.** So I decided eventually to leave --
**MR. PRIGNANO:** Wait for his question.
**THE WITNESS:** I'm sorry.
**Q.** (By Mr. Prentiss) The new venture is the
venture that became H-E Parts. Right?
**A.** That was -- no. Yes and no. It started
in this direction and ended up with quite a few
complications along the way, and it ended up -- as
always the case, you start with an idea, and when you
see the reality of the marketplace, and what you
could -- you adjust your -- you know, your strategy.
It's got to be pragmatic. Sometimes you give up the
whole thing because the market is just not there. I
don't see I can create value there, and you drop it.
But I'll say that the concept of looking
at parts and heavy equipment -- to give you an
example, farm equipment, which is heavy -- I spent a
lot of time looking at farming equipment and much
later on in the process decided to drop it. It's not
part of H-E Parts International. So I don't know if
I answered your question.
**Q.** Again, let's start with this: What was
the initial idea -- maybe you've just answered that

Page 39

question -- the initial idea that you had that became
H-E Parts?
**A.** The initial idea was to acquire a company
which would be involved in used and new replacement
parts for heavy equipment. And the idea was to
acquire companies which would be essentially a
distribution company for such parts and consolidate
them.
**Q.** When did that initial concept first occur
to you? Understanding that you sold ProMach and
became employed by Odyssey in December 2004, when did
the it occur to you that there's this new concept
that you'd like to pursue?
**A.** I found that shortly after I consolidated
ProMach, not staying on as CEO, but just chairman, I
mean, I started thinking of a wide range of ideas,
which I kicked around. Some actually having nothing
to do with what we're talking about here. So, you
know, I was in the first quarter of 2005. That's
when I really started thinking about another venture
I may want to do.
I had been successful in the first one,
and I kind of liked it. And, you know, being just a
chairman was not something that was appealing to me.
I wanted to be more hands-on. And that's when I

Page 40

started thinking about it.
**Q.** How did Gero Meyersiek play into this
initial concept that you had?
**A.** You know, he -- I honestly cannot say. A
contact was made with Gero, and he had called me on
occasion. He had called me on occasion, maybe two
times, three times -- I don't know -- since he -- we
had talked with each other while I was still running
ProMach. And I think our last conversation, he told
me that he had -- he had a fallout with his partner.
And upon this, his company was acquired, was my
understanding, by a small private equity group from
New York. He stayed with them for a while, and then
I think he was asked to leave. That's what I
believe. I'm not sure of it.
And so he let me know that he was, you
know -- I think at that time, when he contacted me,
he had not resolved the separation agreement. He was
still fighting with them about the value of the
stocks that he had, and for him to leave -- I think
it was called -- it was not called -- there was a
company which had been acquired.
**Q.** You said a contact was made with Gero.
You called Gero, correct, in December of 2004?
**A.** I honestly -- I've thought about that. I

Page 41

honestly cannot remember how the contact was made. I don't remember if he -- I know he had called me several times along -- since the time we had met. So I don't remember after -- maybe I had called Gero to tell him that ProMach had been sold.

All I know is contact was made, and I will not say yea or nay about that because I honestly cannot say. But a contact was made sometime after the -- his company was sold, and he was upon the -- he had left upon the -- his previous company.

**Q.** You informed Gero that ProMach had been sold, and you had time to apply yourself to possible new ventures. Right?

**A.** Correct. I probably told him something like that, yeah.

**Q.** Parts Zone, the business that he was associated with, was a company, a business -- or a company in the business of distributing parts to equipment. Is that true?

**A.** No. Parts Zone -- this is -- I think we have to be very clear on that. And that was even explained to him, I think, when I first met him. Parts Zone's concept was based on convincing OEM -- OEM means original equipment manufacturers -- that Parts Zone could take over -- could buy their

Page 42

slow-moving parts or obsolete parts and continue to serve their marketplace without the OEM having to bother with the slow-moving parts that dragged down the inventory turn. That was a concept of Parts Zone.

The problem with this concept was that he was assuming that it would be easy to convince OEM to essentially parts from the obsolete or slow-moving parts and give that to a third party to essentially manage, you know. Actually, I think that's what for three years Gero tried to do, is to try to find OEM. And he had three business associates that he had tried, but it never really worked.

And what I was telling him, you know, "You will never convince a private equity group that OEM are going to be willing to do that because you have absolutely no -- just like for three years, you have never been able to run anything." And what I told him, I think, at the time, what I think makes much more sense is to actually acquire a company which is simply in the parts distribution business and what is called a gray market , which is essentially parts which are either used parts coming from the dismantling of used equipment, CAT or whatever, or new parts or aftermarket parts, which are replacement

Page 43

parts, which are often required from the same supplier as the OEM.

Okay. They are not called genuine parts because they cannot have the CAT name on the box, but they are typically from the same suppliers, and they are sold at a much lower price. There's no restriction for the supplier to sell -- in fact, I told him the aftermarket market for the suppliers is often 30, 40 percent of their business. The rest is for the OEM, and the other is for this market. So that was the fundamental difference between the two.

**Q.** Okay. Are you finished with your answer? I want to try to respect you, but --

**A.** Yeah. I probably shouldn't have indicated to you, and I'm doing that.

**Q.** Well, I'm trying keep us on a question-and-answer basis, so it'll make an easier transcript.

When you said you explained this, your analysis of the Parts Zone business plan, to Gero, was that something you just explained to him back during the time you were initially talking to Gero about the Parts Zone enterprise?

**A.** Yes. And later when we connected again in 2005, yes.

Page 44

**Q.** Okay. So in 2005, you continued the conversation in saying that the Parts Zone model is not going to work --

**A.** Right.

**Q.** -- and being in the parts business, we need to modify the business plan, as you described in your previous answer?

**A.** It's not a modification of the business plan. It's a totally new organized plan. But I insist that it has nothing to do with a modification. It's a totally different plan.

