# EXHIBIT E

a development project that leads to the acquisition of a portfolio company?
A: Yes.
Q: During the development phase leading up to that culminating step, in the case of one of your projects, you would be the designated person for Frontenac to oversee the development of this project?
A: Yes.
Q: Was this largely an investigatory effort on behalf of Frontenac leading up to the decision whether or not to deploy the capital?
A: The whole process was investigative up and until the final commitment decision by the partnership, as it was in all cases.
Q: Is that what is known as due diligence?
A: No, the partnership discussion process is not known as due diligence.
Q: I was confused in my question. The investigatory process leading up to a culminating step, is that the due diligence process?
A: Yes, I think that's a fair characterization.



Q: Did Frontenac, a partner such as you, work with people outside of Frontenac during the development phase?
A: Yes.
Q: And was there a typical structure or relationship that would exist for that?
A: No, because there were a number of different types of people outside of Frontenac that we worked with.
Q: You're familiar with the phrase CEO First?
A: I am.
Q: What is that?
A: CEO First is a branded, trademarked, I believe, term or phrase that Frontenac uses to communicate its investment approach to the outside world.
Q: Can you describe the CEO First investment approach?
A: No, because it doesn't mean just one thing.
Q: Can you give a generic description? CEO First is a trademark, a registered trademark of Frontenac Company, correct?



A: Yes.
Q: What is it that Frontenac Company is looking to communicate to the public by the use of its trademark phrase CEO First investing?
MR. PRIGNANO: Objection. You can answer. You can answer.
THE WITNESS: I believe that the trademark phrase is used to communicate that choice of executive or choice of executive team is — ranks as one of the highest and most important criteria we consider when evaluating the merits of a potential investment.

BY MR. PRENTISS:

Q: Mr. Katz, did you review any materials in preparation for coming here for this deposition?
A: I did.
Q: What did you review?
A: I reviewed the written testimony that J.P. gave at his deposition in December; I reviewed the affidavit that J.P. swore to or made; and I reviewed a couple of other miscellaneous documents.
Q: Are you aware that there is a Frontenac



file that has to do with H-E Parts International?
A: It doesn't surprise me, but I'm not aware of it nor have I seen it.
Q: So you did not have a chance to review Frontenac files?
A: No, I don't have access to the Frontenac files.
Q: I'm going to, over the course of our questioning session today, refer to documents periodically.
I'm going to hand over to you first a looseleaf binder that includes Exhibits 1 through 31 from the deposition of Mr. Richard.
And for the record, Mr. Prignano and I have agreed that we're just going to have this as a traveling exhibit binder for all of the depositions to try to simplify the task a little bit. And I will periodically be marking additional documents, and we will number those sequentially from 32. And I will start with this document and ask that that be marked as Exhibit 32.

you would like to do with Gero." Do you see that?
A: I see it.
Q: Did you call J.P. as requested?
A: I suspect so.
Q: What did you understand he was asking you when he asked you what you would like to do with Gero?
MR. PRIGNANO: Objection. You can answer.
THE WITNESS: I suspect he was seeking my input and feedback about whether or not Gero might be a valuable addition to our effort should one ever materialize.
BY MR. PRENTISS:
Q: As of this time, do you have a recollection of this concept that J.P. referred to as Project Crawl?
A: I do.
Q: What's your recollection of what Project Crawl was as of February of '05?
A: Project Crawl was an idea to build a company up through acquisition of after market — industrial after-market parts and service companies.



Q: Parts and service companies?
A: Correct.
Q: Is this a — just a further development of the concept that you had been discussing with J.P. back in August of 2003?
A: I believe so.
Q: Did J.P. need your approval to include Gero on a team that would be working on Project Crawl?
A: No, because we hadn't fronted anything.
Q: Do you have any knowledge why then he was asking you in February of what you would like to do with Gero?
MR. PRIGNANO: Objection. Calls for speculation. You can answer if you know.
THE WITNESS: Can you please repeat the question?
BY MR. PRENTISS:
Q: Sure.
You testified that J.P. did not need your approval for anybody he was going to be joining with him as a team in developing Project Crawl; do I have that right?
A: I believe that is right.



