# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GERO MEYERSIEK, )
Plaintiff, )
-vs- ) C.A. No. 06-335T
JEAN PAUL RICHARD, et al., )
Defendants. )

The deposition of DAVID KATZ, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Gina Callahan, a notary public within and for the County of Iroquois and State of Illinois, at 131 South Dearborn Street, Suite 3100, Chicago, Illinois, on the 3rd day of January, 2007, at the hour of 10:00 a.m.

REPORTED BY: Gina Callahan, CSR
LICENSE NO.: 084-003623

Page 1

APPEARANCES:

PRENTISS LAW FIRM, by
MR. R. DANIEL PRENTISS
One Financial Plaza, Suite 1800
Providence, Rhode Island 02903
(401) 824-5150
Representing the Plaintiff;

EDWARDS, ANGELL, PALMER & DODGE, LLP, by
MR. STEPHEN M. PRIGNANO
2800 Financial Plaza
Providence, Rhode Island 02903
Representing the Defendants.

Page 2

INDEX


| WITNESS | EXAMINATION |
|---|---|
| DAVID KATZ | |
| By Mr. Prentiss | 4 |
| By Mr. Prignano | 78 |


EXHIBITS


| NUMBER | MARKED FOR ID |
|---|---|
| Deposition Exhibit | |
| No. 32 | 17 |
| No. 33 | 18 |
| No. 34 | 59 |
| No. 35 | 72 |
| No. 36 | 74 |


Page 3

(Whereupon, the witness was duly sworn.)

DAVID KATZ,

having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. PRENTISS:

**Q:** Mr. Katz, I'm Dan Prentiss, and I'm going to be taking a deposition of you in a matter that — a civil litigation matter that's pending in Providence, Rhode Island.

Have you ever had your deposition taken before?

**A:** I have not.

**Q:** I will give you just a few ground rules before we actually formally start the deposition.

The first is, the transcript is being made of my questions and your answers, and the transcript of this deposition will be used in later phases of this case and at the trial of the case. So it is very important that when you give an answer, you understand the question that I've asked.

Page 4

entity?
A: Not in my later years. I was a partnership. I had partnership distributions would have been my form of current compensation.
Q: When you were interacting with J.P. relative to this H-E Parts venture, can you answer as to whether you were acting in your — in a capacity relative to Frontenac Company or Frontenac VIII, LLC or any other specific entity?
A: I believe I would have been acting in my capacity — in July 2005, in my capacity as a representative of Frontenac VIII.
Q: I think earlier you said — obviously, these questions go into intricate structural details of legal entities. You said that these questions can be answered.
Who do you think would be a person, to your knowledge, who would be able to respond to these kinds of questions?
A: Laura Pearl would know. I think Laura Pearl would know the answers to these questions.
Q: Could you turn to Exhibit 17, Mr. Katz, in your volume?



Take a look through this, and then tell me whether you recognize this document.
A: I do recognize it.
Q: What is it?
A: This would have been a letter of intent that would have — that we proposed, submitted to Dave Ellefson at Dom-Ex in July of 2005.
Q: To your knowledge, is this the actual document that was executed by all of the parties? I ask the question because the copy that was provided to me only has your signature on it.
A: I don't remember whether this one was the one that was ultimately signed by everyone. If it was a different one, it would have been similar.
Q: Can you turn to that signature page?
A: Yes.
Q: And here again, we have — this is sort of the interesting array of entities.
Would you say that it would be Laura Pearl who would be best situated to answer the question as to what these entities are and what the relationship to Frontenac Company, which is



the letterhead designation, would be?
A: I don't know if she'd be best, but I think she'd be able to answer.
Q: Better than you?
A: Better than I.
Q: When you sign as managing director here, do you know of which entity you were signing as a managing director? There are three entities that are listed above your signature.
A: I believe I was signing as a managing director of Frontenac Company VIII, LLC, which is the general partner of Frontenac VIII Partners, Limited Partnership, which is the general partner of Frontenac VIII Limited Partnership.
Q: And is it your belief that that is the capacity in which you interacted with J.P. throughout the development of this H-E Parts enterprise?
MR. PRIGNANO: Objection. You can answer if you know.
THE WITNESS: I believe that was the capacity in which I interacted with J.P. in all of my interactions with him up and until and for some



period of time after July 11th of 2005.
BY MR. PRENTISS:
Q: Did that capacity ever change in your interactions with J.P. having to do with H-E Parts International?
A: I don't think it changed for me. My hesitation reflects some uncertainty in my mind, due to the fact that another Frontenac entity ended up funding H-E Parts in February of 2006.
Q: And what was that entity?
A: I don't know. That was after I had left. But up through and until, all of my interactions I believe were on behalf of one of the Frontenac VIII entities.
Q: Did you participate in any presentations regarding H-E Parts to lenders?
A: I did.
Q: Can you turn to Exhibit 29? And I believe that J.P. testified that this is a PowerPoint presentation that was given to potential lenders for this venture. Do you agree with that?
A: It looks like that. I think that's right.

for the deal.

BY MR. PRENTISS:

Q: Let's take individual decisions. The selection of the CFO for the company, was that a decision that was a mutual decision to be made by J.P. and Frontenac leading up to the decision whether to go or no-go?

A: I think you're asking two questions.

Q: Okay.

A: Was it a mutual decision? I don't know what a mutual decision is. Did J.P. have to be comfortable in this choice of a CFO? Yes. Did Frontenac want to be comfortable in the choice of a CFO? Yes. Did that decision have to be made prior to a closing? No. And I don't believe it was. I don't remember, but I don't believe that it did get made prior to the closing of the transaction.

