**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| GERO MEYERSIEK,<br>Plaintiff,<br><br>v.<br><br>JEAN PAUL RICHARD, FRONTENAC COMPANY, FRONTENAC COMPANY VIII, L.L.C., FRONTENAC VIII PARTNERS, L.P., FRONTENAC VIII LIMITED PARTNERSHIP and H-E PARTS, INTERNATIONAL, INC.<br>Defendants. | : | No. C.A. 06-335-T |

## OBJECTION

The plaintiff Gero Meyersiek objects to the Frontenac defendants' amended motion to dismiss for lack of personal jurisdiction. A Memorandum of Law in support of this objection is appended here to.

Respectfully submitted,
GERO MEYERSIEK
By his attorney

**R. DANIEL PRENTISS, P.C.**

/s/ R. Daniel Prentiss
R. Daniel Prentiss (#0783)
One Turks Head Place, Suite 380
Providence, RI 02903
Tel: 401-824-5150
Fax: 401-824-5181

Dated: May 9, 2007

**CERTIFICATION**

I hereby certify that on this 9th day of May, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

Stephen M. Prignano, Esq.
Raymond M. Ripple, Esq.
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
sprignano@eapdlaw.com
rripple@eapdlaw.com

/s/ R. Daniel Prentiss

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| GERO MEYERSIEK,<br>Plaintiff,<br><br>v.<br><br>JEAN PAUL RICHARD, FRONTENAC COMPANY, FRONTENAC COMPANY VIII, L.L.C., FRONTENAC VIII PARTNERS, L.P., FRONTENAC VIII LIMITED PARTNERSHIP and H-E PARTS, INTERNATIONAL, INC.<br>Defendants. | No. C.A. 06-335-T |

**PLAINTIFF GERO MEYERSIEK'S MEMORANDUM OF LAW IN OPPOSITION TO THE FRONTENAC DEFENDANTS' AMENDED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

This memorandum is submitted by the plaintiff, Gero Meyersiek ("Meyersiek"), in opposition to the motion of Defendants Frontenac Company ("Frontenac"), Frontenac Company VIII, LLC, Frontenac VIII Partners, L.P., and Frontenac VIII Limited Partnership (together, "Frontenac Entities") to dismiss Meyersiek's Complaint pursuant to rule 12 (b)(2) of the Federal Rules of Civil Procedure.[1] As explained below, this Court has ample grounds for exercising personal jurisdiction over Frontenac and the Frontenac Entities.

This action arises from an agreement reached by Gero Meyersiek and Defendant J.P. Richard ("Richard") for Meyersiek's services in the development of a business enterprise. Meyersiek agreed, in exchange for defined compensation and participation in equity, to provide

[1] On March 20, 2007, the Court granted Meyersiek's motion to amend his complaint, adding Frontenac Company VIII LLC, Frontenac VIII Partners, L.P. and Frontenac VIII Limited Partnership as defendants and permitting Frontenac to file a supplemental memorandum in support of its motion to dismiss. Meyersiek has combined its arguments from its two previously filed opposition memoranda to Frontenac's motion into this single memorandum.

his research, analytical, and strategic skills in developing and executing a business model for the acquisition and conglomeration of independent businesses in the heavy equipment replacement parts industry. Meyersiek alleges that Richard was at all times acting as an authorized agent of Frontenac and the Frontenac Entities. After the business model reached fruition, in the form of the company (and defendant) H-E Parts International, Inc. ("H-E Parts"), Richard and the Frontenac Entities breached the agreement, refusing Meyersiek's compensation for his work, or equity in the new business venture.

## LEGAL STANDARD

Rhode Island's long-arm statute, R.I. Gen. Laws §9-5-33 establishes jurisdiction to the maximum extent permitted by the Fourteenth Amendment; therefore, what is permitted under the Due Process Clause is the sole inquiry in this case. *See Almeida v. Radovsky*, 506 A.2d 1373, 1374 (R.I.1986). A defendant is subject to *in personam* jurisdiction when it has certain minimum contacts with the forum such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 31, 39 (1945). In a contract case, the Court looks to the parties' negotiations, future consequences, terms of the contract, and the parties' actual course of dealing to determine whether the defendant purposefully established the necessary minimum contacts. *Daynard v. Ness Motley*, 290 F.3d 42, 52 (1st Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (S. Ct. 1985).). Contacts by a particular defendant may be direct, or be imputed from another. *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 7-8 (1st Cir. 2002). The actions of an agent are sufficient to establish jurisdiction over a principal. *Daynard v. Ness Motley*, 290 F.3d 42, 55 (1st Cir. 2002).

The evidence before the Court amply demonstrates that the Frontenac Entities are subject to personal jurisdiction of this Court as a result of their own acts directed towards Rhode Island and from the imputed contacts of Defendant Richard. The discussion of the evidence below speaks principally in terms of "Frontenac," rather than the individual Frontenac Entities. This is a consequence of the manner in which the Frontenac Entities conducted themselves during the period of their interaction with the Plaintiff, and of the manner in which the Frontenac officer deponents described their roles and the Frontenac activities having to do with the Plaintiff and the H-E Parts business venture. The Frontenac Entities, their officers, and Richard all characteristically used the appellations "Frontenac" and "Frontenac Company" to describe the entity for which they were acting, without specification as to any individual Frontenac Entity. The discussion below will demonstrate that in part for this reason, and in part based on the structural relationships among the Frontenac Entities, Richard and the other actors were acting on behalf of all of the Frontenac Entities in their dealings with the Plaintiff, such that their actions may be imputed to all. The Court need not distinguish among the individual Frontenac Entities in analyzing personal jurisdiction.

