UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GERO MEYERSIEK,<br>Plaintiff,<br><br>v.<br><br>JEAN PAUL RICHARD, FRONTENAC COMPANY, FRONTENAC COMPANY VIII, L.L.C., FRONTENAC VIII PARTNERS, L.P., FRONTENAC VIII LIMITED PARTNERSHIP, and H-E PARTS, INTERNATIONAL, INC.,<br>Defendants. | : | CA 06-335 T |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This is an action for breach of contract, intentional misrepresentation, and unjust enrichment. See Amended Complaint (Doc. #34) ¶¶ 36-44. Before the Court is the Amended[] Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #35) ("Amended Motion to Dismiss" or "Amended Motion") of Defendants Frontenac Company ("Frontenac Company") and Frontenac Company VIII, LLC, Frontenac VIII Partners, L.P., and Frontenac VIII Limited Partnership (the "Frontenac Entities") (collectively "Frontenac"). This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). After listening to oral argument, reviewing the memoranda submitted, and performing independent research, I recommend that the Amended Motion to Dismiss be denied.[1]

[1] Defendant Frontenac Company's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #11) ("First Motion to Dismiss") has also been referred to me. Because I have recommended that the Amended Motion to Dismiss be denied, I recommend that the First Motion to Dismiss be ruled moot.

## Facts

***The Parties***

Plaintiff Gero Meyersiek ("Plaintiff" or "Meyersiek"), is a resident of East Greenwich, Rhode Island. See Affidavit of Gero Meyersiek ("Meyersiek Aff.") ¶ 1. He is a career business executive who has been employed in executive positions at General Electric Company and Textron, Inc., among other employers. See id. ¶ 2.

Frontenac is a private equity investment firm based in Chicago, Illinois. See Plaintiff Gero Meyersiek's Memorandum of Law in Opposition to the Frontenac Defendants' Amended Motion to Dismiss for Lack of Personal Jurisdiction ("Plaintiff's Mem."), Appendix ("App."), Deposition of David Katz ("Katz Dep.") at 6-7. Frontenac raises capital from large institutions and uses that money to invest in or acquire companies that it hopes can be sold or taken public in the future — returning the capital and most of the profits to the large institutions. See id. at 7. Thus, its overall business plan as a private equity investor is to obtain a portfolio company, develop the portfolio, and ultimately exit. See id. at 24.

Defendant Jean Paul Richard ("Richard") is a business executive with a career as a top executive at several American industrial corporations. See Plaintiff's Mem., App., Deposition of Jean Paul Richard ("Richard Dep.") at 5-7. At the time this action was filed, he was the Chief Executive Officer ("CEO") of H-E Parts International, Inc. ("H-E Parts"), a global distributor of equipment, components, and parts to the mining and construction industries. See Affidavit of Jean Paul Richard ("Richard Aff.") ¶¶ 1-2. H-E Parts has its principal place of business in Atlanta, Georgia. See id. ¶ 2.

***Background***

Richard first became associated with Frontenac around 1998

when he was seeking equity investors for a packaging machinery company which he wished to start. See Richard Dep. at 7-8; Katz Dep. at 19. Richard contacted Frontenac, see Richard Dep. at 9, and Frontenac agreed to fund the venture, see Katz Dep. at 20. Together they created an entity known as ProMach,[2] Inc., see id. at 21, with Frontenac as the majority shareholder, see id. Richard was the Chairman[3] and CEO of ProMach, making him a Frontenac CEO1ST executive.[4] See Katz Dep. at 20, 22-23. Richard's photograph appeared on the home page of the Frontenac website, where his status as CEO1ST executive and CEO of ProMach was displayed. See Plaintiff's Mem., Exhibit ("Ex.") 1 (Website Pages). From 1998 until December of 2004, when the company was sold, Richard continued as the CEO of ProMach with Frontenac as the controlling shareholder. See Katz Dep. at 22, 26; Richard Dep. at 36. ProMach's business was to manufacture, market, and service packaging equipment used by consumer product companies. See Richard Aff. ¶ 3.

***Frontenac Refers Meyersiek to Richard***

In 2003, Meyersiek was an executive, senior manager, and owner of a business known as Parts-Zone. Meyersiek Aff. ¶ 2. Parts-Zone was in the business of manufacturing and distributing

---

[2] Although Frontenac partner David Katz ("Katz") testified at his deposition that "Pro Mach" was "[t]wo words," Katz Dep. at 19, both Meyersiek and Frontenac in their memoranda refer to the company as "ProMach," see, e.g., Plaintiff's Mem. at 5; Defendant Frontenac Company's Memorandum of Law in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction ("Frontenac First Mem.") at 3. The Court adopts counsel's practice.

[3] Although the board of which Richard was "Chairman," Katz Dep. at 20, 22, was not specifically identified during Katz's deposition, it seems clear that Richard was Chairman of ProMach's Board of Directors, see id. at 20-22.

[4] "CEO1ST" is a trademark appellation which appears to refer to executives who operate companies in which Frontenac invests, see Katz Dep. at 14-15; Deposition of Laura Pearl ("Pearl Dep.") at 39.

replacement parts for heavy equipment that was no longer in production by its original manufacturer. See id. Meyersiek sought equity funding for Parts-Zone to acquire firms in the same or similar business, and he identified Frontenac as a potential equity investor. See id. Meyersiek contacted a managing partner at Frontenac with whom he had formerly worked, and this individual referred Meyersiek to another managing partner, David Katz ("Katz"). See id. ¶ 3. The first partner indicated that Katz was the person at Frontenac who would deal with a proposal such as Meyersiek's. See id.

Meyersiek and another Parts-Zone executive traveled to Chicago to meet with Katz and explain their business plan. See id. During the meeting, Katz identified Richard as Frontenac's person in Meyersiek's industry and told Meyersiek and his colleague that the Parts-Zone plan would have to pass muster with Richard in order for Frontenac to have any interest in the venture. See id. Katz described Richard as a Frontenac CEO1ST executive and stated that he was "currently running a Frontenac company called Pro[M]ach ...." Id.

After the meeting, Meyersiek reviewed the Frontenac website and observed that Richard was identified on the site as a Frontenac CEO1ST executive. See id. For his part, Katz sent Richard an email explaining his referral of Meyersiek. The email stated in part:

> I shared with Gero the fact that you and we have been discussing how we might get into the replacement parts and service industry through acquisition and have been evaluating together potential entry strategies.[5]

---

[5] Katz testified at his deposition that in August of 2003 Frontenac "contemplated ... that there would be an exit strategy for ProMach in the foreseeable future, and we considered the possibility of an ensuing project together with [Richard]." Katz Dep. at 24. Katz characterized it as "coincidental," id. at 25, that Meyersiek

Plaintiff's Mem., Ex. 2 (email from Katz to Richard of 8/18/03). Richard understood that Frontenac wanted his opinion as to whether the Parts-Zone plan was something in which Frontenac should be interested. See Richard Dep. at 28-30.

Meyersiek and his colleague traveled to Atlanta, Georgia, and met with Richard at his offices there. See Meyersiek Aff. ¶ 5. They presented their plan to him and followed up with a few emails. See id. However, the project did not progress further because of Richard's time commitments in running ProMach. See id. The communications between Meyersiek and Richard concluded with Richard stating that he would like to explore Meyersiek's ideas further when he (Richard) had additional time to devote to them. See id.

***Richard Contacts Meyersiek in 2004***

In December 2004, Richard called Meyersiek at his home in Rhode Island and informed him that Frontenac had sold ProMach and that Richard was now ready to start a new venture. See Meyersiek Aff. ¶ 6. Richard indicated that the venture would be a Frontenac investment and that the industry which he had in mind was the replacement parts industry. See id. ¶¶ 6-7. During a January 2005 telephone conversation, Richard stated that he was still working on the transition of ProMach to its new owners but that he expected that process would be completed by March 2005. See id. ¶ 7.

