UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

GERO MEYERSIEK CA No. 06-335 T

plaintiff

v PROVIDENCE, RI
AUGUST 16, 2007

JEAN PAUL RICHARD, et al

defendant

BEFORE MAGISTRATE JUDGE DAVID L. MARTIN

APPEARANCES:

FOR THE PLAINTIFF: R. DANIEL PRENTISS, Esq.
One Turks Head Place
Suite 380
Providence, RI 02903
824-5150

FOR THE DEFENDANT: STEPHEN M. PRIGNANO, Esq.
Edwards Angell
2800 Financial Plaza
Providence, RI 02903
274-9200

AUGUST 16, 2007

THE COURT: Good morning. This is the matter of Gero Meyersiek vs Jean Paul Richard, et al, Civil Action No. 06-335 T. This matter is before the Court on the amended motion to dismiss for lack of personal jurisdiction the Frontenac defendants.

The Court notes there was previously a motion filed by defendant Frontenac Company to dismiss for lack of personal jurisdiction. That is Document No. 11 in the Clerk's file. The amended motion is Document No. 35. The Court has read both motions.

I have some questions for counsel before we hear arguments. But first let me state to counsel that I'm sorry that I wasn't able to take the bench at l0 o'clock this morning as scheduled. I wanted to read everything you had submitted and I frankly did not accurately gauge how long it would take me to do that, and that's the reason for the delay.

Would counsel identify themselves, please?

MR. PRENTISS: Yes, your Honor. Dan Prentiss for the plaintiff Gero Meyersiek.

MR. PRIGNANO: Stephen Prignano, your Honor, for the defendant -- for the Frontenac defendants and Mr. Richard.

THE COURT: Thank you. Mr. Prentiss, I

noted in the memorandum that you had filed in opposition to the amended motion to dismiss that you indicated that your memorandum was consolidated, revised. It wasn't necessary to read the first memorandum, is that correct?

MR. PRENTISS: That's correct.

THE COURT: That's what I wanted to confirm with you. All right. Mr. Prignano, with your memorandum, it's not entirely clear to me -- I read both your memorandum and the reply memorandum. Could you enlighten me, or guide me, as with regard to the memorandum and the exhibits filed in connection with the first motion to dismiss, have they been fully superseded by the amended motion or am I to read both documents together and consider both documents?

MR. PRIGNANO: I would ask that they both be read together, your Honor. It wasn't our intention to necessarily supersede the earlier documents. I think we indicated in a footnote that we were incorporating by reference the previously filed materials in the final document. The real purpose of the amended motion was to address the new entities that had been brought into the case and also to explicate on some of the grounds that we had raised for moving to dismiss, but I would ask that they be read together.

THE COURT: All right. I'll hear argument now. This is defendant's motion so I'll hear from Mr. Prignano.

MR. PRIGNANO: Thank you, your Honor. Stephen Prignano for the Frontenac entities.

Your Honor, we're before the Court this morning on defendant's motion to dismiss for lack of personal jurisdiction.

As your Honor is aware, I represent the Frontenac entities. They are a Chicago private equity firm. We have filed a motion to dismiss for lack of personal jurisdiction on the basis that there are no Rhode Island contacts that would support the exercise of either general or specific jurisdiction as to the Frontenac entities.

As I read the materials, I think the key issue before the Court on this motion is whether or not contacts between the Frontenac entities and Mr. Richard, who is an Atlanta resident, can be imputed such that the exercise of jurisdiction over the Frontenac entities in Rhode Island would comport with fair play and substantial justice. In that regard, it appears that the most significant decision in the First Circuit on this point is the case of Daynard vs Motley and Scruggs, and that case addressed the issue of

whether or not contacts can be imputed to a party for the purpose of satisfying personal jurisdiction, and Daynard really described a two-step process. First, the analysis as to whether contacts can be imputed to a particular defendant, jurisdictional contacts. And then second, if they can, whether the sum of those contacts comport with fair play and substantial justice such that jurisdiction can be assumed over the out-of-state defendant, and the court made clear in that case, I believe, that even if contacts can be imputed, there still must be some evidence of purposeful availment of the out-of-state defendant in order for the Court to exercise personal jurisdiction over that defendant.

In this case, your Honor, we believe that it would be inappropriate to exercise personal jurisdiction over any of the Frontenac entities. We've briefed this issue and gone through some of the facts of the case in the memorandum and we believe that those facts do not support the finding there's any type of agency relationship or joint venture relationship, or other relationship, however one defines it, that would rise to the level of justifying imputing contacts to the Frontenac entities, specifically we believe the facts do not demonstrate that Frontenac was in any way acting

to control the activities of Mr. Richard in the investigatory phase of the H-E Parts opportunity.

THE COURT: Did that phase end in February of 2006?

MR. PRIGNANO: Yes, your Honor.

THE COURT: Everything up until February 2006 is what you call the investigatory phase, correct?

MR. PRIGNANO: That's right, and I define that period really from about December of 2004 up until February of 2006 when the H-E Parts transaction was actually closed. In 2004, the evidence is that Mr. Richard did approach Mr. Meyersiek with the idea of developing an entity for wholesale replacement parts business. Mr. Richard was acting in the capacity of someone seeking to obtain funding, and during the investigatory phase of this process, his role was to develop a business model that would be attractive to a private equity firm, and in that capacity he did various things. He conducted research. He approached entities that might be the subject of acquisitions. He presented financial information to Frontenac. Frontenac, during that same period, was acting in the role of a potential investor in this project, a potential lender, if you will, who was investigating this opportunity to determine whether or not it should

make a funding decision at the end of the line, whenever that was. And so the parties really were acting in different capacities, each pursuing their own interests, which were to some degree different. During this phase, there was no contractual relationship between the parties. When Mr. Richard began this process in 2004, he was not a CEO first executive. At the time he had no contact, connection, rather, at that point with Frontenac.

THE COURT: Had he formerly been a CEO first?

MR. PRIGNANO: He had formerly been a CEO first executive.

THE COURT: Well, when did that end?

MR. PRIGNANO: Well, that ended sometime in prior to 2003, is my understanding, your Honor, when he began acting as a chief executive of Promach, and at the time that he contacted Mr. Richard in December of 2004, he was actually employed by another investor. He was working for Odyssey Partners, which is a different entity altogether. But at the time he began this process, he was not specifically designated as a CEO first executive. He did approach Frontenac with the idea of getting funding, but there was no contractual relationship between the parties at that time. There

is ample evidence in the record, we submit, of arm's length dealing during the investigatory phase between Mr. Richard on the one hand and Frontenac on the other. Frontenac, during the investigatory phase, had not provided any funding to Mr. Richard, had made no commitment that it would do so. Each of the parties were free to go their separate ways. Mr. Richard bore 100% of the financial risk of his activities during this period. He was responsible for all the costs that he incurred for travel and other things he was doing to investigate this process. And Frontenac, on the other hand, was also conducting its own due diligence on the project. They had hired, for instance, an outside consultant to advise them on the merits of the financial model that was being considered and, frankly, as Mr. Richard described in his deposition, and Mr. Katz described in his deposition, that particular report from the consultants was not laudatory of the proposed funding of H-E Parts. In fact, it was fairly negative, and Mr. Richard explained that he needed to work pretty hard to overcome the implications of that report. And we would submit that that is further evidence of arm's length dealing.