**Q.** The only thing in common is that they -- both business plans have to do with parts --

**A.** Fair enough.

**Q.** -- replacement parts?

**A.** Fair enough.

**Q.** Okay. Totally new business plan with a totally different focus is what you had in mind --

**A.** That's correct.

**Q.** -- in 2005?

**A.** That's correct.

**Q.** Did Gero have any part in discussing with you and helping to formulate this totally different business plan?

**A.** No. I would say no. I would say yes. I

mean, I talked to him about it, and he was a sounding board, but I would absolutely insist that the idea was totally mine.
**Q.** So you can't verify today that it was you who called Gero to the tell him, "I'm out of ProMach" yet, but you know that there was a conversation that took place shortly after you -- after ProMach was sold --
**A.** Correct.
**Q.** -- and you informed Gero that, "ProMach has been sold, and I am interested in possibly pursuing a new opportunity." Is that true?
**A.** That's correct.
**Q.** What did Gero say to you?
**A.** I think Gero told me that he had left -- or was let go -- I forgot -- by his -- the people he had worked with, and he was trying to get compensated by them. I think there may have been a lawsuit. I'm not sure. But he was a total -- he was unemployed, basically, at that time.
**Q.** Let me make sure that you understand the focus of my question. I'm not asking for the whole conversation. I'm asking for what Gero said to you specifically in response to your informing him, "Gero, I'm no longer" -- or "ProMach has been sold,



and I have time to pursue a new business venture." How did he respond specifically to that question -- or that statement?
**A.** Well, I don't know if I made the statement that way, so it's difficult for me to tell you how he responded to a hypothetical statement.
**Q.** All right. Let me ask you if this is true: Gero responded to you saying, "I'd be interested in working with you"?
**A.** That's correct. And I was interested in -- I'm sorry. Again, I'm -- yeah, at that time, he had pushed a totally different model, but I assumed he had some knowledge of parts at least, and of the general market. And, you know, he seemed to me like a pretty sound guy, and I had seen his resume before, and it sounded like -- like somebody that could be of value.
**Q.** Did you ask him to work with you on this new venture?
**A.** Yes. We -- I don't know who asked the other, but, yes, we had the meeting where, you know, I had already deadlocked my thoughts at the time. And I met with him and talked with him, and he was very enthusiastic about joining me and helping me in this venture, yes.



**Q.** This was going to be another Frontenac venture. Right?
**A.** At that time -- when I first talked to him, I was employed by Odyssey Partners. Frontenac was obviously a company I was going to contact if I could put enough meat on the bone and get to the point where I had something to present to somebody, because I knew them. We had a good relationship together and successful with them, but there was absolutely no guarantee to be with Frontenac or guarantee to be with anybody.
**Q.** Can you put any date, month, when you had a meeting with Gero in which you said he was very enthusiastic about moving forward?
**A.** It was in the first quarter of 2005. I'm not sure -- exactly weeks or months, I don't know. But it was, you know, definitely in the first quarter of 2005.
**Q.** When was it that, in your mind, this new venture became a venture that would be a Frontenac venture?
**A.** It was after the August meeting that we had, which was kind of a -- how should I say it -- do or don't type of meeting. I was getting shredded by that time whether or not I was really on board. And



I told Gero that, if after this meeting, my idea was not more firmly endorsed by Frontenac, I was really -- and, in fact, I'd already done some investigation myself to contact other private equity firms.
And that was in August and after the meeting -- critical meeting we had, I think, in late August 2005 in Chicago where I presented -- that was the first formal presentation of the business plan of the management team to several of the partners at Frontenac.
**Q.** Up until August, did you consider that you were essentially a free-booter, as far as this enterprise was concerned? You could go any place?
**A.** Absolutely. And even after that. I mean, this is a -- the financial world is not a cuddly world. Okay. I mean, these are pure financial people. And there is absolutely -- until something is signed, there's absolutely no -- no commitment on both parties. In fact, after the August meeting, I mean, on several occasions, I thought of dropping it and saying, you know, I'm -- because it almost went down the drain late in the year. It's a long story. But -- and so on several occasions even after August, I considered trying to sell my idea to other groups.

Page 53

Frontenac because they are the people that I personally know with whom I've had a very positive experience with both them and me. So that would be the first private equity firm I would be contacting to see if there is interest.

**Q.** And will you agree that you told Gero that in that way?

**A.** Yes. Yes. Yes. Yes.

**MR. PRENTISS:** Why don't we take a quick break.

(Recess from 11:29 a.m. to 11:34 a.m.)

**Q.** (By Mr. Prentiss) Mr. Richard, I'd like you to recount for us, to the best of your ability, that part of the conversation between you and Meyersiek that took place at the meeting in Atlanta in early 2005 in which you spoke of his potential compensation if, quote, we are successful.

Tell me, to the best of your recollection, not in the exact words, but closest that you can come, what you told him about the compensation that you described, when and how he could expect it.

**A.** I told him that these were numbers that I think I could convince a financial investor to agree with. And they were consistent with my past experience with ProMach, assuming, obviously, that we

Page 54

are successful. And by "successful," I mean that there is somebody out there, whether it's Frontenac or somebody else, waiting for the bill for and essentially on goals, the business model, and the management team which was presented to them through his business model. That's, to the best of my recollection, what I told them.

**Q.** In this case, the business model that you were talking about in that meeting in early 2005, you were successful. Correct? As you've defined successful.

**MR. PRIGNANO:** Objection.

You can answer.

**THE WITNESS:** Can you repeat the question? I don't understand.

**Q.** (By Mr. Prentiss) Yeah. As I understand your testimony, you said to Gero, "If we are successful, these are the compensations that we can expect"?

**A.** Uh-huh.

**Q.** And you've defined "successful," as you've used it in that answer, as being able to convince an equity fund to get behind and support and actually breathe light into this business plan through an acquisition. That's successful. Right?

Page 55

**A.** No.

**MR. PRIGNANO:** Objection.

**Q.** (By Mr. Prentiss) What's successful?

**A.** Successful was for a private equity firm to endorse the detailed business plan, which by the way, it's much more detailed and a lot of an indication, and a management team to implement it. That goes hand-in-hand. That was being successful. And I was not successful in Frontenac agreeing to that.

**Q.** You were successful in getting Frontenac to endorse the business plan. Correct?

**A.** Ultimately, in February 2006, yes.

**Q.** Did you present a management team, including Gero, and ask Frontenac to endorse that?

**A.** Yes.

**Q.** When?

**A.** In August 2005, in Chicago.

**Q.** And what did the Frontenac say?

**A.** Frontenac got a phone call from David Katz telling me that -- by the way, it's not black and white like that. I mean, he said that, you know, there was three partners there, which is not the core. But they said they were interested in the model, but they didn't feel that there was enough

Page 56

value added to justify them financing him. That's basically it, what was said.