Q: So why, then, would J.P. be asking in February of 2005, giving you a summary of Gero's experience, telling you that he would get much more mileage out of working with Gero than Harvey, and then asking you what you would like to do with Gero?
MR. PRIGNANO: Objection, calls for speculation. Answer if you know.
THE WITNESS: I think he was soliciting my feedback so that he could understand where I stood in the event that he continued to want to partner with or work with Gero, and he and Frontenac came to agreement down the road about a way to formalize a working relationship.
BY MR. PRENTISS:
Q: Well, at some point, as this thing, this development process goes on, did Frontenac have a — maintain a right to determine who the persons would be that J.P. would work with in this project?
A: We had an ability to decide whether or not we were going to fund a project or make an acquisition. That determination — we would make that determination after considering a



number of factors related to the company: The prospects, the strategy, the management team, the CEO, the direct reports of the CEO.
So that would have been one factor and an important factor we would have considered in deciding whether or not to ultimately fund a project or make an acquisition.
Q: You don't have any recollection of whether you gave a positive, negative, neutral response to the inquiry that J.P. made in February of 2005 about what you would like to do with Gero?
A: Are you asking a question?
Q: Yes. Do you have a recollection of whether it was affirmative, negative, neutral, anything?
A: I do.
Q: What is your recollection?
A: Neutral to negative.
Q: And what is your — let's say your best recollection of, if not the exact words, the meaning or intention that you communicated to J.P. in February 2005?
A: I don't know that it was in February.

the valuation at which we might be comfortable — might be comfortable acquiring the company.

Q: In this e-mail, in paragraph numeral 2, you understand that to be J.P., when he says, here is my recommendation, he is making a recommendation as to an offer price for the acquisition of Dom-Ex; is that correct?

MR. PRIGNANO: Objection. Answer if you know.

THE WITNESS: That's what it looks to be.

BY MR. PRENTISS:

Q: Is this true, he was not — he did not have the opportunity to make an offer of whatever he is describing here to the owners of Dom-Ex without Frontenac's approval?

MR. PRIGNANO: Objection to the form of the question. You can answer if you know.

THE WITNESS: This offer was an initial indication of value around which Frontenac, J.P. and Dave Ellefson, the Dom-Ex owner, would agree or not agree to continue to do work to ferret out whether a deal made sense for all parties included.

Page 41

BY MR. PRENTISS:

Q: So I'm going to read back to you my understanding of your answer and just tell me if I've got it right.

That the process that could lead to the acquisition of the target company begins, after a great deal of analysis, with the suggestion of a possible purchase price value to the owner to see whether you can come to an agreement to proceed further to refine and make a final purchase decision?

A: I think that's correct. The only adjustment I would make is to say that in many cases, and I think Dom-Ex was an example of this, it was important to get an initial indication of value and structure out on the table for Dave Ellefson to consider before we were given access to much information and before we were able to complete much work.

So this was relatively early in the game. And this was the initial indication for what became months and months of work prior to the acquisition of that company.

Q: But even at this early stage, you have

Page 42

to give a lot of thought to even this hypothetical number or structure before you lay that on the table to Dave Ellefson to see whether he's willing to go the next step?

A: We give as much thought as we can, given the information we've had exposure to and that's been made available to us.

Q: The number that ultimately is laid out on the table to Dave Ellefson, that is a number that J.P. has to agree to; is that true?

A: It was a — as I said earlier, we, Frontenac, and J.P. and Dave Ellefson all would have to agree on a set of valuation terms, structure four each of the three parties to want to proceed.

Q: But the transaction here is Frontenac and J.P. are on the acquirer side of the table and Ellefson is on the seller's side of the table, right?

A: If something were to happen, that would be the case.

Q: So on the buyer's side of the table, the acquirer's side of the table, both J.P. and Frontenac have to agree on the number that's

Page 43

going to be mentioned to the seller as a first step in moving further down the road?

A: Yes.

Q: Each of you has the decision-making capability on whether you're going to go with that number. By each of you, I mean J.P. and Frontenac each control their own decision as to whether that's to go with the number?

A: I think that's right.

Q: And is that true on the decision making even going forward ultimately to a final purchase price, each of you has the decision-making authority?

A: J.P. has the ability to decide on his behalf and Frontenac had the ability to decide on its behalf.

Q: Could you turn to Exhibit 4 in your binder, Mr. Katz? This appears to be a draft of a letter that relates to what ultimately became the H-E Parts enterprise. Have you ever seen that before?

A: I believe I have.

Q: When would you have first seen that — when did you first see that, to the best of your

Page 44