Q: The ultimate decision as to an offer price, the terms of an acquisition of Dom-Ex, was that a decision in which J.P. and Frontenac had equal rights to control?

A: No, I don't think it was equal or unequal. I think J.P. had to come to the

Page 77

decision for himself on whether or not he wanted to try to close a deal with us as with Frontenac as a financing partner or someone else as a financing partner.

Then Frontenac had to come to a decision, assuming J.P. wanted to do the deal and wanted to bring it to us, then Frontenac had to decide yes or no. And if he and then we decided yes, that would constitute both parties wanting to do a transaction.

If he had decided yes and we had decided no, he likely would have gone out and tried to find another equity partner to help him finance this transaction. And he and I had discussions about the possibility of that happening as late as December of 2005.

Q: I think we're about done. Let me just take a look.

MR. PRENTISS: That's all I have. Thank you very much.

MR. PRIGNANO: I may have a question or two.

EXAMINATION

BY MR. PRIGNANO:

Q: Mr. Katz, in your last answer, you

Page 78

referenced some discussions taking place late in December or as late as December of 2005 regarding the possibility of J.P. Richard perhaps going elsewhere for funding; is that correct?

A: Yes.

Q: How did those discussions come about?

A: When I communicated to J.P. in mid-December of 2005 that I would be leaving the firm in January, and given the fact that Laura had already communicated that she would be leaving the firm shortly, he realized that he would need to get the Frontenac partnership's approval for a deal without the assistance of a lead partner with whom he had been working for seven years in the case of me, or at least a year in the case of anybody else who had been working on this deal with him. And that put him in a difficult spot.

And he and I discussed the possibility that — he and I discussed two potential scenarios. Scenario one is he would work hard and I would help him in any way I could, as would Laura, to get the partnership up to speed

Page 79

with the details of this transaction and create an advocate within the partnership for doing this deal. That was clearly the preferred path on his part and on Frontenac's part, and that's what happened.

However, in December of 2005, the other possibility was that Frontenac decided not to do the transaction or couldn't get comfortable with the transaction after the two partners who had been leading the effort were leaving the firm.

And at that time, I laid out that possibility for him very clearly and told him that I would be — that if it came to that down the road, I would do whatever I could to help him find another equity partner to help him close the transaction.

Q: Other than the discussions that you just referenced in December of 2005, were there other times during the course of Frontenac's investigation of this opportunity where it appeared as though perhaps Frontenac would not be interested in the opportunity that J.P. had presented?

MR. PRENTISS: Objection. You can answer.

Page 80

THE WITNESS: I wouldn't say there were times when it appeared that we wouldn't be interested. I would say, though, that there were a number of times where it wasn't clear we would be interested, in that we had a lot of work to do to get comfortable with the industry, to get comfortable with the company, to get comfortable with the management team.

And it was a bit of a circular process. We learned about the industry through our exploration of the company. We learned about the company through exploration of the industry.

So there were a number of times where our comfort with a potential transaction was — in fact, throughout the process, our comfort with the transaction was nowhere as near as advanced as J.P.'s was.

And that caused me, in my capacity as a representative of the firm and the fund, to want to do more work and to want to slow down the process. That slowness caused frustration in J.P. and there were — as you've showed me in some of the e-mail exchanges, there were a number of times where J.P. tried to bring the

Page 81

decision to a head throughout the summer and into the fall, the August meeting, the LEK study, various discussions throughout October and November when we as a partnership weren't ready to commit.

Q: And the reason for that was because?

A: We hadn't completed our work and we hadn't convinced ourselves on the relative risk return merits of a potential investment.

Q: Now, throughout the course of Frontenac's investigation of this opportunity, did you or Frontenac ever direct or control the activities of J.P. Richard?

MR. PRENTISS: Objection.

BY MR. PRIGNANO:

Q: You can answer.

A: Never.

Q: Was J.P. Richard free to investigate this opportunity and present it to Frontenac as he deemed fit; is that fair?

MR. PRENTISS: Objection.

THE WITNESS: Yes, he was free to do that. He was free to go down other paths if he felt that was more appropriate.

Page 82

We communicated with one another, given our long history of working together and our sense of mutual trust, we communicated regularly while he worked on his path and while we worked on our path. But we did not control him or his actions or his decisions in any way, shape or form.

BY MR. PRIGNANO:

Q: Now, earlier in your testimony, Mr. Prentiss referred you to an exhibit that had been marked at Mr. Richard's deposition and you were shown FRN 000380 in particular. That page, it appears to be a slide from a presentation; is that correct?

A: That is correct.

Q: I think you testified earlier your belief was it was given to a bank; is that true?

A: I believe that is right.

Q: At the time this presentation was made — first of all, do you have any idea when the presentation was made?

A: I think these would have been made in the early to mid-fall of 2005. Probably September, October 2005.

Page 83

Q: And this particular slide starts off at the top a partnership. Do you see that?

A: I see.

Q: And it references J.P. Richard and Frontenac Company. Do you see that?

A: I do.

Q: At this time, early to late fall of 2005, was there any form of formal partnership between Mr. Richard and Frontenac Company?

A: None whatsoever.

Q: What was this slide intended to communicate?

A: It was to communicate — it intended to communicate to potential lenders that in the event that we, Frontenac, and J.P. and Dave Ellefson and that potential lender agreed upon a deal and agreed upon a transaction and closed the deal, that the partnership underlying that closing transaction would turn out to be one between J.P. as the CEO and Frontenac as the private equity sponsor.

Q: Which would occur some time in the future?

A: It would occur when the deal was

Page 84