## BACKGROUND FACTS

### The Parties

Meyersiek is a career business executive who has been employed in executive positions at the General Electric Company and Textron, Inc., among other employers. Meyersiek Affidavit, ¶2.

Frontenac is a private equity investment firm based in Chicago Illinois. Frontenac raises capital from large institutions and uses that money to invest in or acquire companies that it hopes can be sold or taken public in the future – returning the capital and most of the profits to the large

institutions. Deposition of Frontenac partner and managing director David Katz ("Katz Dep.") at 7:3 – 10. Frontenac holds itself out as having a unique relationship with the executives it selects to lead its companies. It uses the trademarked appellation "CEO1ST" to describe its executive program, and the members of its stable of executives. On its website, a page introduced by the link, "How We Partner with Executives," describes the Frontenac model of its relationship with its executives:

> Some private equity firms compete to "land the deal," and afterwards try to find the right management team. Frontenac identifies an executive or team with outstanding industry knowledge and past performance, and then we find the right company together.

Exh. 1 ; Katz Dep. at 14:10 – 15:1.

Frontenac Company does not itself raise equity funds or make investments in companies. It forms subsidiary entities for that purpose. For the transactions relevant to this litigation, Frontenac formed Frontenac Company VIII, L.L.C. ("Frontenac LLC"), whose members are the equity partners of Frontenac Company[2]. Frontenac LLC is the general partner of Frontenac VIII Partners, L.P. ("Frontenac Partners"). The limited partners of Frontenac Partners are present and former equity partners of Frontenac Company. Frontenac Partners, in turn, is the general partner of Frontenac VIII Limited Partnership, which is the entity that actually raises funds in the equity market, and then invests those funds in the Frontenac business ventures. Deposition of Frontenac equity partner and managing director Laura Pearl ("Pearl Dep") 10:7 – 13:13. Frontenac Company functions essentially as a management and service company to the various Frontenac entities, performing administrative functions, employing secretaries and accounting personnel, and holding the lease on the Frontenac offices. Pearl Dep. at 7:13 – 8:15. David Katz

[2] Frontenac Company was a partnership that "some years ago" converted to a limited liability company and is now formally Frontenac Company, L.L.C. Pearl Dep. 7:7 – 12. It uses the names Frontenac Company and Frontenac Company LLC interchangeably, and will be referred to herein as "Frontenac Company."

and Laura Pearl are partners in Frontenac Company, members of Frontenac LLC, and limited partners of Frontenac Partners. Pearl Dep. pp. 11:1 – 12:33.[3]

Frontenac VIII Limited Partnership is the entity that funded the H E Parts International business venture. Pearl Dep. 15:8 – 12.

Defendant Richard is a business executive with a career as a top executive at several large American industrial corporations. Deposition of J. P. Richard ("Richard Dep.") 5:3 – 7:14. Richard first became associated with Frontenac in 1997, in a discussion concerning a Frontenac investment in a "strategic buildup" of companies in the packaging industry. Richard Dep. 8:2 – 9:17. The venture came to fruition in 1998, with Frontenac funding the acquisition of a company that came to be named ProMach, Inc. Katz was the Frontenac lead on the project. Katz Dep. at 19:18 – 21. Frontenac was the majority shareholder and controlling entity of ProMach; Richard was the Chief Executive Officer ("CEO"). Katz Dep. at 21:6 – 8, 22:8 – 13. This made Richard a Frontenac CEO1ST executive. Katz Dep. at 23:15 – 8. His photograph graced the home page of the Frontenac website, where his status of CEO1ST executive, and CEO of ProMach, was displayed. Exh. 1. From 1998 through 2004, Richard continued as the CEO of ProMach, with Frontenac the controlling shareholder. Katz Dep. at 22:8 – 13.

<u>Frontenac Introduces Meyersiek to Richard</u>

In 2003, Meyersiek was an executive, senior manager, and owner of a business known as "Parts-Zone." Meyersiek Aff. ¶2. Parts-Zone was in the business of manufacture and distribution of replacement parts for heavy equipment that was no longer in production by its original manufacturer. *Id.* Meyersiek sought equity funding for Part-Zone to acquire firms in its

[3] This memorandum will follow the convention adopted by Katz, Pearl, and Richard in using the name "Frontenac" to refer to the constellation of Frontenac Entities, except where context requires identification of a specific entity. Because the witnesses for the most part used the name "Frontenac" without qualification, it is impossible to discern whether a witness intended an answer to identify any particular entity.

business. *Id.* Meyersiek identified Frontenac as a potential equity investor; he called a former professional colleague with whom he had worked at McKinsey Company, whom he knew to be a Frontenac partner. *Id.* ¶3. He was referred to David Katz as being the Frontenac partner to whom he should speak. *Id.* ¶3. Meyersiek and another Parts-Zone executive traveled to Chicago to meet with Katz to explain their business plan. *Id.* ¶3.