In February 2005, Meyersiek traveled to Atlanta, Georgia, and engaged in detailed discussions and planning with Richard regarding the new business venture. See id. ¶ 8. They agreed that Meyersiek's role would be primarily strategic marketing,

---

approached Frontenac with an idea having to do with the parts industry at a time when Katz had already been discussing a similar idea with Richard, see id. at 24-25.

including the identification and research of potential target companies, analysis of the market and the potential target companies' place in the market, and preparation of appropriate documents, such as investor presentations, non-disclosure agreements, and letters of intent. See id. They also agreed that Meyersiek would be able to perform all of his functions from his office in Rhode Island, using the telephone, internet, and mail. See id. As compensation, Richard agreed that Meyersiek would receive a four percent equity share in the enterprise, which Richard said was standard in the industry. See id. Richard also stated that Meyersiek would begin to draw a salary of $175,000 per year and be eligible for a performance bonus of up to an additional $175,000 at some point in the future, after the business plan had been approved by Frontenac. See id. Richard told Meyersiek that he would have to "run this by David Katz," id., at Frontenac and get his approval of Meyersiek's compensation package, see id.

The following day Richard sent Katz an email and apprised him of his meeting with Meyersiek. The email began:

> I have had an excellent meeting with Gero yesterday (a full half a day) and a lot was accomplished. I have decided I would get much more mileage out of working with Gero than Harvey. But I want you to be comfortable with him (he would constitute my new team with a new CFO still to be hired). Gero is very bright, listens well, and, I believe, has excellent personal skills. A person with his intellect who has spent the last two years covering all aspects of the parts distribution business has a lot to bring to the party.

Plaintiff's Mem., Ex. 3 (email from Richard to Katz of 2/17/05). Later in the email, Richard asked Katz to let him "know what actions you would like to take with regards to Gero ...." Id. This request was repeated in the final sentence of the email with Richard asking Katz to call him to discuss "(before Friday noon

if possible) what you would like to do with Gero." Id.

A few days after the Atlanta meeting between Richard and Meyersiek, Richard called Meyersiek and told him that Katz had approved Meyersiek's involvement and compensation. See Meyersiek Aff. ¶ 9. Meyersiek began working full time on the venture and continued to do so until August of 2005. See id.

***The New Business Venture***

Meyersiek's and Richard's initial work toward the development of the new business venture was the identification of potential business targets for investments or acquisition by Frontenac. See Richard Dep. at 57-58. The identified companies were then analyzed to make an initial determination of those to which inquiries would be sent. See id. Richard prepared a letter of inquiry to be sent to potential targets.[6] In the opening sentence of the target letter, Richard states:

> I have partnered with the Frontenac Company (www.frontenac.com), a Chicago-based private equity group with revenues in excess of $5 billion, to execute a major build-up in the industrial parts distribution sector.

Plaintiff's Mem., Ex. 4 (draft letter). In the third paragraph, the letter states: "In order to achieve this [build-up] goal, we will have up to $150 million at our disposal, a combination of equity provided by Frontenac and senior debt, to finance not only our acquisitions but also our domestic and international expansion ...." Id. The draft of the letter is dated February 11, 2005. See id. It was sent, essentially in unchanged form,

---

[6] Plaintiff states in his memorandum that this letter of inquiry was prepared by Richard and Meyersiek. See Plaintiff's Mem. at 8. However, Plaintiff provides no citation to the record for this statement, and the Court notes that the date of the draft letter is February 11, 2005, see Plaintiff's Mem., Ex. 4 (Draft Letter of 2/11/05), which is prior to Richard's February 17, 2005, meeting with Meyersiek, see id., Ex. 3 (email from Richard to Katz of 2/17/05).

to dozens of companies around the country over the next several months. See Richard Dep. at 72-73.

The record also contains a copy of the letter dated July 28, 2005, to a target company, Midwest Industrial Sales. See Plaintiff's Mem., Ex. 5 (Letter from Richard to Groholski of 7/28/05). The letter repeats Richard's representation of himself as being in a partnership relationship with Frontenac in the replacement parts industry business venture. See id. The letter again refers to financial backing being provided by Frontenac: "In order to achieve this goal, we will initially have access to as much as $150-200 million in Frontenac equity plus senior debt, to finance acquisitions, domestic and international expansion, and investments in state-of-the-art E-commerce and information technology." Id.

Richard's representation of himself as partnered with Frontenac in the venture was with Katz's knowledge and authorization. See Katz Dep. at 36-37. Frontenac authorized Richard to make this representation because it enhanced his credibility by showing that Richard had access to Frontenac's capital. See id. at 46-47.

During the investigation phase of the venture, Frontenac provided Richard and Meyersiek with some resources, support, and guidance. It allowed them to use its Dunn & Bradstreet database to search for potential acquisition targets. See Richard Dep. at 58. Frontenac had a third party do a new evaluation of the replacement parts market. Id. Richard asked Frontenac managing director and partner Laura Pearl ("Pearl") to run his assumptions into Frontenac's standard financial model.[7] Id. at 90. He

[7] It appears that the task performed by Pearl of running Richard's assumptions was not a one time occurrence, but extended over a period of time. See Richard Dep. at 102 ("most of the work that Laura Pearl did was in the financial model, but occasionally, it was

sought Pearl's assistance in responding to an inquiry from a potential target regarding the structure of the buyout. See id. at 101-102. In explaining why he sought Pearl's assistance, Richard indicated that he lacked resources and that Pearl was more capable than he was to make the response. See id. at 102. Pearl was in direct contact with a representative of at least one acquisition target, see id. at 106, and Frontenac personnel visited at least two potential acquisition targets, see id. at 58. A subordinate[8] or associate of Katz's also helped Richard adapt a confidentiality agreement for use in venture. See id. at 111.

The investigative and analytical efforts undertaken by Richard, Frontenac, and Meyersiek led to the execution of a letter of intent with a target company, Dom-Ex, Inc. ("Dom-Ex") which had been identified and analyzed by Meyersiek, see Meyersiek Aff. ¶ 9. The letter of intent is dated July 11, 2005, and is printed on Frontenac Company letterhead. See Plaintiff's Mem., Ex. 6 (Letter from Richard to Ellefson of 7/11/05). The letter identifies the parties involved as: H-E Parts, Frontenac VIII Limited Partnership, Frontenac VIII Partners, L.P., Frontenac Company, L.L.C., and Dom-Ex. See id. H-E Parts is identified in the letter as "a newly formed Delaware corporation or limited liability company owned by [Richard] and Frontenac VIII Limited Partnership and/or its affiliates ...." Id.

---

[me] asking a question [of her] concerning, you know, the evaluation process of companies because she's more capable than I am to do that"); Pearl Dep. at 24 ("J.P. is interested in having further discussions with these company owners and, you know, wants to get a little feedback from us.").

[8] Richard described this person as being "a subsidiary of David Katz." Richard Dep. at 111. The Court assumes the intended word was subordinate.

***The Alleged Breach***

In August, 2005, after Richard and Meyersiek made a presentation to Frontenac partners in Chicago regarding Dom-Ex and other potential targets, see Katz Dep. at 53-54, Katz informed Richard that Frontenac would not approve Meyersiek as part of the H-E Parts management team, see Katz Dep. at 55-57. Richard then left a voice mail message for Meyersiek, informing him of this news. See Richard Dep. at 146. In a subsequent telephone conversation, Richard told Meyersiek that he would try to get him paid. See id. However, Richard apparently did not do more than "hint[]" to Katz that a check should be given to Meyersiek as a gesture of good will in recognition of the work he had performed over the course of five months. See id. at 147.

***Meyersiek's Reliance***

Meyersiek states that he relied upon Richard's affiliation with Frontenac in agreeing to enter into a contract for involvement in the business venture. See Meyersiek Aff. ¶ 10. He explains that his reliance was based on the fact that, when he initially searched for equity funding, he went to Frontenac which introduced him to Richard as its representative with experience in the replacement parts industry. See id. Meyersiek notes that he had seen Frontenac's website portrayal of Richard as a Frontenac CEO1ST executive. See id. ¶ 4. Meyersiek claims that he relied on the statements of Richard that the venture would be a Frontenac investment and that his (Meyersiek's) participation had to be approved by Frontenac. See id. ¶ 10. Finally, Meyersiek states that he would not have become involved with Richard if Richard had not been representing Frontenac. See id.