Mr. Richard also at various times during the investigatory phase expressed frustration with the slow

pace of Frontenac's decision-making process, and there was at least one e-mail exchange that's been made part of the record where Mr. Richard is clearly prodding Frontenac to get on with it, to come to a funding decision. He's asking, what else do we need to do here? What do you need to make this happen? He's also telling them, if you need to wait very much longer, I'm not sure I can wait. Mr. Richard explained in his deposition that he was really approaching the point in July of 2005 where he was considering going with another private equity firm. Mr. Katz explained during his deposition that the parties were always free to go their separate ways if it came to that. And he acknowledged that Frontenac was moving slowly here because it was not familiar with the industry.

So we believe there is ample evidence in the record here of what is effectively arm's length dealing between the parties in the investigatory or exploratory phase of this opportunity which is typical, we submit, of an applicant for funding and a private equity firm considering whether to invest in a program. Each party is really effectively doing their own due diligence. Now we think that scenario is markedly different from what occurred in the Daynard case.

In the Daynard case, which the First Circuit found

a sufficient relationship to impute jurisdictional contacts, two law firms there were actively pursuing and engaged in tobacco litigation. There was evidence of a sharing of the profits at the time. The Court found numerous instances of a sufficient relationship bordering on a joint venture, or actual partnership from which to impute jurisdictional contacts. Specifically, there was evidence of a joint venture agreement that the parties had been operating under. The partner who had hired Professor Daynard from the Motley firm represented to Professor Daynard that he was acting for both the Scruggs firm and the Motley firm in doing that. The plaintiff pointed to promises that were made by both law firms to him at the time. The Court pointed out that there was a popular book published around the time that well documented the close working relationship and joint venture, if you will, between the two law firms. There were evidence of checks written to the Ness Motley/Scruggs law firms. There was evidence of some direct contact by Mr. Scruggs with the defendant in the State of Massachusetts, and the Court pointed to evidence that the firms consistently purported to be in a joint venture.

Those elements are simply not present here. What

we have here, as I mentioned, is parties investigating a potential business arrangement, each conducting due diligence, but certainly each feel free to go their own ways and no sharing of profits at this time. In fact, I believe we're one step removed from the situation that the Court considered in Daynard. In Daynard, the law firms were actively conducting business and sharing profits. Here, we haven't approached that point yet. The closing on this transaction did not take place until February of '06. At the stage where this activity was occurring, were completely within the due diligence phase of the opportunity. There was no sharing of profits. There was no active engagement in a business activity.

THE COURT: Is it correct to say if the deal was completed, there was going to be a sharing of profits?

MR. PRIGNANO: Clearly, clearly there would be. Clearly there would be, but we really analyzed the jurisdictional mix at the time that Mr. Meyersiek's claim arose, and the time during which Mr. Meyersiek's claim arose and the time at which jurisdictional contacts are relevant, for specific jurisdictional purposes, is during the early part of 2005 up until the point Mr. Meyersiek was told he would

not be part of the venture, which was sometime at the end of August of '05 or the beginning of September of '05. That's the point at which the parties were clearly engaged in a due diligence exploration of this opportunity, and again I think that that is significantly different from the parties in Daynard who were at the time actively conducting a business venture. That is why I think that the phase at which this activity took place --

THE COURT: Before you go back to Daynard, when you say in Daynard the parties were actively conducting a business venture, were they actively sharing profits at the time the plaintiff was dealing with them, or were they going to -- they had an agreement they were going to share profits in the future when the litigation was successful?

MR. PRIGNANO: There was evidence in the case that there was an agreement that there would be a divvying up of the proceeds at the time that the litigation reached fruition, but there was always an understanding between the parties, and I think Mr. Scruggs had testified in that case, that we're going to come to terms. Here, that element is completely lacking. As the parties progressed through this process, and as I think the e-mails make clear,

there was no assurance here that this opportunity would ever come to fruition, and according to the deposition of Mr. Katz, it almost derailed a couple of times, and once in particular toward the end of December of '05 where it appeared that things had really kind of slowed down and almost stopped and Mr. Katz was leaving the firm. That's markedly different than the understanding that was at work in the Scruggs case. So again, I think that there are some real differences between what the Court was dealing with in Daynard and the fact pattern that we have in front of us here.

I think it is true that the parties were working toward an end here. Frontenac was reviewing financials during the due diligence phase. It was reviewing a proposed management team. It was preparing financial models. It was examining proposed acquisitions, and it was communicating with Mr. Richard. All those things are true. Plaintiff argues that those are all evidence of some control that Frontenac was exercising over Mr. Richard. I think that when examined in context of what the parties were actually doing, it doesn't establish control at all. It simply establishes that Frontenac was doing those things that a private equity firm normally does to investigate a business opportunity. Mr. Richard certainly had a motivation to

make the opportunity as attractive as he possibly could to Frontenac, but that does not show or demonstrate that Frontenac was controlling Mr. Richard or that Frontenac had made Mr. Richard its agent for any purpose, or that Frontenac necessarily was dictating the terms of the deal to Mr. Richard. What Frontenac needed to do was to decide whether or not, based on everything that was being presented by him, Mr. Richard, it would make a funding decision at the end of the day. That was the ultimate thing that Frontenac was doing. That does not evidence --

THE COURT: Mr. Prignano, when you say that Frontenac was not dictating the terms of the deal to Mr. Richard, did they not dictate that the deal could not include Mr. Meyersiek?

MR. PRIGNANO: Well, they told him that they would not choose to make a funding decision if it included Mr. Meyersiek. They told him that. But from Mr. Richard's point of view, he had a choice to make. He could accept that condition and proceed with funding with Frontenac or he could choose to go elsewhere. He was not contractually bound in any way to accept those things that Frontenac felt were essential to its funding decision. The parties were still at a point where they could either decide to move forward or move

their separate ways. So, to that extent, no, I don't think he was bound to accept that or that Frontenac was controlling him.

THE COURT: What about the letter, or letters, plural, that Mr. Richard sent out in which he said he partnered with Frontenac?