**Q.** Let's go back to -- there was a great deal of due diligence that was pursued regarding this business plan from early 2005 certainly up through August of 2005. Right?

**A.** Uh-huh.

**Q.** Yes?

**A.** What do you mean by "due diligence"?

**Q.** Are you familiar with the term "due diligence?"

**A.** Very much so. Every time you acquire a company, you have to do due diligence, yes. That's what I call due diligence.

**Q.** Why don't you define here for the record what you mean by "due diligence," so if I use that term, I'll know that you and I have the common understanding of the term.

**A.** For me, the term "due diligence" is reviewing all the facts presented to me by the potential seller and to make sure that it tells me -- you know, is conformed with a reality. That's, for me, due diligence.

**Q.** Very detailed analysis of financial statements and so forth --

Page 57

A. Absolutely.
Q. Detailed analysis of an existing business and even factors that are outside the financial statements. Is that all part of due diligence?
A. Right. And that's done typically after a letter of intent has been signed with the potential seller, only at that time. Before that, it's actually not due diligence, in my understanding of the word.
Q. Is there any investigation that takes place up to the point of signing of the letter of intent?
A. Of course.
Q. What do you call that?
A. Exploration.
Q. Was there a great deal of exploration that took place from early 2005 up to late 2005 regarding this business plan?
A. Yes. The business plan was in permanent formation as we explored and tried to better understand the marketplace and who were their players and what were their sides and who should we write to and who shouldn't we write to to try to see if there's interest out there. And I'll find it was this part of the market versus this other part of the

Page 58

market. That's exploratory. And every time you do that, obviously, your business model is refined, is changed, and sometimes dramatically adjusted. But it has very little to do with any due diligence work.
Q. Were you and Gero both directly involved in that exploratory work during the period from early 2005 up through August of 2005?
A. Correct.
Q. Was Frontenac equally involved with you in that exploratory work from early 2005 through August?
**MR. PRIGNANO:** Objection.
You can answer.
**THE WITNESS:** They were occasionally involved.
Q. (By Mr. Prentiss) What was the nature of Frontenac's involvement up through August 2005?
A. I think they came to a couple of visits of potential acquisition targets. They allowed us to use their D&B, Dun & Bradstreet, database, which is a key we search through for this kind of exploration work. They also -- I don't know about that time or not, but they also, I think, had a third party do a new evaluation of the market. I forgot the name of the consulting firm that they -- they got an independent evaluation of the market.

Page 59

They -- I think that's the main thing that they did during this period. So there was some degree of involvement, but that's part of the job. I mean, that's what they do. They do that on -- I don't know how many at the same time every day. They are becoming very, very difficult spending the money because they got burned in early 2000.
**MR. PRENTISS:** Could you mark that?
(Off the record.)
(Plaintiff's Exhibit 1 was marked for identification.)
Q. (By Mr. Prentiss) Mr. Richard, I'm showing you what's been marked as Exhibit 1. Do you recognize that as an affidavit that you signed in this case?
A. Sure. Yes.
Q. Could you turn to page 3 of the affidavit, paragraph 9?
A. (Witness complies with request of counsel.)
Okay.
Q. The sentence begins, "In August 2005, I presented a business plan for H-E Parts to Frontenac at its offices in Chicago, Illinois." Is that the August meeting that you've referred to in some of

Page 60

your answers here this morning?
A. Yes.
Q. And is it your testimony that that is the first time that you presented to Frontenac this concept of this business venture?
A. What was the question?
**MR. PRENTISS:** Read the question again.
(The record was read by the reporter.)
Q. (By Mr. Prentiss) I thought I heard you say, "Yes, sir."
A. No. No. The answer is, it's the first time I presented at this level of detail with an organization chart, the management team, and so on, yes.
Q. You had presented the business plan and the concept going all the way back --
A. Well, it talked about concept before, yes, but it changed quite a few times. And the first time that the concept -- it pretty much exist in two days, H-E Parts International was presented to Frontenac with an organization chart and so on, yes, to the best of my knowledge, yes.
(Plaintiff's Exhibit 2 was marked for identification.)
Q. (By Mr. Prentiss) I'm showing you Exhibit

Q. Yes?
A. Yes.
Q. And would you agree with me that you sent out literally dozens of letters in this final form to target companies all over the United States and Canada?
A. Correct.
Q. Would you agree with me that you provided Frontenac with copies of at least some of these letters?
A. It's possible.
Q. Well, it's more than possible. It's probable, isn't it?
MR. PRIGNANO: Objection.
Answer, if you know.
THE WITNESS: I don't know. I would say it's possible, yes, that I sent that. This is part of the process -- I mean, they have nothing to do with this. It is up to the person looking for financing to come up with the evidence to convince the private equity source that there's a well business to be made out there. And this is strictly my -- whether I sent them a copy of it, I really don't know.
Q. (By Mr. Prentiss) I'm going to show you



what we are marking now as Exhibit 6.
MR. PRENTISS: Do you have a little thing where you're keeping track for me?
THE COURT REPORTER: Yes.
(Plaintiff's Exhibit 6 was marked for identification.)
Q. (By Mr. Prentiss) Exhibit 6 is an e-mail, multiple pages, which is dated May 28, 2005, from Bernadine to David Katz. Do you see that?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Who's that?
A. She's my wife.
Q. Okay.
A. I used her computer to send the e-mail. She has nothing to do with that.
Q. Is this an e-mail that you sent to David Katz on or about May 28, 2005?
A. I'm sure it is.
Q. It's a lengthy e-mail. Could you take a few minutes to go through it, because I'd like to ask you --
A. Okay.
Q. -- some detailed questions about it?