At the meeting, Katz identified Richard as Frontenac's person in Meyersiek's industry. *Id.* ¶3. Katz described Richard as a Frontenac CEO1ST executive and stated that the Parts-Zone plan would need to pass muster with Richard in order for Frontenac to have any interest in the venture. *Id.* ¶3.

By coincidence, Katz and Richard had at the same time been discussing Richard's next Frontenac venture. Although he continued in his role as CEO of ProMach, Richard and Frontenac by 2003 were ready to begin planning another venture after the conclusion of the ProMach business plan. In an equity investment such as ProMach, "you are always looking at an exit strategy." Richard Dep. at 33:19 – 20, Katz Dep. at 23:8 – 14. In an email to Richard explaining his referral of Meyersiek to him, Katz told Richard,

> I shared with Gero the fact that you and we have been discussing how we might get into the replacement parts and service industry through acquisition and have been evaluating together potential entry strategies.

Exhibit 2.

At Katz's request, Richard met with Meyersiek and evaluated Meyersiek's presentation to determine whether Frontenac should consider investing in Parts-Zone. Richard Dep. at 27:17 – 30:1. Katz was aware that the conversation between Richard and Meyersiek took place and that some of Meyersiek's strategy and ideas were similar to some of those of Richard and Frontenac. Katz Dep. at 25:22 – 26:1. Frontenac did not ultimately pursue the opportunity with Meyersiek.

Katz Dep. at 26:8 – 10. However, communication between Meyersiek and Richard concluded by Richard stating that he would like to explore Meyersiek's ideas further when he had additional time to devote to them. Meyersiek Aff. ¶5

Richard Calls Meyersiek to Start New Venture

In December, 2004, Richard called Meyersiek at his home in Rhode Island to inform him that Frontenac had sold ProMach, and that Richard was now ready to start a new venture. Meyersiek Aff. ¶6. Richard confirmed that the venture would be a Frontenac investment, and that the industry he had in mind was the replacement parts industry. Meyersiek Aff. ¶¶ 6,7. Meyersiek and Richard met in February 2005, engaging in detailed discussions and planning regarding the new business venture. Meyersiek Aff. ¶8. Richard and Meyersiek agreed that Meyersiek's role would be primarily strategic marketing, including the identification and research of potential target companies, analysis of the market and the potential target companies' place in the market, and preparation of appropriate documents, such as investor presentations, non-disclosure agreements and letters of intent. It was agreed that Meyersiek would be able to perform all of his functions from his office in Rhode Island, by telephone, internet, and mail. *Id.* As compensation, Richard agreed that Meyersiek would receive a four percent equity share in the enterprise, which Richard said was standard in the industry. *Id.* Richard stated that Meyersiek would begin to draw a salary of $175,000 per year, and be eligible for a performance bonus for up to an additional $175,000, at some point in the future, after the business plan had been approved by Frontenac. *Id.* Richard acknowledged that he proposed these compensation terms to Meyersiek at the February meeting. Richard Dep. at 50:6 – 14. Richard told Meyersiek that he would have to "run this by David Katz" at Frontenac, and get his approval of Meyersiek's compensation package. Meyersiek Aff. ¶ 8; Richard Dep. at 50:6 – 14.

The following day, Richard emailed Katz to apprise him of his meeting with Meyersiek. He described Meyersiek in laudatory terms:

> I have had an excellent meeting with Gero yesterday (a full half a day) and a lot was accomplished. I have decided I would get much more mileage out of working with Gero then Harvey. But I want you to be comfortable with him (he would constitute my new team with a new CFO still to be hired). Gero is very bright, listens well, and, I believe, has excellent personal skills. A person with his intellect who has spent the last two years covering all aspects of the parts distribution business has a lot to bring to the party.

Exh. 3.

Within a few days of the Atlanta meeting between Richard and Meyersiek, Richard called Meyersiek and told him that David Katz had approved Meyersiek's involvement and compensation. Meyersiek Aff. ¶9. At this time, Meyersiek began working essentially full time on the venture, and continued to do so until August, 2005. *Id.*

Development of the H-E Parts Business Venture

Meyersiek's and Richard's initial work toward the development of the new business venture was the identification of potential business targets for investment or acquisition by Frontenac. Richard Dep. at 57:16 – 58:8. The identified companies were then analyzed to make an initial determination of those to which inquiries would be sent. Richard and Meyersiek prepared a letter of inquiry to be sent to potential targets of the Frontenac business plan. In the introductory paragraph of the letter, Richard stated:

> I have partnered with the Frontenac Company (www.frontenac.com), a Chicago-based private equity group with revenues in excess of $5 billion, to execute a major build-up in the industrial parts distribution sector.