**Travel**

Meyersiek filed this action on July 21, 2006, naming Richard, Frontenac Company, and H-E Parts as defendants. See

Complaint (Doc. #1); Docket. On September 15, 2006, Richard and H-E Parts answered the Complaint, and Frontenac Company filed a motion to dismiss for lack of personal jurisdiction. See Docket; see also Defendant Frontenac Company's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #11) ("First Motion to Dismiss"). The Court subsequently granted a motion to defer ruling on the motion to dismiss and to permit jurisdictional discovery. See Docket. Meyersiek was directed to file his response to the motion to dismiss by February 2, 2007. See Order (Doc. #16).

On January 19, 2007, Meyersiek filed a motion for leave to amend his Complaint. See Docket. This motion was granted at a hearing held on March 20, 2007, before Senior Judge Ernest C. Torres. See id. Meyersiek filed his Amended Complaint on March 22, 2007, adding the Frontenac Entities as additional defendants in the action. See id.; see also Amended Complaint (Doc. #34).

In the meantime, Meyersiek had timely filed his response to the motion to dismiss on February 2, 2007. See Docket; Plaintiff Gero Meyersiek's Memorandum of Law in Opposition to Defendant Frontenac Company's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #26). Frontenac Company filed a reply memorandum to Meyersiek's response on February 16, 2007. See Defendant Frontenac Company's Reply Memorandum in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #31) ("Frontenac Second Mem.").

On April 3, 2007, Frontenac filed the instant Amended Motion to Dismiss. See Docket. Meyersiek's objection to the Motion was received by the Court on May 9, 2007. See Objection (Doc. #41). The Court conducted a hearing on the Amended Motion on August 16, 2007. Thereafter the matter was taken under advisement.

**Discussion**

**I. Frontenac Company**

As an initial matter, the Court addresses Frontenac's

contention that Meyersiek cannot establish personal jurisdiction over Frontenac Company because "Frontenac Company was not involved with the H-E Parts venture." Memorandum of Law in Support of Defendants Frontenac Company, Frontenac Company VIII, LLC, Frontenac VIII Partners, L.P., and Frontenac VIII Limited Partnership's Amended[] Motion to Dismiss for Lack of Personal Jurisdiction ("Frontenac Third Mem.") at 5. In support of this contention, Frontenac argues that Katz and Pearl testified that any contact they had with Richard relating to the H-E Parts venture occurred while they were acting for Frontenac Company VIII, LLC, and not Frontenac Company. See id. at 4-5 (citing Katz Dep. at 67-68; Deposition of Laura Pearl ("Pearl Dep.") at 15, 31). In addition, Frontenac notes that Pearl testified that Frontenac Company is an entity that exists solely for administrative purposes, and is not an entity that engages in investing activities. See id. at 5; see also Pearl Dep. at 14. Relatedly, Frontenac asserts that there is no evidence in the factual record that Richard ever interacted with anyone acting on behalf of Frontenac VIII Limited Partnership. See Frontenac Third Mem. at 11.

The Court is unpersuaded by these arguments. As Meyersiek validly points out, see Plaintiff's Mem. at 3, the manner in which the Frontenac Company and Frontenac entities conducted themselves during the period of their interaction with Meyersiek and the manner in which the Frontenac officer deponents described their roles and the Frontenac activities in relation to Meyersiek and the H-E Parts business venture render the distinction which Frontenac now attempts to draw meaningless. The Frontenac entities, their officers, and Richard all characteristically used the appellations "Frontenac" and "Frontenac Company" to describe the entity for which they were acting, without specification as to any individual Frontenac entity.

For example, Katz testified that he spent "12 years at Frontenac Company ...," Katz Dep. at 6, and that Frontenac Company was "a private equity investment firm," id. at 6, and that "a private equity investment firm[] typically raises institutional capital ... from large institutions and uses that money to invest in or acquire companies with the hopes that those companies can be sold or taken public down the road ...," id. at 7. Although Katz testified that when he signed the July 11, 2005, letter of intent directed to Dom-Ex he "believe[d] [he] was signing as a managing director of Frontenac Company VIII, LCC, which is the general partner of Frontenac VIII Partners, Limited Partnership, which is the general partner of Frontenac VIII Limited Partnership," id. at 67; see also Plaintiff's Mem., Ex. 6 at 2, such technical distinctions are absent from almost all of the rest of his testimony.

Moreover, there is strong evidence that Frontenac has not always recognized the distinction among its various entities which it now seeks to draw. In an affidavit which Frontenac Company filed in support of its original motion to dismiss, Paul Carbery, who identifies himself as a managing director of Frontenac Company, affirms that "Frontenac [Company] is a private equity investment company ...," Defendant Frontenac Company's Memorandum of Law in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction ("Frontenac First Mem."), Ex. A (Affidavit of Paul Carbery ("Carbery Aff."), ¶ 2, and that Frontenac Company "often invests in companies ...," id. ¶ 3. These statements are directly at odds with Frontenac's present contention that "Frontenac Company is an entity that exists solely for administrative purposes, and is not an entity that engages in investing activities." Frontenac Third Mem. at 5 (citing Pearl Dep. at 14).

As for Frontenac's assertion that Richard did not interact

with anyone acting on behalf of Frontenac VIII Limited Partnership, see Frontenac Third Mem. at 11, Frontenac is incorrect. Such interaction is reflected in the letter of intent which was sent to Dom-Ex. See Plaintiff's Mem., Ex. 6. The letter identifies H-E Parts as a newly formed company owned by "Richard and **Frontenac VIII Limited Partnership** and/or its affiliates ("Frontenac") ...."[9] Id., Ex. 6 at 1 (bold added). The letter further identifies the senders of the letter as H-E Parts and "FRONTENAC VIII LIMITED PARTNERSHIP." Id. at 2. To the extent Frontenac may contend that Richard and Frontenac VIII Limited Partnership could be joint owners of H-E Parts and could jointly send the letter of intent without interacting, the Court rejects such proposition.

Accordingly, to the extent that the Amended Motion seeks dismissal of Frontenac Company and Frontenac VIII Limited Partnership as defendants, Frontenac's request should be denied. I so recommend.

## II. Personal Jurisdiction Law

### A. Burden of Proof and Standard

The plaintiff bears the burden of proving the court's personal jurisdiction over the defendants. Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 7 (1st Cir. 2002); Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002); Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st Cir. 1997); see also Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995). This burden of proof is light, although

---

[9] The Court notes that this statement is at odds with Frontenac's present position that "[u]ntil the H-E Parts venture was funded, both Richard and the Frontenac Entities were operating independently." Memorandum of Law in Support of Defendants Frontenac Company, Frontenac Company VIII, LLC, Frontenac VIII Partners, L.P., and Frontenac VIII Limited Partnership's Amended[] Motion to Dismiss for Lack of Personal Jurisdiction ("Frontenac Third Mem.") at 8.

the plaintiff may not rely upon the mere allegations of his complaint but must point to specific facts in the record that support the exercise of jurisdiction. See Jet Wine & Spirits, Inc., 298 F.3d at 8.

"There are several standards that a court can use in determining whether the exercise of personal jurisdiction is lawful. These include the prima facie standard, the preponderance standard, and the likelihood standard." Rodriguez, 115 F.3d at 83 (citing Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675-78 (1st Cir. 1992)); see also Daynard, 290 F.3d at 50-51 ("The district court, faced with a motion to dismiss for lack of personal jurisdiction ... may choose from among several methods for determining whether the plaintiff has met this burden."). Both Meyersiek and Frontenac invoke application of the *prima facie* standard. See Frontenac Third Mem. at 3; Plaintiff's Mem. at 12. Accordingly, the Court utilizes the *prima facie* standard.