MR. PRIGNANO: Well, he did say, and the letters say what they say. They're in the record. There was some testimony on the letters. Mr. Richard had testified that they were essentially a marketing piece. That partnering, the phrase partnering with, was essentially a marketing term designed to create the impression that, you know, Frontenac was involved in this transaction, and the fact is that mentioning Frontenac's name lent some credibility to Mr. Richard when he was approaching potential acquisition targets. The letters don't indicate, and I don't think they go as far as indicating, that there was an actual partnership between the parties, or that one was the agent for the other, or that one was controlling the other. There was certainly some indication in the letters that the parties were working together. I would also point out that that's only one piece of the puzzle, your Honor. Again, many other things were happening here, and many other items showing an arm's

length dealing between the parties are relevant to the jurisdictional question, and the ultimate question is whether or not there is such a sufficient and close relationship between the parties that imputing jurisdictional contacts becomes fair.

THE COURT: Had an executive at Frontenac approved the letters that went out, the phrase that Mr. Richard and Frontenac had partnered?

MR. PRIGNANO: Well, there was testimony that the letters were sent with the approval of Frontenac, and whether or not the specific phrase "partnered with" was specifically approved, I'm not sure the testimony was that explicit, but certainly the letters went out with the approval of Frontenac.

THE COURT: Were the letters sent before February of 2006?

MR. PRIGNANO: Yes, they were. They were.

THE COURT: So that's still in what you call the investigatory stage of the transaction?

MR. PRIGNANO: It was. That was during the exploratory phase of the transaction, and the purpose of the letters was to determine whether there was any business out there that would be interested in becoming an acquisition target for H-E Parts when and if it was formed. Mr. Richard explained in his deposition

testimony that if he were to simply send out the letter without mentioning the involvement of a private equity firm, it's very likely that no CEO would have paid him any serious attention. So the purpose of mentioning the private equity firm was to lend some credibility to Mr. Richard's inquiry.

Again, I think more needs to be shown than simply the parties are working together. You have to have, according to Daynard, such a close relationship that you have something akin to a joint venture or a partnership or an agency. Even if it doesn't technically qualify as that legally, it certainly has to be close enough to that to make the imputation of jurisdictional contacts fair. This is only one element of a much larger picture.

THE COURT: The plaintiff argues in his memorandum that Frontenac provided support services, I think legal opinion or legal advice, sort of like administrative support. I got the impression that meant secretarial services, business information from -- is it Laura Katz? Is that the name?

MR. PRIGNANO: Laura Pearl.

THE COURT: Pearl. Did that happen prior to February 2006?

MR. PRIGNANO: It did. There was some

administrative assistance that Mr. Richard obtained from Miss Pearl. There was some testimony on that.

THE COURT: What about secretarial or administrative support?

MR. PRIGNANO: Well, my recollection of the testimony was that the secretarial or administrative support came from Mr. Meyersiek during the time that he spent time on the project, and then following Mr. Meyersiek's departure, Mr. Richard did obtain some secretarial assistance or support from Frontenac. Again, I don't think that that, standing alone, or even in combination with anything else in the case, really creates a jurisdictional issue. The nature of the relationship that Danar described in all of the facts and circumstances in that case point to a much stronger relationship, business relationship, if you will, than what was happening here. Again, the parties here were really being motivated by their own interests. Certainly Frontenac had some interest in providing some level of assistance to Mr. Richard such that he could complete his work and present his plan to them. But that doesn't necessarily again mean that Frontenac was controlling Mr. Richard or that they had made him his agent, or that Mr. Richard was working for Frontenac, or that the parties were engaged in something akin to a

joint venture, which is really what the Daynard case says we need to have. We have parties who were going down their own paths motivated by their own interests and doing their own due diligence.

The last point I want to make on this, your Honor, is that even if the Court were to determine that some jurisdictional contacts could be imputed, the question still is whether, given that, and we say there shouldn't be any, but even if there were, the question really is, at the end of the analysis, would the imputation of jurisdictional contacts and a finding of personal jurisdiction in Rhode Island, comport with fair play and substantial justice, and we think on this record, being as different as it is from the Daynard case, that that would not be the case, that it would not be fair to impose personal jurisdiction on Frontenac, which was a Chicago based private equity firm which was dealing with an applicant for funding who was living and operating out of Atlanta that did not reach out to Rhode Island specifically to purposefully avail itself of the benefits and protections of Rhode Island's laws, and was acting in the role of a potential lender. Potential lenders need of necessity to deal with applicants for funding, and some interaction, some normal interaction between the

two, will occur, much as we've seen in this case. That type of interaction, if not connected to the State of Rhode Island, should not be a basis, frankly, for imposing jurisdictional contacts on the out-of-state defendant. And for those reasons, we believe that the exercise of specific jurisdiction over Frontenac would be inappropriate in this case.

THE COURT: Mr. Prignano, when the plaintiff first approached Frontenac, I think it was in 2003, they suggested, or directed, or referred him to Mr. Richard.

MR. PRIGNANO: Yes.

THE COURT: You should speak to him. He knows about this.

MR. PRIGNANO: Yes.

THE COURT: At that time was Mr. Richard the CEO first, that title that Frontenac apparently confers on certain CEO's?

MR. PRIGNANO: I believe he may have been, your Honor. I believe he may have been. He was, at the time, I believe the CEO of Promach which was a company that had been funded by Frontenac. Again, this was before the H-E Parts opportunity arose. I think in terms of the significance, if any, of that referral, again, I don't think that necessarily creates an agency

relationship or indicates that Mr. Richard is acting somehow as Frontenac's agent. Mr. Meyersiek was referred to Mr. Richard as someone who Frontenac had some confidence in, in terms of knowing the industry and felt that they could trust Mr. Richard's counsel on whether the opportunity -- in this case it was a totally different opportunity, on a pass muster. But again, more, I believe, needs to be shown here to impute those contacts, as the Daynard case illustrates.

THE COURT: Plaintiff's counsel argues in his memorandum that it's not necessary for the Court to undertake an individual analysis as to each Frontenac company, that the Court can view them collectively, because the Frontenac principals repeatedly refer to Frontenac, or Frontenac Company, without distinguishing among the various individual entities. Do you share the view that an individual analysis of each company is not necessary in this case?

MR. PRIGNANO: I don't share that view, your Honor, to the extent that witnesses may have testified by referring to Frontenac, I've done it here today referring generally to Frontenac. There were a number of Frontenac entities and I think that the references to those entities were really for convenience in terms of simply communicating, but the fact is the deposition

testimony revealed that only one of the Frontenac entities was responsible for funding H-E Parts, and in closing the transaction, and both Mr. Katz, who was deposed, and Miss Pearl, testified that they were acting on behalf of a specific Frontenac entity, which was Frontenac VIII Limited Partnership. That's the company that actually provided the funding and was responsible for the H-E Parts transaction. There was testimony explaining the relationship of the various entities. Frontenac Company itself, it was explained, is simply an administrative company that deals with paying employees and providing benefits but does not engage in private equity activities itself. Frontenac Company VIII LLC is a general partner of Frontenac VIII Partners LP which is in turn the general partner of the entity that actually funded the project. But Mr. Katz and Miss Pearl were clear in their depositions that they were acting specifically on behalf of Frontenac VIII Limited Partners, and therefore we believe that the exercise of jurisdiction as to the other entities here would be inappropriate for that reason.