A. (Witness complies with request of counsel.)
Okay.
Q. What was your intention in sending this e-mail to David Katz in May 2005?
A. I would say, you know, it's in my nature to be -- not to be too patient. And I felt that by then, I started thinking of a better idea of what the business would be -- H-E Parts would be. I had a clear vision of what it would be. And we had at least, at that time, a couple of targets which seemed interested in pursuing discussion.
But, you know, unless I felt that there was a clear indication from Frontenac that they're really serious about it, you know, I was hesitant to go much further. And I -- you know, and I was asking David for some help in telling me what really -- where the step -- as I said before, they had changed since 1998. They were much more cautious about investing until they had much more information about the subject. So I was really asking for, you know, what should we do so that I can become convinced before I go much further that you guys are really behind.
And really I didn't get a satisfactory



answer from them until -- well, really a satisfactory answer until this August meeting. I mean, it was very, very mutual. They were interested. But, you know, I was paying for everything, for the travel, for the expenses, for everything, including some of the -- Gero did the type of travel, and I paid for the travel. I mean, I was on my own knowing that the whole thing might just, you know, fall apart.
My next step was to go find another private equity group if that didn't work. Again, I was attached to Frontenac because, you know, that's what you know. And I knew several other names that I thought might be also possibly interested, but I didn't have experience with them, as was the case with Frontenac. Again, I'm speaking too much probably.
Q. Could you turn to page 2 of this e-mail or memorandum?
A. (Witness complies with request of counsel.)
Q. At the bottom third of that page, you describe a corporate management structure.
A. Uh-huh.
Q. Was one of the managers identified there to be Gero?

Page 85

THE WITNESS: I don't remember saying that. So, you know, you have tried to find it out, and I do not really know. I can't say swear on the truth. I don't know.

Q. (By Mr. Prentiss) You never promised Harvey anything. Correct?

A. All right. I had nothing to do whatsoever. All I did, I lost track of Harvey after the first couple of years at ProMach. I mean, I have not talked to Harvey since 2000.

Q. Okay.

A. And I didn't have it to contact Frontenac --

MR. PRIGNANO: There's no question. No question.

Q. (By Mr. Prentiss) Is this true, Mr. Richard, that as you pursued your exploration of potential targets for the strategic build-up of H-E Parts --

A. Right.

Q. -- you were in contact with regular partners at Frontenac to get the Frontenac partners' view of the facts and figures that you were developing from these targets?

A. I was in contact occasionally, mostly with

Page 86

David Katz, to keep him informed of the progress of the exploration work that I was doing. Nothing more makes sense when you are trying to get financed by a private equity group. You try to keep them informed of the progress you are making, and you try to keep in touch.

Q. Wasn't Frontenac, through its partners, directing you as to information to find and questions to answer?

A. None whatsoever. I mean, they were -- I will suggest to them, as I did in the memo that you just reviewed with me, where I was standing now in terms of business plan. They may have come back to me and asked questions over the phone, or David, if indeed -- again, he's a very difficult guy to catch. He was a very difficult guy to -- well, I expressed my dissatisfaction many times actually because it was so difficult to get an answer back from them. But they had absolutely nothing to do with the formulation of the business model other than, again, you know, acting as a sounding board sometimes when I was making a proposal.

Q. I wasn't talking about formulating the business model. I was talking about directing you in how to pursue your --

Page 87

A. Absolutely not. Absolutely not. This was strictly my own full single-handed effort with a real good-standing if -- rapidly, in fact, I was getting very upset. And I talked with Gero in the summer of 2005. If I was not getting more of a positive feedback from Frontenac, I had no alternative than trying to start contacting other people. And I had other people in mind. I may have mentioned the name -- probably mentioned the name of the other property firm to Gero that I might contact. I was getting very frustrated.

Q. I'm going to show you an e-mail string. I'll start using Bates numbers just so we have a record here. FRN 000085. And it's -- I believe you'll see a string of e-mails between you and Laura Pearl?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Who's Laura Pearl?

A. Laura Pearl announced to -- Laura Pearl, who's a partner of Frontenac, had announced, I think in the spring of 2005, that she was going to leave Frontenac at the end of the year. So no project was given to her anymore, and she couldn't start

Page 88

anything. She was just finishing things. And in response to my frustration in never getting any feedback from Frontenac, I think they agreed to Laura Pearl helping me, you know, especially with the financial modeling of some of the company that I thought I might be able to get.

Because part of putting together a business model is, obviously, a five-year projection of what -- you know, what kind of financing would be necessary, what kind of equity you have, what kind of lending or senior debt would be necessary, what kind of margin you would make on the businesses that would be acquired. And they have their own -- their own type of financial model that they use that she helped me use.

(Plaintiff's Exhibit 7 was marked for identification.)

Q. (By Mr. Prentiss) Could you look at Exhibit 7, and the original e-mail in that string is the one at the bottom. Right? From Laura Pearl to you --

A. Right.

Q. -- dated Sunday, June 5, 2005?

A. Right.

Q. And in that e-mail she's directing

Page 109

the market that I was considering.

(Plaintiff's Exhibit 14 was marked for identification.)

Q. (By Mr. Prentiss) I'll show you Exhibit 14, which is FRN 092. It begins with an e-mail from Laura Pearl dated July 29, '05, to you and references a mining market overview. Do you see that?

A. Yeah. Yes.

Q. Do you recall her providing you with -- one, two, three, four, five, six separate analyses for consultants for your assistance in analyzing this business plan?

A. Yes. And it was for both, you know, as part of Frontenac's process to investigate whether or not they should be investing with me in this market. It's part of their process to get a third-party consultant to give an independent opinion, independent of the person like me who's trying to get financed. And they do that routinely for every business venture they decide to fund.

Yes. So the answer is yes, they did that. And they communicated to me, obviously, the result. Some were even conference calls that we made with some of these people. It's part of the exploration process. It takes a year before you get a business

Page 110

model put together on an average.

Q. I'll show you what we'll mark as Exhibit 15, which is FRN 262 through 264.

(Plaintiff's Exhibit 15 was marked for identification.)

Q. (By Mr. Prentiss) The origin of this is a July 11, 2005, nondisclosure agreement sent by Gero to Bill at Pro-Ex Trading. Do you see that?

A. Uh-huh. Yes.

Q. And that was July 11. There was a cover e-mail from you to Laura Pearl of August 26, 2005, sending this along to Laura Pearl at Frontenac, and that cover e-mail is, "Laura, you can pass on to Meg the confidentiality agreement sent to ProEx last July." Signed J-P. Who's Meg?