Exh. 4 . This draft letter is dated February 11, 2005 (prior even to Richard's meeting with Meyersiek). It was sent, in essentially unchanged form, to dozens of companies around the country over the next several months. Richard Dep. at 72:19 – 73:6; Exh. 5 is a copy of the letter, dated July 28, 2005, to the target Midwest Industrial Sales. It repeats Richard's

representation of himself as in partnership with Frontenac in the replacement parts industry business venture.

Richard's representation of himself as partnered with Frontenac in his venture was with Katz's knowledge and authorization. Katz Dep. at 36:10 – 37:4. Frontenac authorized Richard to make this representation because it enhanced Richard's credibility, showing Richard had access to Frontenac's capital. Katz Dep. at 46:14 – 47:5.

Throughout the initial investigation phase of the venture, Frontenac was closely involved with Richard and Meyersiek, providing critical resources, support and guidance. Frontenac provided resources and support to Richard in pursuit of the venture, including use of databases, hiring a third party to evaluate the market, and providing access to Frontenac administrative support. Richard Dep. at 58:15 – 59:3, 111:10 – 112:1. Frontenac personnel were in direct contact with representatives of acquisition targets and visited potential acquisition targets. Richard Dep. at 106:9 – 22, 58:17 – 18. Frontenac undertook six separate analyses using consultants to analyze the business plan. Richard Dep. at 109:9 – 13. Frontenac received information about possible acquisition targets collected by Richard for inclusion in Frontenac's financial model of the venture. Richard Dep. at 89:20 – 91:12. Frontenac provided Richard with resources that were not otherwise available. Richard Dep. at 101:16 – 102:11.

Frontenac partner Laura Pearl researched the replacement parts industry and shared that information with Richard. Pearl Dep. at 20:18 – 21:2. Pearl worked closely with Richard to organize the various information Richard had informally collected, with Pearl creating a basic financial model of potential targets. Pearl Dep. at 21:19 – 22:18. The financial effort provided by Pearl would normally have already been done by a management team member in a typical venture – but in this case, it was completed by Frontenac. Pearl Dep. at 24:18 – 25:12. Pearl

also provided detailed guidance and instruction to Richard on how to respond to specific inquiries from target companies based upon Frontenac's approach and procedures. Pearl Dep. at 25:20 – 27:2.

Frontenac undertook many of the upfront costs of the venture during the investigation phase. Frontenac commissioned and paid for the financial due diligence process regarding a possible acquisition target. Richard Dep. at 123:20 – 124:6. Frontenac paid for a headhunting firm to help hire additional members of the management team. Pearl Dep. at 30:17 – 19. Frontenac paid for legal counsel to review letters of intent for acquisitions. Richard Dep. at 122:25 – 123:9.

Frontenac exerted review and approval of nearly all of the venture's critical decisions. The ultimate approval of the management team was up to Frontenac. Katz Dep. at 31:21 – 32:7, Richard Dep. at 145:12 – 13. ("If [Katz] tells me he doesn't want Gero, he's not going to fund it, I don't have a choice"). Prior to making offers to purchase acquisition targets, Richard sought Frontenac's approval on offer amounts, on which Frontenac had the final say. Richard Dep. 105:14 – 106:8, Katz Dep. at 77:19 – 78:8. Legal documents sent to potential acquisition targets, including the non-disclosure agreement, were drafted by Frontenac's counsel. Richard Dep. at 112:5 – 21. Selection of the lender for the venture was Frontenac's decision. Pearl Dep. at 35:9 – 18. Richard's compensation was determined by Frontenac. Pearl Dep. at 40:17 – 41:12. In short, Frontenac was in ultimate control of the venture moving forward. Richard Dep. at 146:20 – 22 ("There's not much I can do. They control the game. If they don't want to finance you, they don't want to do that, there's not much I can do").

Katz met with Meyersiek two or three times during the investigation period, and had some email exchanges with him, demonstrating Frontenac's awareness of his involvement in the

business. Katz Dep. at 51:22 – 52:2. Meyersiek also met with Laura Pearl. Pearl Dep. at 17:2 – 8.

The investigative and analytical efforts led to the execution of a letter of intent with a target company, Dom-Ex, Inc., ("Dom-Ex") that had been identified and analyzed by Meyersiek. Meyersiek Aff. ¶ 9. The letter of intent, dated July 11, 2005, is printed on Frontenac Company letterhead; its parties include H E Parts, Frontenac VIII Limited Partnership, Frontenac Partners, and Frontenac LLC. Exh. 6.

Frontenac then went to the financial markets to seek out lenders for the venture. A PowerPoint slide presentation prepared by Richard and Pearl, which Pearl edited September 20, 2005, has a slide added by Pearl, identifying "The Partnership" that was seeking funds for the acquisition of Dom-Ex:

- J-P Richard
- Frontenac Company

Exh. 7. This representation, with further elaboration, was carried through on a PowerPoint slide for presentation October 5, 2005 to "M & I Bank," several other banks, and to the Frontenac partners in November, 2005. Exh. 8. Richard Dep. at 138:10 – 140:9.