The prima facie standard "permits the district court 'to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction.'" Daynard, 290 F.3d at 51 (quoting Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995)(quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d at 675)). Under this standard, the Court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Daynard, 290 F.3d at 51 (quoting Foster-Miller, Inc., 46 F.3d at 145). The Court takes these facts "as true (whether or not disputed) and construe[s] them in the light most congenial to the plaintiff's jurisdictional claim." Id. (quoting Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)); see also Northeastern Land Servs., Ltd. v. Schulke, 988 F.Supp. 54, 56

(D.R.I. 1997)("[T]he court does not assume the role of fact finder, but instead accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law.")(internal quotation marks omitted). It then "add[s] to the mix facts put forward by the defendants, to the extent that they are uncontradicted." Daynard, 290 F.2d at 51 (quoting Mass. Sch. of Law at Andover, Inc., 142 F.3d at 34).

"To make this prima facie showing, the plaintiff cannot rest upon mere averments, but must adduce competent evidence of specific facts." Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001); accord Microfibres, Inc. v. McDevitt-Askew, 20 F.Supp.2d 316, 319-20 (D.R.I. 1998).

**B. Types of Personal Jurisdiction**

There are two types of personal jurisdiction: general and specific. See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992).

**1. General Jurisdiction**

"General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." Id. This jurisdiction exists only where the defendant's in-state activities "are so substantial and of such a nature that they will justify a lawsuit against [the defendant] on causes of action distinct from those activities." Microfibres, Inc., 20 F.Supp.2d at 320 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154 (1945)). The general jurisdiction standard is considerably more stringent than the standard for specific jurisdiction. See Barry v. Mortgage Servicing Acquisition Corp., 909 F.Supp. 65, 74 (D.R.I. 1995); see also Daynard, 290 F.3d at 54. "The continuous and systematic requirement has been characterized as being satisfied when the defendant's forum

contacts are extensive and pervasive." Barry, 909 F.Supp. at 75 (citations and internal quotation marks omitted). Here it is obvious that Frontenac's in-state activities are not "continuous and systematic," United Elec. Workers, 960 F.2d at 1088, and that general jurisdiction is not present. Meyersiek does not appear to contend otherwise. See Plaintiff's Mem. at 21-24 (arguing exclusively that requirements for specific jurisdiction are satisfied).

**2. Specific Jurisdiction**

In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction. Daynard, 290 F.3d at 51. Specific jurisdiction applies where "the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." United Elec. Workers, 960 F.2d at 1088-89. For a court properly to exercise specific personal jurisdiction over the defendant, the requirements of both the state's long-arm statute and the United States Constitution must be satisfied. See Barrett, 239 F.3d at 26; Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994). The Rhode Island long-arm statute, as interpreted by the Supreme Court of Rhode Island, is coextensive with federal due process mandates. See Levinger v. Matthew Stuart & Co., Inc., 676 F.Supp. 437, 439 (D.R.I. 1988) (citing Conn v. ITT Aetna Fin. Co., 252 A.2d 184, 186 (R.I. 1969)); see also Microfibres, Inc., 20 F.Supp.2d at 320. Therefore, Fourteenth Amendment due process requirements determine the exercise of personal jurisdiction in the District of Rhode Island. See Levinger, 676 F.Supp. at 439; Northeastern Land Servs., Ltd., 988 F.Supp. at 57.

"Due process demands minimum contacts between a nonresident defendant and the forum such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Northeastern Land Servs., Ltd., 988 F.Supp. at 57

(citing Int'l Shoe Co., 326 U.S. at 316, 66 S.Ct. at 158). The First Circuit applies a three-part analysis in evaluating minimum contacts. See Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999); Sawtelle v. Farrell, 70 F.3d at 1388-89.

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Sawtelle, 70 F.3d at 1389 (quoting United Elec. Workers, 960 F.2d at 1089). The "Gestalt factors," id. at 1394, are: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies," id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 105 S.Ct. 2174, 2184-85 (1985)).

**III. Imputed Contacts**

Meyersiek contends that Richard was at all times acting as an agent of Frontenac, see Plaintiff's Mem. at 2, and that Frontenac is subject to personal jurisdiction of this Court as a result of its own acts directed towards Rhode Island and from the imputed contacts of Richard, see id. at 3.[10] Meyersiek further

---

[10] Meyersiek does not identify any acts of Frontenac independent of Richard which were directed towards Rhode Island, and the Court finds none in the record (beyond having a website which is accessible in Rhode Island). Accordingly, if this Court may exercise personal

represents that "it is uncontested that Richard is subject to the personal jurisdiction of the Court,[11] and so the only issue remaining is whether Frontenac's own acts and its relationship with Richard supports the imputation of Richard's contacts to Frontenac." Id. at 14. In determining whether contacts may be imputed to Frontenac, this Court is guided primarily by the law as explained in Daynard, 290 F.3d 42 (1st Cir. 2002), and Jet Wine & Spirits, Inc., 298 F.3d 1 (1st Cir. 2002).

**A. Law Re Imputed Contacts**

The leading First Circuit case on imputed contacts for purposes of determining personal jurisdiction is Daynard.[12] Applying the teachings of Daynard, the "basic question" here is whether the relationship between Frontenac and Richard, however one labels it, is sufficient to attribute any of Richard's contacts to Frontenac for the purpose of reaching Frontenac under

---

jurisdiction over Frontenac, it must be on the basis of contacts imputed from Richard.

[11] Counsel for Frontenac agreed that there was no dispute that Richard was subject to jurisdiction in Rhode Island. See Tape of 8/16/07 Hearing.

[12] In Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42 (1st Cir. 2002), the First Circuit held that a Mississippi law firm ("Scruggs defendants") and a senior partner of that law firm ("Scruggs") were subject to specific personal jurisdiction based on their contacts with Massachusetts, particularly contacts attributed to them from a South Carolina law firm ("Motley defendants"). See id. at 44. The plaintiff in Daynard alleged that the defendants were engaged in a tobacco litigation joint venture or at least held themselves out to be in a type of agency relationship. See id. at 44-45. Based on the facts alleged, the Court of Appeals found that the plaintiff, Daynard, reasonably understood that a partner of the Motley defendants was acting on behalf of a joint venture or other agency relationship between the Motley defendants and Scruggs defendants when a Motley partner engaged Daynard's services in Massachusetts and that Daynard had relied on this understanding by providing his services to both defendants. See id. at 59. The Court of Appeals further found that the Scruggs defendants subsequently ratified the Motley defendants' conduct by, among other things, knowingly accepting the benefits of the Motley defendants' retention of Daynard. See id. at 59-60.

the Rhode Island long arm statute as cabined by the Due Process Clause of the Fourteenth Amendment. Daynard, 290 F.3d at 53. In answering this question, the Court must determine: 1) whether Frontenac was in an actual or apparent agency relationship, or at least held itself out to be in a joint venture or other agency relationship, with Richard; and 2) whether Frontenac ratified Richard's conduct. See id. at 53-54. The Court bears in mind that even if the relationship of Frontenac and Richard falls slightly outside of a partnership, joint venture, or other particular agency, this does not prevent a finding that a sufficient relationship exists under the Due Process Clause between them to permit exercise of jurisdiction. See id. at 56-57; see also id. at 57 (explaining that the issue is not "whether, in a dispute between the two [defendants], a joint venture agreement could be enforced").

**1. Joint Venture or Other Agency Relationship**

Meyersiek argues that the relationship between Richard and Frontenac satisfies the requirements of either agency or agency by apparent authority. See Plaintiff's Mem. at 14-17. The Court, however, will follow the analytical approach used by the First Circuit in Daynard rather than focusing on whether the precise requirements of either doctrine have been met. See Daynard, 290 F.3d at 56-60; see also Jet Wine & Spirits, Inc., 298 F.3d at 7-8 ("The exact type of agency relationship used to impute contacts is not crucial to our inquiry regarding traditional notions of fair play and substantial justice, nor are the technical differences between the states' different rules of agency vital."); Daynard, 290 F.3d at 56-57 ("[T]he question before us is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists.").