THE COURT: Do these various Frontenac entities all occupy the same physical location? They're all at one office in Chicago?

MR. PRIGNANO: I believe that may be the

case, your Honor. I don't know specifically. I make that assumption. I can tell you that I make that assumption.

THE COURT: Do you have any knowledge as to whether there are different employees of these various Frontenac entities or whether the employees overlap between them?

MR. PRIGNANO: What I know about that is what came out at the deposition, and I believe there was testimony that Frontenac Company employs administrative people, and those administrative people get their checks from Frontenac Company, and their benefits from that company, and that company is formed for that purpose. The Frontenac VIII Limited Partnership, to my understanding, consists of partners who include Mr. Katz and Miss Pearl, who are actually the equity partners responsible for providing the private equity funding.

THE COURT: There was reference in an e-mail to the project perhaps having to wait until Frontenac Company IX LLC, which suggests to me that a new entity is created for each new funding venture or each new investment?

MR. PRIGNANO: Each new entity is created and raises a certain amount of capital, and as that

capital is applied to new ventures and exhausted, a new entity is created and additional capital was raised. That's generally the process that private equity firms go through.

THE COURT: I gather it's undisputed that there is jurisdiction over Mr. Richard?

MR. PRIGNANO: There's no dispute as to that.

THE COURT: Thank you, Mr. Prignano.

MR. PRIGNANO: Thank you, your Honor.

MR. PRENTISS: Your Honor, I'd like to begin by giving an overview in which I would like to point out, I believe, that the defendants are arguing essentially the wrong case here, and really the wrong principles.

Mr. Prignano just asserted that the question before the Court is whether the imputation of Mr. Richard's contacts with Rhode Island is fair, and that's not the case at all. The case law makes very clear that the contacts of an agent are necessarily imputed to the principal. That's not a discretionary thing that you make a decision whether it's fair to impute this contact or that contact. The question isn't is it fair to impute contacts. The question is, was there an agency relationship.

As the Court noted in its last question, there's no dispute that this Court has jurisdiction over John Paul Richard. The question then is whether John Paul Richard was acting as the agent for Frontenac entities at the time that he made a promise to Meyersiek in exchange for getting Meyersiek to permit his efforts and expertise and skills in furtherance of what would ultimately be a venture -- that became H-E Parts.

When the defendant argues, again in its memorandums and here that Richard and Frontenac were dealing at arm's length, and they were free to go their ways, and there was no contract between them until the closing on February 2006, those are facts, but they're facts that are not relevant to the issue here. If this were a case of J.P. Richard suing Frontenac for failure to fund H-E Parts, then the fact that Richard and Frontenac had never executed a contract during this period of time would certainly be relevant, and it might be a tough case for Richard to prove that there was an enforceable obligation by Frontenac to fund his investment, but that's not what the case is here, and that's not what the question that's before the Court is. The question before the Court is very simply, is there evidence which a jury could find that Richard was acting as the agent for Frontenac when he made the

promise in February 2005 to Meyersiek, which Meyersiek accepted and then acted on.

One point that is relevant to that question that I'd like to clarify, the Court asked whether, as of 2005, Mr. Richard was a CE first executive, designated so by Frontenac, and the answer to that question is yes. Exhibit 1 to my memorandum, which is a two-page excerpt from the Frontenac website, which prominently displays Mr. Richard. His photograph is on the top row, second from the left. Response to request for admissions, Frontenac has admitted that this web page was active and on the air as of November 2005, which is the date that I was able to extract it from a website. So as of November 2005, after Richard had left Promach, and during the time that he was doing the investigation for the H-E Parts Venture, he was officially designated on the website as a CEO first executive.

In February of 2005, prior to Richard's meeting with Meyersiek and making the promise, Richard had written letters with express approval by Frontenac to say, I have partnered with Frontenac on this venture, the specific venture on which he made the promise to Meyersiek, which is the subject matter of this litigation. Mr. Katz testified at his deposition that he was aware of that representation and that he

authorized Richard to make the representation, I have partnered with Frontenac. And he authorized Richard to make that representation because in his words it gave Richard credibility in the marketplace to show that he had access to Frontenac capital.

Meyersiek's affidavit which is before the Court on this motion states he specifically relied on the website and on Richard's representations that he was working on behalf of Frontenac in order to go forward with this venture with Richard.

The defendants assert the Daynard case is sort of the legal underpinning and the legal framework for the Court's decision, I think, on this motion, and the defendants assert that Daynard stands for the proposition that you've got to show that there is an actual joint venture agreement between Richard and Frontenac, in this case, in order to have Richard's contacts with Rhode Island imputed to Frontenac, and I would submit that that's not at all the case, and that is not at all the holding in Daynard.

It is true that the facts in Daynard were facts that were most analogous. The relationship between Scruggs and Ness Motley were most analogous to a joint venture relationship. But what the First Circuit said in analyzing those contacts and analyzing the law, in

both the Daynard case and the subsequent decision Jet Wine & Spirits against Baccardi, is we don't have to -- the relationship doesn't have to fit any particular analytical structure, whether agency, partnership or joint venture. Quoting from Jet Wine & Spirits, the exact type of agency relationship used to impute contacts is not crucial to our inquiry regarding traditional notions of fair play and substantial justice, nor are the technical differences between the state's different rules of agency vital. Going on, the question before us is whether a sufficient relationship exists under the due process clause to permit the exercise of jurisdiction, not whether a partnership, joint venture or other particular agency relationship between the two defendants exist. The question, therefore, is not analytically to determine the existence of one or another. The question is, what was the working relationship between the Frontenac entities on the one hand and Richard on the other with specific reference to the transaction at issue here, the promise of a job and the acceptance of the promise.

The e-mail traffick that are -- there are just a few key ones that I think really answer this question. The first is the e-mail from David Katz to J.P. Richard back in 2003 on the initial inquiry from Gero Meyersiek

where Katz says to J.P., and this is Exhibit 2 in my memorandum, it says this is an area in which we are thinking about moving in the future, so please talk to Gero, see what he has to say. That is what established the initial relationship between Gero and J.P. Richard and between Gero and Frontenac.

Exhibit 3 is Richard's memorandum, e-mail memorandum back to David Katz at Frontenac following his meeting with Meyersiek in which he made the offer of employment and equity participation. There's no question, looking at Exhibit 3, that Richard is reporting back to Katz on his meeting stating laudatory, in laudatory terms, his feeling that Gero would be the ideal member of the team, implicitly, if not explicitly, asking for Katz's approval of Meyersiek as a part of the team. Richard testified at his deposition essentially to the same thing, it was subject to David's approval. He admits, acknowledges, he made the proposal. He acknowledges 4 percent equity.