A. Meg is a lawyer who is in charge of the Frontenac account at -- in Chicago.

Q. Why were you sending this July nondisclosure agreement to Frontenac at the end of August?

A. I frankly don't remember.

MR. PRIGNANO: Don't speculate.

THE WITNESS: I could speculate, but that's all I could do.

MR. PRIGNANO: Don't.

Page 111

Q. (By Mr. Prentiss) Now I'll show you what we'll mark as Exhibit 16, which is one page, FRN 15, an e-mail that begins with Gero Meyersiek's communication to ITT New York regarding the confidentiality agreement.

(Plaintiff's Exhibit 16 was marked for identification.)

Q. (By Mr. Prentiss) Do you see that?

A. Yes.

Q. Now, you have forwarded this e-mail to Michelle Reitz?

A. Correct.

Q. Michelle Reitz is somebody at Frontenac?

A. She's a subsidiary of David Katz.

Q. And you've asked her to adapt the attached confidentiality agreement?

A. Correct.

Q. What were you --

A. The confidentiality agreement is always the same, but you have to insert a new name for the company and a new name for the other person it's addressed to. So I was asking her to help me remember. And actually, it was really no secret. So I asked Michelle to help me on the side, without even asking David, you know, "Can you just do that for

Page 112

me?"

Q. Did Frontenac have to approve the nondisclosure agreement that you used for the targets in this --

A. No. Because this is a confidentiality agreement that we've been using since -- in my previous life. It was ProMach, and I know it has been drafted by K&E. And it will be approved --

Q. K&E is Kirkland --

A. Kirkland & Ellis.

Q. -- & Ellis?

A. Yes.

Q. Which is Frontenac's Chicago's law firm?

A. Correct.

Q. K&E had drafted this confidentiality agreement or nondisclosure agreement as a part of your process of investigating companies during the strategic build-up that became ProMach. Is that correct?

A. Correct. And I can say, as of today, I'm still using the same one.

Q. Did you enter into a letter of intent with Dom-Ex?

A. Yes.

Q. Who drafted the letter of intent?

Page 121

Q. Would you agree with this characterization of this series of communications that in it, Laura Pearl is forwarding to you information about a possible CFO for H-E Parts?
A. Correct.
Q. And if you turn to page 293, which is page 3 in the e-mail string, the paragraph at the top is Laura Pearl's e-mail to this candidate --
A. Uh-huh.
Q. -- prospective candidate.
A. Uh-huh.
Q. She said, "I will forward to the CEO of the initiative currently in process. It is a roll-up of several companies in the distribution of aftermarket parts and used equipment in the surface mining and heavy construction industries. We have one deal under LOI and another that is close."
Did you understand that to mean she's referring to H-E Parts there?
A. Yes.
Q. And when she says, "We have one deal under LOI," was she referring to Dom-Ex?
MR. PRIGNANO: Objection.
You can answer, if you know.
Q. (By Mr. Prentiss) What's your belief?

Page 122

A. Yes. It's my belief she was referring to Dom-Ex, yes.
Q. Now I'm going to show you what I'm marking as Exhibit 20, which is FRN 274.
(Plaintiff's Exhibit 20 was marked for identification.)
Q. (By Mr. Prentiss) This e-mail string refers to a letter of intent for an entity called Pro-Ex?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Pro-Ex is another one of the target companies in the H-E enterprise?
A. Which fell through, yes.
Q. It fell through. In this case, would you agree with me that the beginning part of this e-mail is Laura Pearl's communication to Frontenac's law firm and you, enclosing markup of the letter of intent that was going to be submitted to Pro-Ex?
MR. PRIGNANO: Objection.
If you know.
THE WITNESS: That's what it appears be, yes.
Q. (By Mr. Prentiss) Who was paying

Page 123

Kirkland & Ellis for its work on working on letters of intent in the H-E Parts enterprise?
A. Well, the way it works is --
THE WITNESS: I'm sorry. Can I explain?
MR. PRIGNANO: If you know the answer to that question, you can answer it.
THE WITNESS: Yeah. I believe I know. The way it works is, that's all part of their business development. Okay. If this ever leads to anything, and there is, indeed, ever an H-E Parts constituent down the road, it will be part of the start-up cost of H-E Parts. It will be allocated to H-E Parts.
But meanwhile, I was taking the risk of all my costs, a hundred percent, not a single cost paid by Frontenac during all that time. And until February 15, 2006, was when I finally got a contract. That's part of -- of playing this game.
Q. (By Mr. Prentiss) Did Frontenac commission Winston Young to perform a financial due diligence process of the Dom-Ex acquisition?
A. For any acquisition, as part of the procedures, Frontenac -- and I'm assuming at most privately equity firms -- after the letter of intent

Page 124

is signed, the first step is to do a final check of due diligence by one of the big firms recognized by the banking community to ensure Frontenac and whoever they're working with that the numbers, as presented to us, are, indeed, correct. So I guess your answer is yes.
Q. I'm going to turn now to -- I'll mark as Exhibit 21, FRN 134.
(Plaintiff's Exhibit 21 was marked for identification.)
Q. (By Mr. Prentiss) Starting at the e-mail at the end from John Kokotovich, who we've already identified as the CFO of Dom-Ex --
A. Uh-huh.
Q. Can you describe, in summary form, what was the topic that was being communicated about there?
A. When you sign the letter of intent, typically it takes three to four months before you sign off. In many cases, it never comes to fruition. And, you know, you try to establish early in the game a target for working capital a time of closing so that, you know, there is not -- so that the seller doesn't take advantage of this period to essentially deplete the working capital. So I'm assuming that's

Page 133

through 49. Can you identify, first, just what those two are?
A. Yeah. Yeah. I don't know how to type, and sometimes I don't have the time to get it typed. It's the same typed version. Probably Michelle Reitz or someone typed it for me, yes.
Q. What is this memorandum?
A. Oh, that was an important one. The LEK study -- it was LEK. That's the consulting for marketing consulting occasionally used by Frontenac And I wrote this memo at that time to express my disagreement with many of the conclusions and present my point -- my point of view.
Q. So this was a memorandum you presented to Laura and David Katz?
A. Following the reception of the LEK report, which was damaging to my view of the thing, which shows to you how fragile the thing was at the time. Laura and David, especially David, was one of the young, aggressive managing partners there. I mean, they don't want to go to the major step of presenting to all of the partners until they have all their ducks in a row. And that was a real -- the LEK report was not good. I had to really fight to reverse the completion of this report. That's what