<u>Frontenac Refuses to Honor Its Obligation</u>

In August, 2005, after Richard and Meyersiek made a presentation to Frontenac partners in Chicago, Katz informed Richard that Frontenac would not approve of Meyersiek being a part of the management team. Katz Dep. at 55:3 – 18. Richard then informed Meyersiek via a voicemail message that he was out, although he promised that he would try to get Frontenac to pay him for all of his efforts. Richard Dep. at 146:9 – 13. Richard says that he made "hinted"

communication to Katz about some kind of payment to Meyersiek, but never followed through with an actual request. Richard Dep. at 147:11 – 15, 148:12 – 21.

Meyersiek's Reliance

Meyersiek relied upon Richard's affiliation with Frontenac in agreeing to enter into a contract for involvement with the business venture. Meyersiek Aff. ¶10. Meyersiek's reliance was based upon the fact that when he initially searched for equity funding, he went to Frontenac, which introduced him to Richard as its representative with experience in the replacement parts industries. *Id.* Meyersiek had seen Frontenac's website portrayal of Richard as a Frontenac CEO1ST executive. *Id.* ¶ 4. Meyersiek relied on the statements of Richard that the venture would be a Frontenac investment and that his participation had to be approved by Frontenac. *Id.*¶ 10. Meyersiek would not have agreed to become involved with Richard if he had not been representing Frontenac. *Id.*

ARGUMENT

I. Standard for Establishing Personal Jurisdiction

The First Circuit uses the *prima facie* standard to determine whether personal jurisdiction exists, accepting the plaintiff's properly documented evidentiary proffers as true and construing them in the light most favorable to the plaintiff's jurisdictional claim. *See Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81,83 (1st Cir. 1997; *Brian Jackson 7 Co. v. Eximias Pharm. Corp.*, 248 F. Supp. 2d 31, 34 (D.R.I. 2003) (*citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir.2002); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n.*, 142 F.3d 26, 34 (1st Cir.1998)).

II. The Record Establishes Personal Jurisdiction Over Frontenac

In analyzing the assertion of jurisdiction through imputed contacts, the First Circuit looks to a broad range of agency relationships including partnership by estoppel and joint venture. *Daynard v. Ness Motley*, 290 F.3d 42, 56 (1st Cir. 2002). The court stated that "even if a defendant's relationship were to fall slightly outside of the confines of these specific doctrines, the question…is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists." *Id.* at 56-7.

In *Daynard*, the court held that personal jurisdiction was proper and consistent with the Due Process Clause for a defendant, based on imputed contacts from a co-defendant, when Plaintiff alleged that defendants led plaintiff and the public to believe they were joint venturers. Id. at 56-7. The Court stated that this inquiry "was a different issue from whether, in a dispute between the two firms, a joint venture agreement could be enforced." Id. at 56-7.

The First Circuit further elaborated in *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 7-8 (1st Cir. 2002), stating, "[t]he contacts need not be actions directly taken by [defendant]. Instead, [plaintiff] may rely in whole or in part on actions imputed to [defendant] through its agents-as indeed it must, because any action legally attributed to a corporation is that of one agent or another. The exact type of agency relationship used to impute contacts is not crucial to our inquiry regarding traditional notions of fair play and substantial justice, nor are the technical differences between the states' different rules of agency vital." *Citing Daynard*, 290 F.3d at 56-57 ("[T]he question before us is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists.").

In the instant case, it is uncontested that Richard is subject to the personal jurisdiction of the Court, and so the only issue remaining is whether Frontenac's own acts and its relationship with Richard supports the imputation of Richard's contacts to Frontenac.

Agency

To establish agency under Rhode Island law, a plaintiff must show "1) a manifestation by the principal that the agent will act for him, 2) acceptance by the agent of the undertaking, and 3) an agreement between the parties that the principal will be in control of the undertaking." *Powers v. Coccia*, 861 A.2d 466, 470 (R.I .2004); *Lawrence v. Anheuser-Busch, Inc.* 523 A.2d 864 (R.I. 1987).

The first two elements of actual agency are easily shown. In 2003, Frontenac and Richard were discussing Richard's next project and assignment for Frontenac. Because Meyersiek's proposed funding was within the ambit of Richard's previous discussions with Frontenac, Frontenac tasked Richard with reviewing and evaluating the proposal. Richard accepted the assignment and reported back on his results. This clearly constituted a manifestation by Frontenac that Richard would act for it, and Richard's agreement to do so.

In 2004, when Richard called Meyersiek to announce that he was ready for his next project, stating that it would be a Frontenac-financed venture, the deduction is clear that he did so in a continuation of his Frontenac relationship from 2003. The pattern of conduct that ensued resolutely reinforces this deduction. From the beginning of 2005 through the end of Meyersiek's involvement, Richard advanced Frontenac's interests in the development and execution of a business plan in the replacement parts industry. The close collaboration between Frontenac and Richard in all stages of the investigation and analysis phase of the effort permit no other

conclusion. Richard and Frontenac were operating under an agreement that Richard would act for Frontenac in the investigation and development of the business that became H E Parts.