The Court begins by taking the facts alleged and produced by Meyersiek in the light most favorable to his jurisdictional assertions. See Daynard, 290 F.3d at 57. Meyersiek swears that he believed that Richard was representing Frontenac and that this is why he agreed to become involved with him. See Meyersiek Aff. ¶ 10. The question is whether Meyersiek had a basis for this belief grounded in Frontenac's own conduct or conduct undertaken with their consent. See Daynard, 290 F.3d at 57.

In support of his understanding, Meyersiek states that when he was searching for equity funding on behalf of Parts-Zone in 2003, he contacted Frontenac and was referred to Katz. See Meyersiek Aff. ¶¶ 2-3. Katz told Meyersiek the plan would have to pass muster with Richard, whom Katz identified as Frontenac's person in the heavy equipment replacement parts industry. See id. ¶¶ 3, 5. Meyersiek supports his claim with the following evidence indicating the existence of a partnership, agency, or joint venture relationship between Frontenac and Richard.

***a. Frontenac's Website***

Frontenac's website identifies Richard as one of its "CEO1ST partners ...." Plaintiff's Mem., Ex. 1 (Frontenac Website page). Although Richard testified that when Frontenac sold ProMach in December of 2004, he "was dropped from the [Frontenac] CEO team ...," Richard Dep. at 36, there is no evidence that his photograph was removed from Frontenac's website or that this alleged change in status was in any way communicated to the public or to Meyersiek. Indeed, Meyersiek's counsel represented at the August 16, 2007, hearing that Richard's photograph still appeared on the Frontenac website in November of 2005. See Tape of 8/16/07 Hearing.

On the website, a page introduced by the link, "How We Partner with Executives," Frontenac describes the relationship which it has with its CEO1ST Executives:

> Some private equity firms compete to "land the deal," and afterwards try to find the right management team. Frontenac identifies an executive or team with outstanding industry knowledge and past performance, and then we find the right company together.
>
> Together, we analyze a market and the companies capable of succeeding within it. **We work side by side with our CEO1ST partners throughout the process from initial identification of investment targets, through company courtship and evaluation,**[13] the structuring of a transaction tailored to meet sellers' needs, implementation of a growth plan, and eventual liquidity.

Plaintiff's Mem., Ex. 1 (bold added).

***b. August 18, 2003, Email***

The second piece of documentary evidence is the August 18, 2003, email from Katz to Richard. See Plaintiff's Mem., Ex. 2. The email supports Meyersiek's claim that Frontenac referred him to Richard. It also partially supports Meyersiek's claim that Katz told him that Richard was "Frontenac's person in [Meyersiek's] industry," Meyersiek Aff. ¶ 3, that Meyersiek's "plan would have to pass muster with [Richard]," see id., and that a close relationship existed between Frontenac and Richard. The email reflects that Frontenac[14] is enthusiastic about

---

[13] This description of a close working relationship between Frontenac and its chosen CEO1ST partner is in marked contrast to the arms-length relationship which Frontenac claims existed with reference to the H-E Parts venture. Richard testified that he had "absolutely no contract or relationship or no partnership or ... [a]gency [relationship]," Richard Dep. at 148, with Frontenac until February 15, 2006, see id. at 140, when the Dom-Ex acquisition closed and he closed his financing agreement with Frontenac, see id. at 149. Katz similarly testified that up until that point "Frontenac[] had no formal relationship with J.P. [Richard]," Katz Dep. at 57, and that no decisions had been made which "were binding in any way, shape or form ...," Katz Dep. at 54.

[14] The Court's use of the term "Frontenac" rather than Katz is deliberate. Katz states in the email "I shared with Gero the fact that you and **we** have been discussing how we might get into the replacement parts and service industry ...." Plaintiff's Mem., Ex. 2

Meyersiek's business idea and that Katz wants Richard's opinion regarding it. See id. The email additionally indicates that Frontenac and Richard have been discussing how they "might get into the replacement parts and service industry ...," Plaintiff's Mem., Ex. 2.

#### *c. February 17, 2005, Email*

Plaintiff next points to the February 17, 2005, email from Richard to Katz. See Plaintiff's Mem., Ex. 3. It supports most strongly Meyersiek's claim that, after he accepted Richard's compensation offer, "Richard ... stated that he would have to 'run this by David Katz,' at Frontenac, and get his approval of [Meyersiek's] compensation package," Meyersiek Aff. ¶ 8. While the email does not mention compensation, it is plainly seeking approval or, at least, agreement that Meyersiek will be a part of the new venture. The email is highly complimentary of Meyersiek, and Richard clearly wants him to be part of Richard's "new team ....," Plaintiff's Mem., Ex. 3. Richard twice asks Katz to please tell him what to do with "Gero," id. Given the content and tone of the email, it appears that Katz and Richard have had previous communications regarding the new venture (and probably Meyersiek).[15] It also appears that Frontenac had already provided some assistance to Richard regarding the project.[16] See

---

(bold added). The Court interprets the first "we" to mean Frontenac.

[15] The Court infers this from the fact that the email begins with Richard stating "I have had an excellent meeting with Gero yesterday ...," Plaintiff's Mem., Ex. 3, omitting Meyersiek's last name. Given that eighteen months had elapsed since Katz had referred Meyersiek to Richard in August of 2003, it seems unlikely that Richard would have omitted Gero's last name unless Richard was confident that Katz would know to whom he was referring. The Court, therefore, infers that there must have been at least some more recent communications between them regarding Meyersiek and the contemplated new venture.

[16] In the email, Richard thanks Katz "for your help with Chad Bern," Plaintiff's Mem., Ex. 3, and states "Once I have my first list of candidates (at least 50 to 100) I will send it to him for D&B

id.

The email also provides some support for Meyersiek's claim that Richard told him "the new venture would be another Frontenac investment," Meyersiek Aff. ¶ 7, in that it reflects that Richard is seeking Frontenac's approval of action which he wishes to take relative to the venture (i.e., to make Meyersiek part of his "new team,"), Plaintiff's Mem., Ex. 3. The fact that this email was sent the day after Richard had his lengthy meeting with Meyersiek is consistent with Meyersiek's claim that Richard told him at the meeting that Frontenac had to approve his involvement in the project.

#### *d. The Target Letters*

In the opening sentence of the target letters, Richard states that he has "partnered with the Frontenac Company ...." Plaintiff's Mem., Ex. 4; see also id., Ex. 5. The letters tout his relationship with Frontenac. See, e.g., Ex. 5 (referring to Frontenac Company "as my financial partner"); id. ("we will initially have access to as much as $150-200 million in Frontenac equity plus senior debt, to finance acquisitions ..."). Frontenac (in the person of Katz) authorized Richard to make these statements, see Katz Dep. at 36, 45-47, and it did so specifically to "enhance his credibility," id. at 47. Thus, the letters provide support for Meyersiek's claim that Richard told him that the venture was "another Frontenac investment" and that Richard was an agent, partner,[17] or otherwise engaged in a joint

---

evaluation (ownership/CEO, sales and number of employees)," id. Chad Bern was an associate at Frontenac. See Katz Dep. at 39.

[17] In Daynard, the First Circuit referred to the doctrine of "partnership by estoppel" or "joint venture by estoppel," 290 F.3d at 56, and quoted the Uniform Partnership Act:

> **When a person** ... represents himself, or **consents to another representing him to any one, as a partner** ... he is liable to any such person to whom such representation has been made, who

venture with Frontenac.

***e. The Letter of Intent***

Meyersiek's strongest evidence is the July 11, 2005, letter of intent which Richard and Frontenac sent to the president of Dom-Ex. See Plaintiff's Mem., Ex. 6. The letter is on Frontenac letterhead. See id. It states that H-E Parts is "a newly formed ... company owned by Jean-Paul Richard and Frontenac VIII Limited Partnership and/or its affiliates ("Frontenac") ...," id. at 1, and the letter is signed by Richard and Katz,[18] see id. at 2.