THE COURT: What was subject to his approval?

MR. PRENTISS: The contract with Gero Meyersiek. And he acknowledges having made the proposal to Meyersiek, $175,000 a year, bonus of

$175,000 earned, 4% of equity. He acknowledged in his deposition that that was subject to Katz's approval. The affidavit testimony of Gero Meyersiek is that shortly after that meeting Richard called Gero to say it's been approved, we're all set to go. Those facts, just that set of facts, is sufficient to establish at the very least a prima facie case of agency for the purpose of hiring Gero Meyersiek. You have clearly a delegation of authority to Richard to set up a management team. Richard accepting that authority. And clearly the evidence that the ultimate decision was subject to the control of Frontenac.

As the Court pointed out in the questioning of Mr. Prignano this morning, that exercise of control, in fact, was manifested when Frontenac ultimately said no, we're not going to accept Meyersiek, changed its mind. Those three facts are the three elements that are necessary to establish agency. Even if you didn't have the three elements of agency, you unquestionably have agency by estoppel, which is another phrase for apparent authority, that Richard had the apparent authority. When Frontenac held him out as a CEO first executive, when Frontenac authorized Richard to say to the world at large I'm partnered with Frontenac, when Frontenac authorized Richard to engage in these

discussions with Meyersiek, Meyersiek had a reasonable basis for relying on those representations, and the assumption that the specific offer of employment, and of equity participation, was within his authority, and he acted to his detriment in reliance on what he assumed, and reasonably assumed to be Richard's authority to bind Frontenac to this deal.

So that's really just the pure question before the Court, is there sufficient evidence for a jury to find either agency, or agency by estoppel, agency in law, agency in equity, apparent authority. If the answer is yes, this motion must be denied.

I'd like to address --

THE COURT: Mr. Prentiss, you make reference to the plaintiff being informed that Frontenac had, in fact, approved the promised employment and 4% equity?

MR. PRENTISS: Yes.

THE COURT: Who testified to that? Is that your client's testimony?

MR. PRENTISS: Correct.

THE COURT: Was Mr. Richard asked about that?

MR. PRENTISS: I don't --

THE COURT: Does anyone other than the plaintiff -- I'm just curious. The plaintiff said he

was told Frontenac has approved my employment and 4% equity. Has anyone else -- is there any other evidence that happened other than the plaintiff's testimony?

MR. PRENTISS: There is no evidence before the Court other than Mr. Meyersiek's affidavit that Richard called Meyersiek in February 2005, February, March 2005, and said it's been approved. I don't remember whether the specific question was asked of Richard. Richard did expressly state at his deposition that the retention of the plaintiff was subject to Frontenac's approval, and stated that on several different occasions, it was all David Katz's decision ultimately. There is no -- I cannot represent to the Court that Richard agreed, yes, I told Gero it was all set and we're ready to go. Richard says, clearly, I never would have done it without that approval, since he told me at the very beginning it was subject to Katz's approval. And I think -- that gets to the ultimate question of liability, of course, under the contract.

THE COURT: When was the plaintiff informed, you're out, you're not going to be hired?

MR. PRENTISS: July of 2005 he received a voice mail which he has a transcript, a phone, J. P. Richard, which said, in effect, listen, we had a

meeting and unfortunately Frontenac just doesn't think you're going to be a part of the show, you're a generalist, not a specific technical person, really sorry about that, I'm going to try to get you something for all your efforts. I'm sure we can try to get you paid something, and sorry.

THE COURT: Mr. Prignano has indicated that February 2006 is a demarcation point between the investigatory phase and the implementation phase. So July 2005, the plaintiff was notified, you're out, this would still be in what the defendants call the investigation portion of this venture.

MR. PRENTISS: Yes. There's no question about that but I think that gets to -- that argument addresses somebody else's case. Richard does not have to have a formal development contract with Frontenac in order to have an agreement to act as Frontenac's agent for certain purposes. That's the only question before the Court, did Richard accept from Frontenac a delegation of authority to start this investigation, and did Frontenac retain the ultimate control over incremental decision-making of Richard as to how he was to carry out his agency. That's the question before the Court. It just seems to me it's impossible to deny that Richard could well be an agent for Frontenac well

before a formal development agreement for the creation of H-E Parts International. An agent is an agent for particular purposes. I said it somewhere in my memorandum. Agency doesn't exist in the abstract.

THE COURT: So what was Mr. Richard an agent for? You say he's an agent for Frontenac, an agent for what?

MR. PRENTISS: For the investigation, exploration, and preliminary conduct required to develop what may be a development plan that ends up in a development contract investment decision. He was specifically, in the case of Gero Meyersiek, he was Frontenac's agent for the purpose of gathering together a management team that would put together -- that would conduct all of the due diligence exploration to find out whether or not this is going to be a deal. And most specifically, he was Frontenac's agent for this question, is Gero Meyersiek going to be a part of the team. Richard informed Frontenac I'm going to be meeting with Gero Meyersiek. He met with Meyersiek. I'll take that back a couple of steps. This whole transaction began with Richard calling up Meyersiek to say we, Frontenac, had sold Promach. I'm out putting together a new venture for Frontenac. It's going to be in the replacement parts industry. I want to get back

together with you, are you still available. And Gero said yes. That led to the meeting in Atlanta in February of 2005 where they specifically discussed, this is what we want to do, are you interested? This is a Frontenac venture. We're going to go forward. This is what we want to do. Will you do it? Here's what we'll pay you to do it. And said to Gero, it's subject to David Katz's approval. And we have the e-mail that went out the next day from Richard to David Katz saying, I had this great meeting with Gero, I believe he's our man. That -- I don't think you can talk about, in the abstract, what was he the agent for Frontenac for. It depends on the specific transaction. I'll give you an example. There's a headhunter contract that was executed by, I think it turned out it was by Frontenac, to search for a CFO for this business. If that contract had been signed by Richard, then on behalf of Frontenac, then he would be acting as the agent for Frontenac. I think, as it turns out, that contract was signed by Richard on behalf of H-E Parts, but you have to look at it specific issue by specific issue.

THE COURT: Mr. Prentiss, in the e-mail that you cite, the February 17, 2005 e-mail from Mr. Richard to Mr. Katz, I note the statement at the end of the

first paragraph, "Please let me know what actions you would like to take with regard to Gero. I will send you his updated resume next Wednesday when I'm back from a long weekend in Florida." I'm sure you would have told me what the answer was, but was there any answer to that e-mail? Did Mr. Katz respond with some instruction as to what Mr. Richard was to do with regard to Gero?

MR. PRENTISS: There is no responsive e-mail to this that exists. The evidence is Meyersiek's affidavit that Richard, after this date, called him up and said David Katz is all set with it.