Page 134

it was. So this is -- yeah, this was October. Yeah. That was way after Gero, by the way. He had nothing to do with it whatsoever.
Q. So you didn't get Gero to type that for you?
A. No, I didn't. I didn't need him anymore.
Q. You had Michelle?
A. I had Michelle. In all fairness, Gero did more than just typing there. I'm just kidding. I like Gero. I'm very disappointed that it came down to this.
**MR. PRIGNANO:** There's no question pending.
**THE WITNESS:** I know.
(Plaintiff's Exhibit 26 was marked for identification.)
Q. (By Mr. Prentiss) Exhibit 26 is FRN 746 and 747, if you could look at that for a second, sir?
A. (Witness complies with request of counsel.)
Okay.
Q. Are you ready for a question?
A. Wait one second.
Q. Go ahead.
A. Okay.

Page 135

Q. This string of e-mails relates to an entity called Eton Partners.
A. Yes.
Q. What are they?
A. They are a search firm in Atlanta.
Q. A headhunter --
A. Executive.
Q. A headhunter executive search firm?
A. Correct.
Q. Was a contract entered into with Eton relative to H-E Parts?
A. Not with H-E Parts. It was Frontenac, I think.
Q. Okay. But the contract was to seek executives for H-E Parts?
A. Just one, a CFO.
Q. Okay. A CFO. Do you recall that there was a written contract with Eton?
A. I'm sure there was one, yes.
Q. The e-mail from David Katz to Walter Florence at the top there, January 4, 2006, says, "I believe that either J-P or Laura signed the contract with Eton." Do you recall the answer to that? Did you sign the contract, or did Laura?
A. No. I do not recall that, but it can

Page 136

easily be verified.
**MR. PRENTISS:** Let's go off the record.
(Off the record.)
Q. (By Mr. Prentiss) Who is Jeff Reed?
A. Jeff Reed was my CFO at ProMach, but I didn't want to rehire him for H-E Parts, but he has been -- I've used him on some of my due diligence at H-E Parts since February of this year. He's not an employee.
Q. Jeff Reed, does he remain the CFO of ProMach?
A. No. He's freelance right now. He's looking for other employment.
(Plaintiff's Exhibit 27 was marked for identification.)
Q. (By Mr. Prentiss) Exhibit 27 is FRN 650 and 651, e-mails dated November 2005, and they include messages to and from Jeff Reed. Where was Jeff Reed employed at that time?
A. He was freelance. He was paid on a per-hour basis.
Q. Who paid him?
A. Frontenac, I'm sure. I didn't pay him, so it could only be Frontenac. So I was wrong before when I say that I used the money after February of

Page 145

intention of giving him in a position in H-E Parts. I believe David Katz knew that. But I also believe that David Katz was totally clear that that was my intention, but he had never ever -- and that's the truth -- ever made any kind of commitment to that.

**Q.** (By Mr. Prentiss) But my question is -- I'm looking at not what he knew, but what you said to him. Did you make a stand to him and say, "I'm committed to Gero, and I really want Gero a part of this project"?

**A.** No, I didn't. If he tells me he doesn't want Gero, he's not going to fund it, I don't have a choice. He knew Gero by then. He was there at the final presentation. I made clear at the presentation that that was Gero. I would not have brought Gero into the meeting if I had already written him off, would I have -- wouldn't have I -- would I have? Whatever. And that's exactly the way it happened.

All I can tell you is that I knew David pretty well. We worked together closely. And to a large extent, I think he was successful at ProMach together, and that made him successful within -- I'm not saying only that. He's a very bright guy. But I knew him enough to know that -- I was a little

Page 146

surprised, to tell you the truth -- I was surprised at how -- normally these people are -- they take a long time to take a clear position because they always want more information. It was black and white. It really was. And I was -- yes, I was a little embarrassed for Gero because I felt bad and I had to give him the news. He's not going to like it.

**Q.** Did you give him the news?

**A.** I gave him the news, yes.

**Q.** How?

**A.** I believe -- I believe that I sent him an -- I don't think I got him right away. I left him a voicemail, and then he called me -- I already kind of warned him about what had happened, and that was very shortly after this meeting. It's not like it dragged forever. As soon as I knew that, I let Gero know. I left a message, and he called me back, and yeah, he got very -- very upset about it. And I told him -- I was apologetic about it. But I said, you know, "There's not much I can do. They control the game. If they don't want to finance you, they don't want to do that, there's not much I can do."

**Q.** Did you tell him you were going to try to get him paid in the telephone message you left him?

**A.** Yes, I did tell him that. And it was my

Page 147

honest intention to give him at least some kind of compensation for the work he had done during this period. And what he asked me actually was not for compensation. He wanted to the meet with David Katz. So I tried to arrange that on several occasions. And unfortunately, it was unsuccessful to make this happen.

**Q.** Did you ask anybody at Frontenac to agree to make a payment to Gero?

**A.** I may have hinted when I asked David Katz to meet with Gero. I've hinted to David that it would be appropriate to at least make a good will, a gesture in the form of a check to Gero, especially for the administrative work he gave me during the four or five months if -- again, if the that thing was ever to go to fruition.

**Q.** Okay. Did --

**A.** Remember, we were all working without a net, no safety net, until February 15. In fact, everything almost collapsed at the end of January. So, you know, that's the nature of the game. David, as you know, left the company at that time, and I didn't know that. And I didn't know the circumstances at the time.

**MR. PRIGNANO:** Have you finished your

Page 148

answer?

**THE WITNESS:** Yes.

**Q.** (By Mr. Prentiss) When you called and left a voicemail with Gero, you acknowledged that you said, "I'm going to get you something" -- "get you paid for your work at Frontenac," didn't you?

**A.** Yes. I believe so. Not the kind of million that he's talking about. That was about three months of administrative work, which, you know, was realistic to me. So it would have been a nice gesture, yes.

**Q.** The question was not whether you hinted. The question was, did you make a request, articulate a request to anybody at Frontenac to pay Gero for his efforts?