The third element of agency, the right of control by the principal, is also easily shown on this record. Richard, Katz, and Pearl all candidly acknowledged that Frontenac was the controlling authority on all decisions of any significance. It had approval authority of the forms to be used for non-disclosure agreements and the letter of intent. It was the decision-maker as to the terms of any deal, the lender to selected, and the financing to be obtained. When Richard negotiated the letter of intent with Dom-Ex, he offered a purchase price that had been approved and authorized by Frontenac. There was no aspect of the venture on which Richard was free to act on his own; every term and detail was subject to the approval of Frontenac. As Richard stated, "They control the game. If they don't want to finance you, they don't want do that, there's not much I can do." Richard Dep. at 146. That the parties agreed that the principal would control the agent may be shown by the agent's following the principal's instructions. *Baker v. ICA Mortgage Corp.*, 588 A.2d 616, 617 (R.I. 1991).

Agency by Apparent Authority

Alternatively, agency may be established under the doctrine of apparent authority. Under Rhode Island law, the elements of apparent authority are 1) the principal manifestly consented to or knowingly permitted the agent to exercise the principal's authority, 2) a third person knew of this fact and, acting in good faith had reason to believe and actually did believe that the agent possessed such authority and 3) in reliance on this appearance of authority, the third person changed his position and will be injured or suffer a loss if the act or transaction does not bind the principal. *Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 278 (D.R.I. 2004) (Citing Restatement (Third) of Agency, section 3.03). The third party need not have direct communication with the

principal for the third party to justifiably rely on the agent's apparent authority – just a reasonable belief that the agent possessed the authority. *Schock v. U.S.,* 56 F. Supp. 2d (D.R.I. 1999), *Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp. 58 (D.R.I. 1996), *731 Airport Associates v. H & M Realty Associates, LLC ex rel. Leef*, 799 A.2d 279 (R.I. 2002).

The elements of apparent authority are also easily met here. The hallmark of a finding of agency by apparent authority is the manifestation by the principal of the agent's authority. The analysis looks in the first instance at the acts of Frontenac, not Richard.

Here, Frontenac's first act in cloaking Richard with authority was its direction of Meyersiek to Richard as its person for evaluation of the business plan for which Meyersiek sought equity funds. Katz described Richard as one of Frontenac's CEO1ST executives, a description that was documented in Frontenac's website. The website's description of the relationship between Frontenac and its CEO1ST executives further elaborates on the air of apparent authority such executives enjoy.

Frontenac augmented its manifestation of authority in Richard in approving his representation that he had partnered with Frontenac in the H E Parts venture. The first iteration of that representation is in the draft letter dated February 11, 2005, which was *before* the meeting at which Richard offered terms of employment to Meyersiek. There is certainly a plethora of "indicia of authority given by the principal to the agent," *Fraoili v. Lemcke*, *supra*, 328 F. Supp. 2d 278, to satisfy this prong of apparent authority.

The nature of the doctrine of apparent authority is demonstrated in the remaining elements to be proved: that the third party asserting apparent authority reasonably believed that the putative agent had the principal's authority, and relied to his detriment on that belief. Apparent authority is a species of estoppel, designed to protect those who reasonably rely on a

principal's manifestations of authority to its agent, from being injured as a result of that reliance. "The doctrine of apparent authority exists to promote business and protect a third party's reasonable reliance on an agency relationship." *Id.* 328 F. Supp 2d 278-9.[4] *See* Restatement (Third) of Agency, §2.03 ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has the authority to act on behalf of the principal and that belief is traceable to the principal's manifestations").

Regardless of the analysis, there is sufficient evidence to support a finding of Richard's apparent authority to bind Frontenac in offering terms of employment to Richard.

<u>Richard's Authority to Offer a Contract to Plaintiff</u>

A principal is bound by all acts of its agent within the agent's actual or implied authority. When Richard named a purchase price to the executives of Dom-Ex, he did so with the actual authority of Frontenac. But Richard's authority to bind went beyond the actual authority expressly granted by Frontenac. Implied authority of an agent may be characterized as "actual authority, circumstantially proven, which the principal is deemed to have actually intended the agent to possess." *McBurney v. Roszkowski,* 875 A.2d 428, 437 n.8 (R.I 2004)(citing 3 Am.Jur.2d *Agency* § 75 (1986)). "Implied authority embraces authority to do whatever acts * * * are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.*

It may readily be inferred that Richard had the actual authority of Frontenac to resume in 2004 the discussion with Meyersiek that he took up in 2003 at David Katz's request. Richard's

[4] *See* R.I. Gen. Laws §7-12-27, "Partnership by Estoppel," subpart (2)(b) "When a person is represented to be a partner in an existing partnership, or with one or more persons not actual partners, he or she is an agent of the persons consenting to the representation to bind them to the same extent and in the same manner as though he or she were a partner in fact, with respect to persons who rely on the representation."

detailed email to Katz of February 17, 2005, recounting the meeting and Richard's enthusiasm for having Meyersiek part of the management team (and requesting Katz's approval of his inclusion) is persuasive evidence of that authority. The further authority to offer the terms of Meyersiek's engagement in the venture is necessarily implied from these facts. Richard expressly stated that authority to Meyersiek when he told him that the terms he offered were subject to David Katz's (Frontenac's) approval. This is more than sufficient evidence to support a finding that Richard was acting with the actual authority of Frontenac in his offer of terms of employment, and in all of his other dealings with Meyersiek.