---

> has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

Daynard, 290 F.3d at 56 (quoting Unif. P'ship Act § 16(1))(alterations in original). The Daynard court also quoted the following passage from the Restatement (Second) of Agency:

> [a] person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if
>
> (a) he **intentionally or carelessly caused such belief**, or
> (b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts.

Id. (quoting Restatement (Second) of Agency § 8B (1958))(alteration in original)(bold added). "[C]onduct which leads a third party to believe that the agent has authority and thus creates apparent authority to those persons who act upon it, frequently causes the principal to be liable to those who have changed their position in reliance to their detriment." Id. (quoting H.G. Reuschlein & W.A. Gregory, The Law of Agency and Partnership § 25, at 65-66 (2d ed. 1990).

[18] Although the copy of the letter which appears as Ex. 6 only bears Katz's signature, there is no suggestion that Richard did not sign the original letter which was sent to the president of Dom-Ex.

Certainly, a reader of this letter would conclude that Richard and Frontenac were partners or otherwise engaged in a joint venture, namely H-E Parts. Cf. Daynard, 290 F.3d at 58 (noting that defendants "at least held themselves out to be ... engaged [in a joint venture]").

This letter, printed on Frontenac letterhead and signed by a Frontenac managing director, undermines Frontenac's assertion that until the H-E Parts venture was funded both Richard and the Frontenac entities were operating independently, see Frontenac Third Mem. at 8, and that the investigation and development phase of H-E Parts was entirely Richard's undertaking and responsibility, see id. at 9.[19]

#### ***f. Contradictory Evidence Offered by Frontenac***

Although Richard testified that he had no relationship with Frontenac between December of 2004, see Richard Dep. at 36, and February 15, 2006, when he "finally got a contract [with Frontenac for the Dom-Ex venture]," id. at 123, this testimony is contradicted by the documentary evidence described above. Richard's photograph continued to appear on Frontenac's website, he sent dozens of target letters which stated that he had "partnered with Frontenac Company," and he signed the July 11, 2005, letter of intent which identifies H-E Parts as "a newly formed ... company owned by [himself] and Frontenac."

---

[19] At the hearing Frontenac's counsel, in arguing that there was no enforceable relationship of any type between Richard and Frontenac during the investigatory phase of the venture (i.e., from February 2004 to February 2006), appeared to indicate that H-E Parts had not been formed at the time the Dom-Ex letter of intent was sent. The Court received this impression from his use of the phrase "when and if [H-E Parts] was formed," Tape of 8/16/07 Hearing, suggesting that the entity would not be created until Frontenac had contractually committed to the project which did not occur until February 15, 2006. However, even if H-E Parts had not been formally created as of July 2005, Frontenac represented in the letter of intent that it had, and this supports Meyersiek's claim that Richard was an agent, partner, or otherwise engaged in a joint venture with Frontenac as of that date.

**2. Finding Re Joint Venture or Other Agency Relationship**

The Court finds that the facts as alleged by Meyersiek are sufficient to make the jurisdictional showing that Richard engaged him to assist Richard in a new business venture, that Meyersiek reasonably understood Richard to be acting as a partner, agent, or joint venturer with Frontenac in that venture, and that Meyersiek relied upon this understanding in providing his services to both Richard and Frontenac.[20] It is true that in Daynard, Scruggs admitted that there was a general cooperative effort between his law firm and Ness Motley to advance the litigation against the tobacco industry, see Daynard, 290 F.3d at 58, while here Frontenac portrays itself and Richard as operating independently and proceeding on their own "paths" relative to the H-E Parts venture, see Frontenac Third Mem. at 7. However, this degree of independence and separateness is not what was communicated through Frontenac's website, the target letters, and the letter of intent. Cf. Daynard, 290 F.3d at 58 (citing evidence of "public perception" as relevant to determination of whether defendant was acting on behalf of a joint venture or other agency relationship). Moreover, unlike Daynard where Ness Motley did not sign the joint venture agreement, see Daynard, 290 F.3d at 57, here both Frontenac and Richard signed the letter of intent which states that they are joint owners of H-E Parts and that they are making a joint proposal to Dom-Ex, see Plaintiff's Mem., Ex. 6 at 1.

**3. Finding Re Ratification**

As was the case in Daynard, 290 F.3d at 59, many of the same

[20] Frontenac may dispute that Meyersiek provided it with any services. However, Meyersiek affirms that he identified and analyzed Dom-Ex, see Meyersiek Aff. ¶ 9, the company which Richard and Frontenac acquired in February 2006 through the H-E Parts venture.

facts which support the finding of a partner, agency, or other joint venture relationship also support the conclusion that Frontenac subsequently ratified Richard's conduct in engaging Meyersiek. First, in his February 17, 2005, email Richard clearly sought approval, or at least agreement, from Frontenac to include Meyersiek as part of his "new team." Plaintiff's Mem., Ex. at 3. Although Katz testified that his response to Richard's request was "[n]eutral to negative," Katz Dep. at 32, and that he communicated to Richard "that it was hard to envision how Gero could play a meaningful role post-closing of an acquisition should we and J.P. [Richard] ever get to that point," id. at 33, there is no documentary evidence supporting this testimony, and it is somewhat at odds with Richard telling Meyersiek a few days after the email was sent that Katz "'was OK with' [Meyersiek's] involvement and compensation," Meyersiek Aff. ¶ 9. Thus, viewing the evidence in the light most favorable to Meyersiek's jurisdictional assertions, Frontenac was aware as of the end of February 2005 that Richard had started to work with Meyersiek on the new venture, that Richard wanted Meyersiek as part of the management team for the new venture, that Richard sought Frontenac's approval or agreement of Meyersiek's involvement in the venture, and that Frontenac was agreeable (or voiced no strong objection) to Meyersiek's being involved at least in the investigatory phase of the new project which included the evaluation and identification of target companies.

Second, Frontenac was aware that Meyersiek was helping Richard during this investigatory phase of the project, see Katz Dep. at 34-36, and that this help included the discussion and evaluation of potential targets, see id. at 36 ("I know that J.P. [Richard] and Gero discussed targets, pros and cons, positives and negatives ...."), and the preparation of letters to target

companies,[21] id. at 35. Frontenac was, thus, willing to accept the benefits of Meyersiek's work, which included the identification and evaluation of potential targets, including Dom-Ex, the company which Richard and Frontenac later acquired in their H-E Parts venture. Cf. Daynard, 290 F.3d 60 ("By knowingly accepting the benefits of the transaction initiated in Massachusetts,[22] the Scruggs defendants ratified Patrick's act of hiring and retaining Daynard on behalf of both law firms, which ultimately gave rise to this law suit."); id. at 58 (noting that "Scruggs concedes ... that the profits from the Mississippi litigation were eventually divided with Ness Motley"); Myers v. Bennett Law Offices, 238 F.3d 1068, 1073 (9th Cir. 2001)(finding that principal ratified acts of agent where plaintiff provided evidence that agent requested credit reports with principal's knowledge and principal failed to do anything about it and paid resulting invoices).

Third, Frontenac continued to identify Richard on its website as one of its "CEO1ST partners" and executives even though Richard claims that he ceased to hold this status after

---

[21] Thus, it can be reasonably inferred that Meyersiek was aware of the statements in the target letters that Richard had "partnered with the Frontenac Company ...," Plaintiff's Mem., Ex. 4; see also id., Ex. 5, and that Frontenac was Richard's "financial partner," id., Ex. 5.

[22] It is true that here the contract between Meyersiek and Richard appears to have been made in Atlanta. See Meyersiek Aff. ¶¶ 8-9. However, Richard first reached into Rhode Island and sought out Meyersiek's assistance in the new venture. See id. ¶¶ 6-7. It was also agreed that Meyersiek would perform the contract in Rhode Island. See id. ¶ 8. Thus, the fact that the contract may have been made outside of Rhode Island does not significantly diminish the ratifying effect of Frontenac's knowing acceptance of the benefits of Meyersiek's work. Cf. Daynard, 290 F.3d at 59 ("Even if the Scruggs defendants did not come to Boston, we think there is adequate other evidence of ratification, accepting Daynard's allegations."); Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc., 65 F.3d 1427, 1433 (8th Cir. 1995)(finding that principal ratified agent's actions where principal "supported, accepted, and followed through on the efforts initiated" by agent).