I would like to address the structure of fraudulent act, and I believe that the answer to the structure is really set forth in the signature page of Exhibit 6 which is the joint -- the letter of intent that was executed with the new company, Dom-Ex. The letter of intent is on Frontenac Company letterhead, and it is executed by the Frontenac entities by David H. Katz. In his argument, Mr. Prignano said that Katz and Pearl were acting only on behalf of Frontenac VIII Limited Partnership, which is the top line on that signature page. Actually, I think he was mistaken in that. The testimony of Katz and Pearl is that they were acting on behalf of Frontenac Company VIII LLC,

which is the bottom entity on that cascade. This signature block establishes that David Katz signed as the managing director of Frontenac Company VIII LLC. Now that obviously makes this act the act of that entity LLC, but the signature block also shows that LLC in executing this was doing so in its capacity as general partner of, and therefore on behalf of, Frontenac VIII Partners LP, the next tier up in the cascade which, in turn, was executing on behalf of the Frontenac VIII Limited Partnership which is the actual funding entity.

In the Court's questioning of Mr. Prignano, I think -- I may have been less articulate in communicating my position as to how these different entities should be treated. I'm not suggesting that you don't actually look entity by entity. I think that you do have to look at entity by entity. I think that the fact that the defendants refer to themselves so completely interchangeably is evidence that is relevant to the question on whom, on behalf of whom, or which entities were Katz and Pearl acting. Their testimony is they were acting on behalf of the lowest rung, the Frontenac Company VIII LLC, of which each one of them was a partner. The testimony is, you take this back, the original entity is Frontenac Company, which itself

is now a, I believe, an LLC. It has certain members, and all of the members of Frontenac Company are members of the lowest level on the signature page, Frontenac Company VIII LLC. This is strictly an investment entity that is used to manage money that is raised by Frontenac VIII Limited Partnership. The next level up in the tier, Frontenac VIII Partners LP, is another -- it's expanded slightly in its population from Frontenac Company VIII LLC. Frontenac VIII Partners LP, the members there consist of all of the members of Frontenac Company, plus some retired partners, to give them a carry-on equity interest in Frontenac investments. So the first two levels are strictly the leverage equity piece of this equity funding outfit. They in turn leverage the funds that are actually raised in the marketplace and invested in companies, in ventures of one sort or another such as H-E Parts. My position as to the jurisdiction of the individual entities is by virtue of their membership in, and expressly stating they are acting on behalf of Frontenac Company VIII LLC, their acts clearly are the acts of that entity. But the corporate, or organizational structure, necessarily makes every act of Frontenac Company VIII LLC the act of Frontenac VIII Partners LP and the act of Frontenac VIII Limited

Partnership. The law is clear that an agent can act in sub-agency and that this kind of a cascade clearly will create agency all the way up the line. The law is clear that a specific agent can act as an agent of multiple principles, if you wanted to look at it that way, but you can't separate out these different entities. They are all within the same business entity and merely a layer of shelves in the entity to allow access by investors at different levels to participate in the investment. Frontenac Investment Company itself is apparently not one of the investors. It is an administrative arm. That's the testimony and I don't dispute that, but I don't think that Laura Pearl or David Katz by saying, "I was only acting on behalf of Frontenac Company VIII LLC," can disavow the fact that they have held themselves out to the public in this transaction as acting on behalf of Frontenac Company. The letter that they authorized Richard to send out to prospective partners identifies not the individual investment entities but identifies Frontenac Company. I have partnered with Frontenac Company.

The power point presentations to lenders and investors identifies the partnership, J. P. Richard, Frontenac Company, and there are multiple sets of these.

THE COURT: When was that power point presentation being presented, during when?

MR. PRENTISS: 2005, before -- this was in anticipation of obtaining the financing that was ultimately put together for the February 2006 closing. All of these power points were during the so-called investigatory phase.

The Frontenac Company website does not identify the specific entities but just says Frontenac Company. As I pointed out before, the letter of intent itself is on Frontenac Company letterhead. The e-mails that Katz and Pearl sent to, among others, Gero Meyersiek, identified themselves as managing partners of Frontenac Company. I don't think -- you know, the defendants take the point of view, or take the position that because there are so many entities involved the Court must have jurisdiction over none. I think it's just the opposite. The evidence is sufficient to support clearly a finding that Katz and Pearl were acting on behalf of Frontenac Company, all of the evidence that I just recited. Their own testimony that they were acting on behalf of Frontenac VIII, whatever the lowest level of the echelon is, and the legal structure of the Frontenac VIII entities necessarily imputes their actions all the way up the chain to the ultimate

Frontenac VIII Limited Partners, therefore the Court has jurisdiction over all of them.

The last thing I would point out to the Court is, the standard here is a prima facie standard. I believe that the evidence is -- even right now, is adequate to support a finding, and it would be hard to see how a contrary finding could come out from a jury trial that there was, in fact, this agency. But the only question before the Court is whether there is sufficient evidence to support a jury finding of this relationship. I think the evidence is overwhelming.

THE COURT: Mr. Prentiss, you've referred to the chain of corporate entities.

MR. PRENTISS: Yes.

THE COURT: Referring to one at the top of the chain and one at the bottom of the chain.

MR. PRENTISS: Yes.

THE COURT: Are you able to identify for me right now which entity you consider to be at the top of the chain and which entity you consider to be at the bottom? If you're not able to do it at this moment, I would take a letter from you, but --

MR. PRENTISS: No. I can do that right now, your Honor, and I would refer to the second page of what is Exhibit 6 to my memorandum.

THE COURT: Is that the second page of the July 11, 2005 letter?

MR. PRENTISS: Correct. And if you look at the signature blocks in the center of the page, you have in caps, Frontenac VIII Limited Partnership. That is the entity which is at the top echelon. The testimony of Katz and Pearl is that Frontenac Company formed Frontenac VIII Limited Partnership as the entity that actually holds the funds. When Frontenac goes to the market and goes to pension funds and the like, the major equity markets and asks for investments, the money is deposited in Frontenac VIII Limited Partnership. Frontenac VIII Limited Partnership is managed by a general partner and that's the next entity down the line, Frontenac VIII Partners LP. The limited partners of Frontenac VIII Partners LP are the members of Frontenac Company, plus some additional former members of Frontenac Company. That entity is managed by its general partner which is the next entity down on the signature block, Frontenac Company VIII LLC. And the testimony is that Frontenac Company VIII LLC was organized for the purpose of managing the top entity here, Frontenac VIII Limited Partnership, and the Frontenac Company VIII LLC, its members are the current, or as then current members of Frontenac

Company. By, I guess, narrative explanation, the members of Frontenac Company gain their rewards by virtue of being the members of the LLC which manages the funds that are raised in the market. So as Frontenac VIII Limited Partnership, let's take Promach, which is believe was a Frontenac VIII investment, Frontenac VIII took X million dollars from the funds that it had raised in the marketplace and used those monies to acquire Promach, used those monies, plus additional financings, to acquire other companies in the same field, to grow Promach up to a much larger entity, and then sold that entity in 2004 to a complete third party, Odyssey Partners. The profit from that sale, based on the contracts that were in existence, goes to the investors at the Frontenac VIII level plus some part down to the management companies, and ultimately a proportionate share distribution at the bottom level to the actual individual members of that LLC. So that's a leverage concept --

THE COURT: So when you say the bottom, is the individual members the LLC?