**A.** You must understand that I cannot articulate a request to somebody with whom I have absolutely no contract or relationship or no partnership or -- what's the beautiful word? Agency. I didn't have such a thing. So I could only be in the begging mode to be really nice. That's the way I presented it. It's not my style to dictate anything. There was no obligation whatsoever by Frontenac to do anything. I did -- I repeat, I did -- I felt a moral obligation for Gero to try to get him something, and

Page No. 12 Line Nos. 21-25 should read: for today.

If they bring an executive to this private equity group who ultimately ends up being accepted.

Page No. 15 Line No. 9 should read: really do not

Recall what is said.

Page No. 15 Line Nos. 15-17 should read: I had just left

AGCO when they called me, and I had nothing to lose in talking to them.

Page No. 16 Line No. 8 should read: involved in

Filing. Some were involved in labeling.

Page No. 17 Line Nos. 8-9 should read: Correct.

Page No. 18 Line No. 7 should read: whole

agreement,

Page No. 18 Line No. 13 should read: equity right

in the company,

Page No. 21 Line No. 4 should read: an agreement

which Frontenac was

Page No. 24 Line No. 6 should read: actually

had three employees.

Page No. 25 Line Nos. 21-23 should read: committed,

if you want, to a certain amount of equity that they would inject in the venture.

Page No. 26 Line No. 4 should read: financing

ProMach.

Page No. 26 Line Nos. 16-18 should read: equity

Industry had some difficult years -- you know, they had a difficult time with 2001 with the telecom industry, and so on.

Page No. 28 Line Nos. 11-14 should read: After

his presentation, David asked me -- Frontenac was mostly involved in the service side at the time. I was one of the only industrial-type guys with whom they worked.

Page No. 29 Line Nos. 20-23 should read: that Gero

had made a presentation to Frontenac who would be, and asked if I didn't mind taking the call, and listen to what he would have to say, because they were curious about my opinion on

Page No. 30 Line No. 3 should read: '03 or '04

Page No. 32 Line No. 6 should read: That was

unlikely.

Page No. 32 Line Nos. 8-12 should read: on the board of the companies they financed. Could I have been a director of this new entity if Frontenac had decided to finance it? Maybe.

Page No. 32 Line Nos. 13-14 should read: Yes, it could not have been possible for me to be an active participant.

Page No. 32 Line Nos. 18-22 should read: valve creation for the investment only. But companies like Frontenac will use the expertise of some of the CEOs that they are in contact with to get opinions. That's a different story.

Page No. 34 Line Nos. 8-9 should read: at business models for which people want to get

Page No. 36 Line No. 1-3 should read: shown experience and success in a given industry.

Page No. 36 Line Nos. 12-14 should read: 2004 when ProMach was sold and I actually had a new agreement with Odyssey Partners.

Page No. 38 Line No. 10 should read: chances along the way, and it ended up -- as it is always

Page No. 38 Line No. 14 should read: You have got to be pragmatic. Sometimes you give up the

Page No. 38 Line Nos. 19-20 should read: which is a type of heavy equipment. I spent a lot of time looking at farm equipment and much

Page No. 39 Line No. 6 should read: build companies which would be essentially a

Page No. 39 Line No. 14 should read: I found that shortly after I sold

Page No. 40 Line No. 16 should read: And so he Let me know that he was available, you

Page No. 40 Line Nos. 19-22 should read: still fighting with his former partners about the value of the stocks that he had.

Page No. 41 Line Nos. 2-4 should read: don't Remember if he called me or I called him. I know that he had called me several times since the time we met. It is possible that I had called Gero to

Page No. 41 Line Nos. 9-10 should read: after he had left his previous company.

Page No. 42 Line No. 4 should read: the concept

Page No. 42 Line Nos. 6-13 should read:

The problem with this concept was that it was assuming that it would be easy to convince OEM to essentially separate themselves from the obsolete or slow-moving parts and give them to a third party to essentially manage, you know. Actually, I think that's what for three years Gero tried to do, is to try to find OEMs willing to hand over the obsolete parts, but it never really worked.

Page No. 42 Line Nos. 15-18 should read:

Will never convince a private equity group that OEMs are going to be willing to do that and in fact for three years, you have not really been able to do it.

Page No. 43 Line No. 1 should read:

parts, which are often acquired from the same

Page No. 44 Line No. 9 should read: plan.

It's a totally new plan. But I

Page No. 47 Line Nos. 24-25 should read: I was getting

frustrated by that time whether or not Frontenac was really on board.

Page No. 48 Line No. 3 should read: ready --

And in fact, I'd already done some

Page No. 48 Line No. 9 should read: The first

Formal presentation of the business plan and of

Page No. 49 Line Nos. 7-8 should read: I was a totally

free person. They were totally free. That's the way it works.

Page No. 50 Line Nos. 18-20 should read: absolutely

no authority to do that. And at that time, I was

Page No. 54 Line Nos. 3-7 should read: Or somebody

else, willing to foot the bill for the goals, the business model, and the management team which was going to implement the business model. That's to the best of my recollection, what I told him.

Page No. 55 Line Nos. 5-7 should read: To endorse

the detailed business plan, and a management team to implement it.

Page No. 55 Line No. 20 should read: I got a phone

Call from David Katz

Page No. 55 Line No. 23-24 should read: there were

three partners there, which is not a quorum. But he said they were interested in the

Page No. 56 Line No. 1 should read:

Value added to justify them financing Gero. That's

Page No. 56 Line Nos. 21-22 should read: potential seller and to make sure that what he tells me – you know, is conformed with the reality. That's for

Page No. 57 Line Nos. 21-22 should read: understand the marketplace and who were the players and what were their size and who should we write to

Page No. 59 Line Nos. 4-6 should read: mean, that's what they do. They do that kind of reviews for I don't know how many business ventures at the same time every day. They are becoming very, very careful about spending the money

Page No. 60 Line Nos. 17-20 should read: Well, I talked about concept before, yes, but it changed quite a few times. But this was the first time that the concept of H-E Parts International was presented to Frontenac

Page No. 64 Line No. 9 should read: specific call from David Katz.