<u>Lack of Joint Venture Agreement between Frontenac and Richard is irrelevant</u>

Frontenac's argument that it had no contractual obligation to Richard during the formative stages of the enterprise is beside the point. The Plaintiff does not dispute that the formal relationship between Frontenac and Richard in the H-E Parts venture was not sealed until the consummation of the Dom-Ex acquisition in February, 2006. However, a written contract is not necessary to the establishment of a principal-agent relationship. That status is determined by the facts surrounding the relationship between the two parties and the act for which the relationship is sought to be established. Agency does not exist in the abstract. The question of agency arises from one or more specific acts undertaken by a putative agent, for which a party seeks to hold the putative principal responsible. If the criteria for agency or agency by apparent authority are met with respect to an act, and the act comes within the agent's actual or implied authority, then the principal will be bound by the agent's acts, whether or not a written contract exists.

Clearly, Frontenac can make a promise to Meyerseik (or Richard) to compensate him for his efforts in putting a deal together by providing him an equity participation upon

consummation of the deal. If the requisite elements of a contract exist surrounding that promise, it is enforceable. That promise is no less binding merely because at the time of the offer and acceptance, the ultimate deal documents had not been executed. Such is the case here. Richard made a promise to Meyersiek of future compensation, contingent on successful completion of an acquisition, in exchange for Meyersiek's efforts in accomplishing the deal. When the contingency was fulfilled, the promise came due. If Richard made his promise as an agent for Frontenac, within the scope of his authority, then the promise is binding on Frontenac.

The Frontenac Entities

Frontenac asserts in its amended motion to dismiss that the evidence revealed during jurisdictional discovery that there were several layers of Frontenac entities involved in the H-E Parts transaction requires the conclusion that the Court lacks jurisdiction over any of the Frontenac Entities. This argument lacks a logical basis. The conclusion it seeks does not follow from the evidence before the Court.

As the court noted in *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd., supra,* 298 F.3d at 8, "any action legally attributed to a corporation [or limited partnership or limited liability company] is that of one agent or another." There are three individuals whose actions are at issue here, Richard, Katz, and Pearl; the question is to which entities their actions may be legally attributable based on agency.

Katz and Pearl were partners, members, and limited partners of three Frontenac Entities, Frontenac Company, Frontenac LLC, and Frontenac Partners. In communications with Richard and others they identified themselves as being partners/managing directors of Frontenac Company. Exh. 2, 9. [5] In communications with bankers and investors, Pearl and Katz identified their principal, Richard's partner in the H-E Parts venture, as Frontenac Company. Katz

[5] Pearl also used an email address identifying her as a managing director of Frontenac LLC. Exh. 7.

authorized Richard to represent himself to target companies and the market in general as a partner of Frontenac Company. The Dom-Ex letter of intent was on Frontenac Company letterhead.

This evidence is more than sufficient to establish that Katz and Pearl were acting on behalf of Frontenac Company in their dealings with Richard and Meyersiek in the H-E Parts business enterprise. Based on the evidence of Richard's status as an agent of the entity for which Katz and Pearl were acting, this establishes jurisdiction over Frontenac Company through the imputed contacts of Richard, and the direct activities of Katz and Pearl. Frontenac Company cannot simply disavow this evidence, and the conclusion that flows from it, by Katz's and Pearl's unilateral assertions that they were technically working for Frontenac LLC in putting together the H-E Parts deal.

Katz's and Pearl's assertions do have legal effect, however. Their testimony, and the evidence of the financial and corporate structure of the Frontenac financing model, make clear that they were indeed acting on behalf of Frontenac LLC in the H-E Parts transaction. Their actions in furtherance of the venture certainly bind their immediate principal, Frontenac LLC. Since Frontenac LLC's role in the venture was to act as the general partner of Frontenac Partners, Katz's and Pearl's actions also bind Frontenac Partners. The acts of the general partner in furtherance of the partnership business are binding on the limited partnership. By the same analysis, the actions of Frontenac Partners, as general partner of Frontenac VIII Limited Partnership, are binding on that entity as well. This relationship is formally demonstrated in the Dom-Ex letter of intent (Exh. 6). David Katz executed that letter as managing director of Frontenac LLC, which executed it as general partner on behalf of Frontenac Partners, which executed it as general partner on behalf of Frontenac VIII Partners, Limited Partnership. Katz's

act of executing the document was the act of all three of the Frontenac Entities named in the document.

The relationship of Katz and Pearl, and, by extension, Richard, with the different Frontenac Entities can be viewed as existing through sub-agency. *See* Restatement (Third) of Agency, §3.15 (2006). Katz and Pearl act on behalf of Frontenac LLC, which acts on behalf of Frontenac Partners, which in turn, acts on behalf of Frontenac VIII Limited Partners the equity fund by which Frontenac currently raises equity and invests in businesses. In this cascade of layers of related entities, the acts of the individual agents are attributable up the line to the ultimate principal. *See* Restatement (Third) of Agency, §3.14, 3.15.