December of 2004 when Frontenac sold ProMach.[23] In doing so, Frontenac continued to ratify that it was in a partnership relationship with Richard through the period from February to August 2005 when Richard retained and utilized Meyersiek in the new venture.

Fourth, the strongest evidence of ratification is found in the target letters and especially in the letter of intent. Almost all of these letters were sent after Richard had made the contract with Meyersiek, and it is a reasonable inference that a good number were sent after Frontenac was on notice that Richard was utilizing Meyersiek to identify and evaluate potential acquisition targets and to assist in the preparation of the target letters. The statements in the letters about Richard's relationship with Frontenac were authorized by Katz for the specific purpose of enhancing Richard's credibility. See Katz Dep. at 46-47. The letter of intent, written on Frontenac letterhead, states without qualification that Frontenac and Richard are the owners of a newly formed company, H-E Parts, and repeatedly uses the pronoun "we" in describing the equity investment which Frontenac and Richard are proposing to make.

It is true that, unlike Daynard, 290 F.3d at 58-59, there is no evidence that Frontenac ever told Meyersiek that he would be compensated for his efforts. This distinction has given the Court considerable pause. Ultimately, however, the Court concludes that the totality of evidence produced by Meyersiek is sufficient to support a finding of ratification. Frontenac deliberately sought to enhance Richard's credibility by allowing him to represent that he had partnered (or was engaged in a joint venture) with Frontenac. Richard made essentially the same representation to Meyersiek, and based on it Meyersiek agreed to

---

[23] The Court infers this from the fact that the website still contained Richard's photograph as of November 2005.

accept Richard's offer. Meyersiek's work included identifying and evaluating Dom-Ex, the company which Frontenac and Richard subsequently acquired through their H-E Parts venture, thus reaping the rewards of Meyersiek's labors. Having cloaked Richard with at least apparent authority (through Katz's statements to Meyersiek in 2003, its website, and Katz's authorization of the representations contained in the target letters and the letter of intent), Frontenac's implicit contention that the signature of Katz on the letter of intent should not be considered ratification of acts taken by Richard in connection with the H-E Parts venture is unpersuasive.

#### 4. Finding Re Imputed Contacts

Thus, for the reasons stated above, I find that Richard's contacts with Rhode Island may be imputed to Frontenac.

## IV. Remaining Constitutional Analysis

### A. Contract Cases

In contract cases, parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities. Daynard, 290 F.3d at 61. Here Richard reached out from Atlanta and contacted Meyersiek in Rhode Island regarding Richard's next Frontenac project. See Wessels, 65 F.3d at 1432 (noting that agent was aggressor in relationship and initially solicited services).

> [A] contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors—**prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated** in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King Corp., 471 U.S. at 479, 105 S.Ct. at 2185 (internal citations and quotation marks omitted)(bold added); see also Phillips Exeter Acad., 196 F.3d at 289 ("In contract cases, a court charged with determining the existence *vel non* of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach.").

Frontenac's imputed contacts were clearly instrumental in the formation of the contract as Richard reached into Rhode Island and sought out Meyersiek. The contract contemplated that it would be performed, at least during the initial investigatory stage during which Meyersiek searched for and identified potential target companies, in Rhode Island. The contract further contemplated a continuing relationship among Frontenac, Richard, and Meyersiek in that they would all be shareholders when their new company was established and that Meyersiek would be part of the executive team running that company. Richard engaged in extensive communication with Meyersiek in Rhode Island during this period, and Richard's actions are imputed to Frontenac.

**B. Specific Personal Jurisdiction**

Frontenac has no direct contacts with Rhode Island. Therefore, the Court must determine whether Frontenac's imputed contacts from Richard are sufficient to constitute "minimum contacts" with Rhode Island "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Daynard, 290 F.3d at 60 (quoting Int'l Shoe Co., 326 U.S. at 316, 66 S.Ct. 154 (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339 (1940))). Bearing those imputed contacts in mind, the Court proceeds with the constitutional

analysis required for specific jurisdiction. See id.

**1. Relatedness**

Relatedness requires that the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Daynard, 290 F.3d at 61. Meyersiek's breach of contract claim arises out of, or relates to, Richard's activities in reaching out to Meyersiek in Rhode Island, and these actions are imputed to Frontenac. Meyersiek's suit is based on his claim that Defendants owe him money for his work pursuant to an agreement which was initiated by Richard who reached into Rhode Island and engaged Meyersiek to perform work which would be done in Rhode Island. The relationship contemplated ongoing interaction and a continuing relationship among Frontenac, Richard, and Meyersiek in the new company.

**2. Purposeful Availment**

The defendant's in-state contacts must represent a purposeful availment of the privilege of conducting business in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state courts foreseeable. Id. (citing Foster-Miller, 46 F.3d at 144). The cornerstones upon which the concept of purposeful availment rests are voluntariness and foreseeability. Id. (citing Sawtelle, 70 F.3d at 1391 (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 207 (1st Cir. 1994))).

Although the evidence relating to this factor is not strong, the Court concludes that it sufficient, although just barely, to satisfy a finding of purposeful availment. Unlike the situation in Daynard, where the First Circuit noted that the Scruggs defendants had at least some "minimal" direct contacts with the forum state, Daynard, 290 F.3d at 61, and the plaintiff alleged that the Scruggs defendants had agreed to pay him a share of the fees as compensation for work performed in Massachusetts, here

Frontenac has no direct contacts with Rhode Island and Meyersiek does not claim that Frontenac ever agreed to compensate him for his services. The only basis for finding that Frontenac "engaged in ... purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable," id. at 62 (quoting Rush v. Savchuk, 444 U.S. 320, 329, 100 S.Ct. 571 (1980))(alteration in original), is Richard's conduct, properly attributed to Frontenac, in reaching into Rhode Island and contacting Meyersiek and the ongoing relationship between Richard and Meyersiek. However, that relationship encompassed Meyersiek's work in Rhode Island of identifying and analyzing target companies, including Dom-Ex, the company which Richard and Frontenac ultimately acquired, reaping the rewards of Myersiek's labors. The Court concludes that this evidence is sufficient to satisfy the purposeful availment requirement.

In reaching this conclusion, the Court attaches significant weight to the fact that Frontenac authorized Richard to represent that he was in a partnership relationship with it.[24] Cf. Daynard, 290 F.3d at 54 ("In the partnership context, 'the activities of the partner are generally attributed to the partnership and jurisdiction over the partnership follows from the partner's contacts, if sufficient, regardless of the absence of independent contacts between the partnership *qua* entity and the forum.'")(quoting Donatelli v. Nat'l Hockey League, 893 F.2d 459, 466 (1st Cir. 1990)). The Court's determination is also supported by the fact that the First Circuit in Daynard apparently found that the purposeful available requirement was satisfied as to defendant Scruggs (not just his law firm) notwithstanding the following facts. Attorney Scruggs claimed:

---

[24] In this respect, the evidence of partnership or joint venture relationship between Frontenac and Richard is stronger than the evidence of such a relationship in Daynard.