MR. PRENTISS: The bottom level on the signature block, Frontenac Company VIII --

THE COURT: Forgive me for interrupting, Mr. Prentiss, but there is a total of -- how many

Frontenac entities are there? Are there eight that are part of this case?

MR. PRENTISS: There are four Frontenac entities that are part of this case.

THE COURT: Of the four, which is the lowest level?

MR. PRENTISS: The lowest level for the investment vehicle is Frontenac Company VIII LLC, which is a limited liability company whose members are the equity owners of Frontenac Company.

THE COURT: Frontenac Company VIII LLC --

MR. PRENTISS: Correct.

THE COURT: -- is the lowest.

MR. PRENTISS: Correct.

THE COURT: All right. Thank you.

MR. PRENTISS: Thank you.

THE COURT: Mr. Prignano, I have a couple of questions.

MR. PRIGNANO: Certainly, your Honor.

THE COURT: With regard to this July 11, 2005 letter on Frontenac letterhead to David Ellefson, president of Dom-Ex, which has a signature block for Mr. Richard and then a signature block for Mr. Katz, or its' signed by him, this letter is referred to as a letter of intent? Is that the accurate term?

MR. PRIGNANO: That's correct, your Honor.

THE COURT: I'm sure this is because I don't understand the intricacies of the business world on this sort of investment, but I'm confused as to how such a letter is sent in July of 2005 during the phase of what you call the investigatory phase of this transaction. I mean, as I look at this, this would seem that Frontenac has made a decision as of July 2005 that it is prepared to back Mr. Richard in his quest to acquire an interest in Dom-Ex. So can you enlighten me? Why is this still in what you call the investigatory stage when I would think this would be after a decision is made by Frontenac we're going to go with Mr. Richard's proposal with our backing. Can you explain that to me?

MR. PRIGNANO: One of the pieces that needed to be in place before a closing could occur, and even before a decision could be made on funding, would be that a potential acquisition target be identified and would be ready to be acquired at the time that a closing eventually occurs. H-E Parts was to be created, had not been created at this point, to my knowledge, was to be created, and would be populated, if you will, with companies in this particular market that would be acquired following the closing of the

private equity transaction. This was a step that was preparatory to ultimately a funding decision and then a closing. Now, interestingly, after this letter, after July, in August, the very next month, there was testimony of this in the case, there was a presentation made by J.P. Richard to the Frontenac partners with respect to the H-E Parts opportunity, and he went through the financial model, and the fact that a potential acquisition target had been identified, and this was part of the package that Mr. Richard, in August, was presenting to the Frontenac partners, but this was a necessary step for Mr. Richard to accomplish in order to ultimately acquire funding from Frontenac. One of the items that had to be in order. Frontenac would not have made a decision to fund the project unless it knew that at some point there would be a potential company to be acquired so that the business could be started and off and running when this all came together. So that's really the background and what the purpose of this particular letter was.

I do have one or two comments, your Honor, on Mr. Prentiss's presentation but I do want to make sure --

THE COURT: I'll allow you to make those comments. Isn't July of 2005 the same time when

Mr. Richard sends the e-mail complaining about the lack of decision by Frontenac and may have to go elsewhere?

MR. PRIGNANO: It is, it is. There are many other facets of this project that needed to be decided upon, come together. There was a whole financial model that was the subject of intense discussion. Whether or not the financial projections that Mr. Richard was presenting to Frontenac would be acceptable, would fit within their range of what they'd consider to be an acceptable investment that they were prepared to move forward in. Mr. Richard testified in his deposition that he was not getting the kind of feedback he needed from Frontenac to understand whether or not he was on target with them. He wasn't getting adequate decisions made and felt that things were just dragging on far too long. This is something that had been under discussion and in the investigatory phase of this project for over 6 months at this point, and he was again expressing frustration at the slow progress.

THE COURT: I still have some difficulty understanding, is there a phase before the investigatory stage? I have some difficulty, Mr. Prignano, understanding how a letter like the letter of July 11, 2005 on Frontenac letterhead can be sent out to a company indicating interest in either

acquiring a company or making an investment in a company without some sort of decision having been made by Frontenac that we are, you know, willing to go -- to be part of this transaction. Is there some pre-investigatory stage that exists? I mean, I assume for a letter like the July 11th letter -- I realize you may not have a copy of the letter. Would you like to see it, Mr. --

MR. PRIGNANO: I'm looking at it right now, your Honor.

THE COURT: It would seem to the Court, and I acknowledge that this is certainly not an area I'm familiar in, I'm really looking to be enlightened, that for a letter like this to be sent, some sort of preliminary decision must have been made by Frontenac to say, yes, we're going to send out a letter to a president of a company expressing interest in acquiring his company or making a major investment in it.

MR. PRIGNANO: My understanding is, as I'm reading the letter, essentially an expression of interest on the part of Dom-Ex to move forward in accepting statements in this letter, an expression of interest to move forward with discussions for its acquisition. Many pieces need to be -- and I'm just speaking about my own understanding of this area from

dealing with this case, but many pieces need to be in place in order for Frontenac to have adequate comfort to make an affirmative decision to fund the project. One of the essential pieces that needs to be in place is whether or not, in fact, there is a viable acquisition target for H-E Parts so that it can acquire a company and move forward with business operations. This is an expression of that interest and of that intent, and forms part of the application, if you will, that Mr. Richard is making to Frontenac. He is telling Frontenac, I've got a potential acquisition target here. They are prepared to move forward with the discussions for an acquisition with H-E Parts, with Frontenac. They've expressed their interest. What I have is a viable financial model for Frontenac to commit to. This was part of that process, and formed one element of Mr. Richard's presentation to Frontenac. This was again something that was in place before a presentation was made, a formal presentation was made to Frontenac's partners in Chicago in August of 2005, the following month, to really press for a decision, and to press for approval of not only the financial model but at the management team. It was after that decision that Frontenac basically told Mr. Richard that it would not be interested in the management team that

he had specifically tendered.

THE COURT: I didn't mean to cut you off. Had you finished the point?

MR. PRIGNANO: I was finished.

THE COURT: Before I let you make your rebuttal remarks to Mr. Prentiss's presentation, what about the slide presentation that describes Mr. Richard as a partner with Frontenac? It's my impression that this presentation was not made just internally to the partners at Frontenac but it was being made to, I guess, target companies, am I right on that?