Page No. 65 Line No. 8 should read: to finance you, you try to keep him in the loop as much

Page No. 65 Line No. 13-16 should read: As I said, David did accompany me on a couple of visits, two or three visits. Because they also like to have a firsthand understanding of what the market is about. And, yes,

Page No. 66 Line No. 2 should read: using a rifle and trying to hit as many potential targets as

Page No. 69 Line No. 24 should read: is -- and that's something that Harvey taught me,

Page No. 70 Line No. 2-3 should read: mean, it's a catch-22 thing. I mean, you cannot be credible with a target that you contact unless

Page No. 70 Line No. 6 should read: And we understand -- that there is only a potential of

Page No. 70 Line Nos. 11-13 should read: have partnered on this funding." And you say that on the basis that there was been some indication that a company like Frontenac might be

Page No. 73 Line Nos. 22-23 should read: a good business to be made out there. And this is strictly my responsibility – whether I sent them a copy of

Page No. 75 Line No. 8 should read: then, I started having a better idea of what the

Page No. 75 Line No. 17 should read: David for some help in telling me what really was Frontenac's position --

Page No. 75 Line Nos. 23-24 should read: before I go much further that they were really behind what I was trying to do.

Page No. 76 Line No. 6-7 should read: Gero's travel. I mean, I was on my own knowing that the

Page No. 77 Line Nos. 15-16 should read: And I think that in each letter I say, "Call me or

Page No. 77 Line No. 20 should read: led to a visit. And I think Gero came with me to --

Page No. 77 Line No. 24 should read: to see if we could agree on a valuation. I mean, a visit is very,

Page No. 78 Line No. 2 should read: Dom-Ex deal happened, yeah.

Page No. 78 Line Nos. 11-12 should read: of his job -- at the time, as I said, I was viewing him as strategic marketing and business development person. I

Page No. 78 Line No. 22 should read: get a response, some e-mails, some phone calls, you

Page No. 79 Line Nos. 1-2 should read: size of each company and whether or not -- what was their specialty, whether or not they were potential targets, they were

Page No. 79 Line Nos. 5-7 should read: So his duties were mostly to keep updating, to interface for me, because I have no administrative assistance.

Page No. 79 Line No. 18 should read: that they introduce me to Frontenac. Okay. And I

Page No. 79 Line Nos. 22-24 should read: with this executive and the endorsement of a business plan and a management team, they ultimately would get a piece of the equity. That's what they're

Page No. 82 Line Nos. 17-20 should read: The 4 percent mentioned to Gero was different. I knew I had got 2 percent of equity for my guys. So I thought that I

Page No. 83 Line No. 6-7 should read: Frontenac. And they do that, and if there's never a contract signed they

Page No. 83 Line Nos. 15-19 should read: first year or so they got -- actually, as brokers do, there's some kind of -- I forgot the lehman, l-e-h-m-a-n formula, it's a kind of fee that gives them X percent of the sale for any given deal of the deal they bring. So what I was saying, by the

Page No. 83 Line No. 23-24 should read: Experience in doing this kind of thing. So I could use their help. At the time of H-E Parts they didn't help me write the

Page No. 85 Line No. 7 should read: All right. I had nothing to do with Harvey

Page No. 86 Line Nos. 2-3 should read: The exploration work that I was doing. It makes total sense when you are trying to get financed by a

Page No. 86 Line No. 11 should read: would suggest to them, as I did in the memo that you

Page No. 87 Line Nos. 2-3 should read: strictly my own full single-handed effort. Rapidly, in fact, I was getting

Page No. 87 Line No. 10 should read: private equity firm to Gero that I might contact. I was

Page No. 89 Line No. 7 should read: thing that I used. I use the financial model – even

Page No. 89 Line Nos. 9-10 should read: with them, I just wouldn't try to use the format, they wouldn't want me to use.

Page No. 89 Line No. 13 should read: Concerning the financial modeling, yes.

Page No. 91 Line No. 3 should read: No, Heavy-Quip, which was one of my

Page No. 92 Line No. 2 should read: explain. Typically, I have two partners who have an

Page No. 92 Line No. 4 should read: I mean, He was a very junior guy coming as a young

Page No. 92 Line No. 7 should read: that, she means to give a copy to David Katz, probably and

Page No. 92 Line Nos. 10-12 should read: But it's important. The final decision is made in a consensus with all of the partners. And there are 8 to 10 of them. So this is just a working

Page No. 93 Line No. 4 should read: Laura Pearl, she announced her departure. You must

Page No. 93 Line Nos. 8-9 should read: provide financial expertise help for me. Do you follow me?

Page No. 102 Line No. 2 should read: working for

is signed, the first step is to do a financial due diligence by one of the big firms recognized by

Page No. 124 Line No. 20 should read: sign the final

Purchase Agreement. In many cases, it never comes to fruition.

Page No. 124 Line No. 22 should read: a target for

working capital at the time of closing so

Page No. 130 Line No. 5 should read: meeting

Frontenac requirements, so there would not be unnecessary work to be

Page No. 133 Line No. 9-10 should read: study --

it was LEK. That's the marketing consultant occasionally used by Frontenac

Page No. 133 Line No. 25 should read: reverse the

conclusion of this report. That's what

Page No. 136 Line No. 25 should read: when I say

that I used Jeff after February of

Page No. 137 Line No. 2 should read: technical

accountant.

Page No. 137 Line No. 18 should read: The only

difference is that it's a slight

Page No. 139 Line No. 24-25 should read: M&I, which

is H-E Part's current bank. Another one was a branch of the Royal Bank of Scotland. I forgot the

Page No. 141 Line No. 17-20 should read: I made most of the presentation. Gero probably said a few words, but it was my presentation. I introduced the position that I had planned for Gero in the organization chart, which was

Page No. 142 Line No. 1-5 Should read: been able to

check that. But I believe the partners present were David, Laura. At one

Page No. 143 Line No. 19 Should read: have the

confidence in you, we feel that Gero is not

Page No. 145 Line No. 22-23 should read: large extent,

I think we were successful at ProMach together, and that made him successful within Frontenac. I'm

Page No. 147 Line No. 6 should read: unfortunately,

I was unsuccessful to make this

Page No. 147 Line No. 12-13 should read: would be

appropriate to at least make a good will gesture in the form of a check to Gero, especially

Page No. 148 Line No. 21 should read: the begging

mode to tell the truth. That's the way I