Alternatively, the individuals could be viewed as acting on behalf of multiple principals, which would be all of the Frontenac entities that were involved in the transaction. Restatement (Third) of Agency, §3.16 (2006) ("Two or more persons may as coprincipals appoint an agent to act for them in the same transaction or matter").

In either event, the actions of Katz and Pearl are attributed to all entities for which they are acting during their interactions with Richard and Meyersiek. It is emphatically not the case that the mere fact that Katz and Pearl were acting on behalf of one or more Frontenac entities precludes them from acting also as the agents of others.

<u>Remaining Constitutional Analysis</u>

Frontenac's direct contacts with Rhode Island and its contacts imputed from Richard constitute sufficient "minimum contacts" with Rhode Island "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (U.S. 1945).

For specific jurisdiction, the 1st Circuit tests the constitutionality of jurisdiction based on three categories - relatedness, purposeful availment, and reasonableness: first, the claim underlying the litigation must directly rise out of or relate to the defendant's forum state activities; second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and third, the exercise of jurisdiction must be reasonable. *United Elec. Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F. 2d 1080, 1089 (1st Cir. 1992).

A. The Defendants' Contacts Directly Relate to the Underlying Litigation

The claims in this case – breach of contract and unjust enrichment, arise directly out of the course of dealings between Meyersiek, Frontenac and Richard, in which the relationship started in the form of communications by telephone and email between Rhode Island, Georgia and Illinois. The agreement contemplated Rhode Island as Meyersiek's place of performance. Meyersiek performed his obligations of the agreement In Rhode Island, with defendants communicating with him regarding the work he completed under the agreement via telephone, email and fax directed to Rhode Island.

B. Defendants' Purposeful Availment

It is undisputed that Richard purposefully availed himself of the forum of Rhode Island, through telephone, email and faxes direct at Rhode Island. Frontenac, through Katz, knew that Meyersiek was working closely with Richard on the venture and himself had exchanges with Meyersiek in Rhode Island regarding the very work Meyersiek performed under the terms of the agreement at issue in the litigation, making it foreseeable to Frontenac that it could be haled into court in Rhode Island to answer a claim by Meyersiek arising out of the transaction.

C. Gestalt Factors Support Jurisdiction

The "Gestalt" factors articulated in *World-Wide Volkswagen Corp. v. Woodson*, 44 U.S. 286, 292 (U.S. 1980) support jurisdiction. *See also Scarlatelli v. Swarovski North America Limited*, Slip Copy, 2006 WL 2474862, *7 (D.R.I.).

Richard's draft letter of February 11, 2005 describes Frontenac as having revenues in excess of $5 billion. It cannot demonstrate any kind of special or unusual burden if required to appear in Rhode Island. *See Scarlatelli at *7* (citing *Pritzker*, 42 F.3d at 64). Furthermore, its cost of appearing in Rhode Island is mitigated by the fact that it is represented by the same counsel as defendants Richard and H-E Parts (which do not contest jurisdiction).

Rhode Island, the forum state, has an interest in securing the safety and well-being of people working in Rhode Island. The plaintiff is entitled to obtain "convenient and effective relief." *Id.* (citing *Pritzker,* 42 F.3d at 64). The court should "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience." *Id.*

The judicial system's interest is that of "obtaining the most effective resolution of the controversy". *Id.* (citing *Nowak v. Tak How Inv., Ltd.,* 94 F.3d 708, 718). Plaintiff and plaintiff's documents are located in Rhode Island; this Court will be hearing the claims against two other defendants Richard and H-E Parts on the identical issues in Rhode Island. An additional suit against Frontenac in another forum on the same matter would be a waste of resources and therefore not in the interest of the judicial system.

With regard to the state's common interests, "the most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors. *Id.* (citing *Sawtelle*, 70 F.3d at 1395 (quoting *Burger King*, 471 U.S. at 473).

## CONCLUSION

The discussion above demonstrates that there is a solid evidentiary foundation for a finding that Richard acted with the authority of Frontenac Company and Frontenac LLC in offering employment to Meyersiek, and that these Frontenac Entities are bound by the agreement that Richard and Meyersiek reached. The evidence also shows that these facts are sufficient to bind Frontenac VIII Limited Partnership. This evidentiary array is far more than is needed to support the assertion of jurisdiction. As the court in *Daynard* and *Jet Wine & Spirits, Inc.* has expressed, the inquiry at the jurisdictional stage is not the determination of the fact of agency, or even the presentation of a *prima facie* case of agency. Rather, the question is just "whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists." *Daynard v. Ness Motley*, 290 F.3d at 56-7. The evidence before the Court certainly meets this test.

Respectfully submitted,
GERO MEYERSIEK
By his attorney

**R. DANIEL PRENTISS, P.C.**

/s/ R. Daniel Prentiss
R. Daniel Prentiss (#0783)
One Turks Head Place, Suite 380
Providence, RI 02903
Tel: 401-824-5150
Fax: 401-824-5181

Dated: May 9, 2007

## CERTIFICATION

I hereby certify that on this 9th day of May, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

Stephen M. Prignano, Esq.
Raymond M. Ripple, Esq.
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
sprignano@eapdlaw.com
rripple@eapdlaw.com

/s/ R. Daniel Prentiss