1) that neither he nor his law firm ever had an office, any real estate, bank accounts, or other property in Massachusetts; 2) that they had never practiced law in Massachusetts;[25] 3) that he had never traveled to Massachusetts in connection with any fee sharing arrangement with the plaintiff or in any connection with any of the plaintiff's work under the alleged arrangement; 4) that he did not have any role in contacting or retaining the plaintiff in Massachusetts; 5) that he did not request or even have knowledge of the Motley defendants' meetings with the plaintiff (including the meeting in Boston when a Motley partner retained plaintiff's services); 6) that he and his law firm did not give the Motley defendants any directions with respect to the plaintiff; and 7) that he and his law firm were not engaged in a joint venture with the Motley defendants which provided for a sharing of attorney's fees in the nationwide tobacco litigation. See Daynard, 290 F.3d at 49. Frontenac cites similar facts in arguing that it did not avail itself of the privilege of conducting activities in Rhode Island. See Frontenac First Mem. at 11-13; Carbery Aff. ¶¶ 4-10. Given the determination in Daynard of purposeful availment by Scruggs, this Court concludes that Frontenac's citation of similar facts here does not prevent a finding of purposeful availment.

It is true that in Daynard, the plaintiff alleged that he had conversations with Attorney Scruggs in which Scruggs agreed that the Plaintiff would be compensated, see Daynard, 290 F.3d at 46, 47, and that Meyersiek makes no similar allegation here. However, it does not appear that in Daynard any of the alleged conversations between Scruggs and the plaintiff occurred in Massachusetts, see id., or that the work for which Scruggs allegedly agreed to compensate the plaintiff was to be performed

[25] The plaintiff in Daynard did not deny these first two claims by Scruggs. Daynard, 290 F.3d at 49.

in Massachusetts, see id. Thus, this allegation would not seem to add significantly to the determination of whether Attorney Scruggs purposely availed himself of the privilege of doing business in Massachusetts. Moreover, in Daynard, the First Circuit stated that "[the Motley partner's] action [in traveling to Boston and retaining the plaintiff] alone is probably sufficient to support jurisdiction over the Motley defendants and, when imputed, the Scruggs defendants as well." Id. at 62 (citing Burger King Corp., 471 U.S. at 475 n.18, 105 S.Ct. 2174 (noting that "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction") (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199 (1957)(alteration in original))). Thus, it does not appear that the plaintiff's allegations in Daynard that he had conversations with Attorney Scruggs in which Scruggs agreed that the plaintiff would be compensated were essential to the Court's finding of purposeful availment. While here Richard did not come to Rhode Island to retain Meyersiek, he did reach into Rhode Island for that purpose, and imputing that conduct to Frontenac causes this Court to find that purposeful availment is satisfied. See Daynard, 290 F.3d at 62 ("Even in cases where the defendant was not physically present in the forum, where the defendant initiated the transaction by mailing or calling the plaintiff in the forum and when the defendant contemplated that the plaintiff would render services in the forum, as alleged by [plaintiff] here, many courts have found jurisdiction.").

Furthermore, unlike Daynard where Scruggs denied that the Motley defendants were a party to the written joint venture agreement, see Daynard, 290 F.3d at 49, and asserted that "there was simply no arrangement [between Scruggs Millette and Ness Motley] with respect to the sharing of attorney's fees in the nationwide tobacco litigation," id. (alteration in original),

here Frontenac acknowledges that it authorized Richard to represent that he was in a partnership or other joint venture relationship with Richard. In addition, Frontenac actually signed the letter of intent to Dom-Ex which affirmatively states that Frontenac is in such a relationship with Richard as a result of the formation of H-E Parts. Based on Frontenac's imputed contacts, the Court finds that Frontenac purposefully availed itself of the privilege of conducting activities in Rhode Island.

**3. Reasonableness**

The third prong of the personal jurisdiction analysis, the Gestalt factors, arises after the establishment of minimum contacts and centers on whether the exercise of jurisdiction is reasonable. See Burger King Corp., 471 U.S. at 476-77, 105 S.Ct. 2174. Reasonableness equates with "fair play and substantial justice." Id. at 476, 105 S.Ct. 2174 (citing Int'l Shoe Co., 326 U.S. at 320, 66 S.Ct. 154).

This third portion of the jurisdictional test is not inflexible and varies in accordance with the strength of the first two parts. That is, "the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." Ticketmaster-New York, Inc., 26 F.3d at 210. On the other hand, "an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness." Id.

**a. Defendant's Appearance Burden**

In terms of the burden of defending this suit in Rhode Island, "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64. Frontenac is located in Chicago, and it appears that its partners have traveled to other states in connection with Frontenac's business interests. See Katz Dep. at 38; Pearl

Dep. at 17 (noting that Katz had been on Richard's board), 30 (stating that Pearl participated in presentations to potential lenders concerning H-E Parts). Given that regularly scheduled commercial airline service exists between Providence and Chicago, the Court is unpersuaded that an unusual burden will be imposed on Frontenac by requiring it to appear.

**b. Forum State's Interest**

In determining Rhode Island's interest in adjudication, this court should assess its legitimacy and "not ... *compare* [its] interest to that of some other jurisdiction ...." Foster-Miller, Inc., 46 F.3d at 151 (citing Burger King Corp., 471 U.S. at 483 n.26, 105 S.Ct. 2174), for the proposition that two forums may simultaneously have legitimate interests in the dispute's resolution). Rhode Island has a strong interest in providing a forum to one of its citizens who alleges that he has been wronged by out-of-state actors who reached into the state, engaged him to provide valuable services for them in Rhode Island, and then refused to honor their contractual commitments after he had performed a substantial portion of those services.

**c. Plaintiff's Interest in Relief**

The aim of this factor is to ensure that Plaintiff is able to obtain "convenient and effective relief." Pritzker, 42 F.3d at 64. To achieve this end, a court must generally "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience ...." Id. (citing Ticketmaster-New York, Inc., 26 F.3d at 211. It is obvious that it is more convenient for Meyersiek to litigate this action in Rhode Island than in Illinois.

**d. Judicial System's Interest**

The key to applying this factor is ensuring "the most effective resolution of the controversy." Sawtelle, 70 F.3d at 1395. The controversy between Plaintiff and Defendants will be

most effectively resolved within the confines of a single judicial action. Since there is no dispute that Richard is subject to this Court's jurisdiction, that portion of the dispute will almost certainly be litigated in Rhode Island. Efficiency favors combining the entire controversy in a single action in this forum.

**e. States' Common Interest**

To the extent that this factor is applicable, the court which is most concerned with a controversy should adjudicate the dispute. Of the three possible locations for this action, Rhode Island, Georgia, and Illinois, it appears that Rhode Island has the greatest connection with the controversy and should adjudicate it. Although the agreement was made in Atlanta, that occurrence followed Richard's action of reaching inside of Rhode Island and soliciting Meyersiek's assistance. Additionally, as already noted, the contract was to be performed, at least during the initial stages, in Rhode Island.

**f. Summary Re Gestalt Factors**

None of the Gestalt factors weighs against the application of jurisdiction.

**4. Finding Re All Factors**

After lengthy reflection, the Court concludes that Frontenac's contacts, properly imputed from Richard, constitute minimum contacts with Rhode Island "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Daynard, 290 F.3d at 63 (quoting Int'l Shoe, 326 U.S. at 316, 66 S.Ct. 154 (quoting Milliken, 311 U.S. at 463, 61 S.Ct. 339)). The Court reaches this conclusion utilizing the prima facie approach, taking Meyersiek's properly documented evidentiary proffers as true, whether disputed or not, and construing them in the light most congenial to Meyersiek's jurisdictional claim. See id. In particular, the Court finds

that it does not "offend traditional notions of fair play and substantial justice," Int'l Shoe, 326 U.S. at 316. 66 S.Ct. 154 (internal quotation marks omitted), to subject Frontenac to jurisdiction in Rhode Island where Frontenac deliberately sought to enhance Richard's credibility with regard to a business venture and because of that enhanced credibility Richard was able to enlist and retain for five months the services of a Rhode Island resident in the pursuit of that venture and where Frontenac and Richard ultimately reaped the benefits of the Rhode Island resident's labors. Accordingly, Frontenac's Amended Motion to Dismiss should be denied, and I so recommend.

## Conclusion

For the foregoing reasons, I recommend that Frontenac's Amended Motion to Dismiss be denied.[26] Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
David L. Martin
United States Magistrate Judge
May 30, 2008

[26] I also recommend that the First Motion to Dismiss be ruled moot.