MR. PRIGNANO: Banks, banks for additional funds. The testimony was that those power point presentations were made in October toward the end of 2005 to banks. They indicated that, I believe, Frontenac partnered with Mr. Richard -- this term partnering, your Honor, is something that Mr. Richard explained on the record. I believe Mr. Katz spoke to it. It's a marketing term. It's understood by people in the business world as an expression of parties who are working together. I don't think there's any doubt that Mr. Richard and Frontenac were moving toward a common goal and working together, although they were clearly, during the investigatory phase, pursuing their own interests, and neither had made a commitment to the

other. But the fact is that the representation to banks after Mr. Meyersiek was already out of the picture at that point, that the two were partnering towards this end, --

THE COURT: So the power point presentation was not being made prior to the plaintiff's notification that you're out of this, you're not part of this. That post-dates it?

MR. PRIGNANO: I believe that power point presentation post-dates the plaintiff's involvement, your Honor. It was made following Mr. Meyersiek's departure. This was evidence that was developed during jurisdictional discovery. In fact, there's a notation from one slide of a presentation being made in November of '05, the presentation being made to the Frontenac partners, and there's other testimony in the record that this presentation was presented to banks in October and months towards the end of 2005, but after Mr. Richard was gone.

THE COURT: Thank you for answering those questions. Now please let me hear whatever you'd like to say in rebuttal to Mr. Prentiss's remarks.

MR. PRIGNANO: Just very briefly, your Honor. I think there's one point that Mr. Prentiss made that demonstrates the real difference in the

positions of the plaintiffs and defendants on this whole issue of imputing jurisdictional contacts and that is with respect to the issue of agency. Mr. Prentiss said the question is whether or not Mr. Richard accepted a delegation of authority from Frontenac to conduct an investigation during the exploratory phase. The evidence that's before the Court on this record, your Honor, is completely contrary to that. The evidence on this record is that it was Mr. Richard who first approached Mr. Meyersiek and then approached Frontenac with the idea of developing this opportunity for H-E Parts. Mr. Richard was not deputized or did not accept a delegation of authority from Frontenac to conduct an investigation. The evidence is that he formulated this idea. He was the driving force behind it. He brought it to Frontenac and pursued it. Now, during this phase where the parties are conducting due diligence, clearly there's going to be an exchange of information. Clearly Mr. Richard is looking for ways to appease Frontenac, if you will, to make his proposal as attractive as it can be so that he will ultimately get funding. Certainly Frontenac is looking at this and asking questions and trying to determine whether or not the financial model works, and there's an exchange of

information, and the parties appear to be working together. That's occurring, but the fact is there's no agency as a result of that. Mr. Richard has not been deputized to act as an agent for Frontenac in carrying this out. If the deal eventually comes together and it works out for both parties, so much the better, but the opposite could have been equally true, and almost was at different times during this. So I think that if you go right to the beginning of this and look at the overall context of the relationship and how it developed, it becomes very clear that this was Mr. Richard's proposal. Not the other way around. Not Frontenac telling Mr. Richard to go out and do this for us. And I think that's critical to this whole question and distinguishes this case from Daynard.

The other point I'd like to make, your Honor, is that, and Mr. Prentiss seemed to indicate the narrow question here is really whether there was an agency or not. I think the point of the Daynard case is that you look to the context of the entire relationship to determine whether or not the relationship is so close as to rise to the level of joint venture or some other close relationship, whether or not it actually satisfies those legal requirements, but what's very clear in Daynard is there needs to be a very very tight

relationship between the parties and some exercise of control.

As far as the agency relationship question is concerned, Mr. Prentiss pointed out that the deal that was offered to Mr. Meyersiek was allegedly approved by Frontenac, and he points to that as evidence that Mr. Richard was the agent of Frontenac, but the problem with that analysis, your Honor, is that the only evidence we have of that is from Mr. Meyersiek and he says that he learned of it from Mr. Richard. You can't establish agency through the representations of the agent. You have to have a manifestation from the principal. In this case Frontenac. There's no evidence on the record that Frontenac ever approved a deal with Mr. Meyersiek. In fact, the only evidence on the record is when it came time to consider Mr. Meyersiek as part of the team, he was told he wouldn't be part of the team for reasons that Frontenac had made clear at that point. So it would be inappropriate to find an agency relationship based on Mr. Meyersiek's report of what Mr. Richard told him. Mr. Richard was the purported agent here and cannot establish agency. That's the other point I wanted to make, your Honor.

THE COURT: Thank you, Mr. Prignano. All

right, the Court will --

MR. PRENTISS: Just one matter, as a matter of agency law, it's an important distinction.

THE COURT: You have three minutes.

MR. PRENTISS: Three minutes. The law establishing agency through the words of the purported agent is that you cannot prove agency through the hearsay testimony of a purported agent. That's not the case here. That is the case where if I say that a man in the street told me he was working on behalf of Narragansett Electric Company, and the man in the street is unidentified, we never find out who he is, I can't establish that he was acting on behalf of Narragansett Electric that way. The testimony of the purported agent is always relevant and probative of the existence of the agency, and we do have the testimony of Richard. Thank you.

THE COURT: Do either of you know how long the actual deposition of Mr. Richard is; how many pages?

MR. PRENTISS: My excerpt ends on page 148. It's fairly lengthy.

MR. PRIGNANO: I don't have the exact page count, your Honor, but it was a full day.

MR. PRENTISS: Would you like me to provide

the Court with a full transcript?

THE COURT: Well, that was sort of what was behind my question, Mr. Prentiss. Sometimes I find that I'm reading an excerpt and either one of two things happen, sometimes the compressed version is really not that easy to read. These look acceptable. But then sometimes I'll read an excerpt and be very curious what the next page said, and I don't have the next page, but there are transcripts from Mr. Richard and Mr. Katz and Ms. Pearl, is it?

MR. PRENTISS: Correct.

THE COURT: And those have all been excerpted? One of you or the other has cited the transcripts?

MR. PRENTISS: Yes.

MR. PRIGNANO: Those are substantially shorter, your Honor. Those were half-days.

THE COURT: I think what I'll do, Counsellors, when I get to this, if I feel I need to, I'll contact one or both of you and ask you to submit the entire transcript, but I certainly have enough paper in chambers that I don't need to add to the large volume. I thank the attorneys for their arguments. I'll take this matter under advisement. It sounds like an interesting legal issue. I need to tell you I have

several matters already in front of this one. I'll get to this as soon as I can, but it's going to be not immediate. I'll do the best I can. Court will stand in recess.

(RECESS)

**C E R T I F I C A T I O N**

**I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.**

**/sJoseph A. Fontes/**

**JOSEPH A. FONTES, COURT REPORTER**

**June 6, 2008**

**DATE**