UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GERO MEYERSIEK<br><br>Plaintiff,<br><br>v.<br><br>JEAN PAUL RICHARD, FRONTENAC COMPANY, FRONTENAC COMPANY VIII, LLC, FRONTENAC VIII PARTNERS, LP, FRONTENAC VIII LIMITED PARTNERSHIP and H-E PARTS INTERNATIONAL, LLC<br><br>Defendants. | ) | C.A. No. 06-335-T<br>**(Oral Argument Requested)** |

**OBJECTION TO REPORT AND RECOMMENDATION**

Pursuant to Rule 72 of the Federal Rules of Civil Procedure and LR Cv 72(d), Defendants Frontenac Company, Frontenac Company VIII, LLC, Frontenac VIII Partners, LP, and Frontenac VIII Limited Partnership (collectively, "Frontenac") hereby object to the Report and Recommendation issued by Magistrate Judge Martin dated May 30, 2008. Specifically, Frontenac objects to the Court's findings that (1) Jean Paul Richard's contacts with the State of Rhode Island may be imputed to Frontenac for purposes of the requisite personal jurisdiction analysis; and (2) that Frontenac purposefully availed itself of the privilege of conducting business in Rhode Island sufficient to make its involuntary presence before this Court foreseeable. In support of its Objection, Frontenac submits the accompanying Memorandum of Law.

Pursuant to LR Cv 7(e), Frontenac requests oral argument on its Objection.

FRONTENAC COMPANY, FRONTENAC COMPANY VIII, LLC, FRONTENAC COMPANY VIII PARTNERS, LP, and FRONTENAC COMPANY VIII LIMITED PARTNERSHIP

By their Attorneys,

/s/ Stephen M. Prignano
/s/ Raymond M. Ripple

Stephen M. Prignano (#3649)
Raymond M. Ripple (#6489)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)
sprignano@eapdlaw.com
rripple@eapdlaw.com

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that this document has been filed electronically on this 13th day of June, 2008 and is available for viewing and downloading to the ECF registered counsel of record:

R. Daniel Prentiss, Esq.
R. Daniel Prentiss, P.C.
One Turks Head Place, Suite 380
Providence, RI 02903
dan@prentisslaw.com

/s/ Raymond M. Ripple
Raymond M. Ripple

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GERO MEYERSIEK<br><br>Plaintiff,<br><br>v.<br><br>JEAN PAUL RICHARD, FRONTENAC COMPANY, FRONTENAC COMPANY VIII, LLC, FRONTENAC VIII PARTNERS, LP, FRONTENAC VIII LIMITED PARTNERSHIP and H-E PARTS INTERNATIONAL, LLC.<br><br>Defendants. | ) | C.A. No. 06-335-T |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OBJECTION TO REPORT AND RECOMMENDATION**

**Introduction**

Defendants Frontenac Company, Frontenac Company VIII, LLC, Frontenac VIII Partners, LP, and Frontenac VIII Limited Partnership (collectively, "Frontenac") submit this Memorandum of Law in support of their objection to the Report and Recommendation issued by Magistrate Judge David L. Martin on May 30, 2008 ("R&R"), which recommends that Frontenac's Amended Motion to Dismiss for Lack of Personal Jurisdiction be denied.[1] The Court concluded that Frontenac has sufficient minimum contacts with Rhode Island to permit the exercise of specific personal jurisdiction based solely on the attribution to Frontenac of co-defendant Jean Paul Richard's ("Richard") contacts with the forum. The Court further held that Frontenac, a Chicago, Illinois-based private equity firm with no connections to Rhode Island of its own, purposefully availed itself of the privilege of conducting business in Rhode Island solely on account of Richard's interactions with the Plaintiff.

[1] The Amended Motion to Dismiss was necessary on account of the Plaintiff's amending of the Complaint to add additional Frontenac entities on March 22, 2007. Prior to the filing of the Amended Complaint, on September 15, 2006, Frontenac had moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) (Doc. #11).

Frontenac objects to these findings. The jurisdictional analysis in this case is rooted in specific personal jurisdiction. The Plaintiff's cause of action, therefore, must relate to or arise out of the defendant's in-forum activities. Here, the Court erred by basing its finding of specific personal jurisdiction solely on "imputed" Rhode Island contacts that are unrelated to the alleged formation of the underlying contract at issue in this case. In this case, the contract at issue was allegedly formed in Atlanta, Georgia, at a meeting between Plaintiff and Mr. Richard, not in Rhode Island. The evidence reviewed by the Court does not support a finding of a joint venture or agency relationship between Richard and Frontenac during this time, and therefore it was error to impute any of Richard's Rhode Island contacts to Frontenac during the time the contract was allegedly formed. Further, even if there was a basis to impute Mr. Richard's Rhode Island contacts, those Rhode Island contacts did not relate to the formation of the contract in Atlanta, Georgia. For these reasons, it was error for the Court to find that imputed contacts support the finding of specific personal jurisdiction over Frontenac.

Moreover, the Court further erred by finding that Frontenac, having no direct contacts to Rhode Island of its own, somehow purposefully availed itself of the privilege of voluntarily conducting business in Rhode Island. In this case, unlike Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42 (1st Cir. 2002), upon which the Court acknowledged placing heavy reliance, there was no evidence of any voluntary acts by Frontenac (distinct from Richard) to purposefully avail itself of the benefits and protections of Rhode Island law. Unlike Daynard, there is no evidence in this case that Frontenac made any promise of compensation to Plaintiff. Moreover, unlike Daynard, the alleged contract was not negotiated and entered into in the forum state (Rhode Island), but was negotiated and entered into at a meeting in Atlanta, Georgia. Unlike Daynard, there is also no evidence that Frontenac was aware that Richard somehow reached into Rhode Island, or was aware that Plaintiff had performed services in Rhode Island. In these circumstances, based solely

on Richard's contacts with Rhode Island unrelated to the formation of the alleged agreement, it is simply not foreseeable that Frontenac could be haled into court in this jurisdiction. Indeed, the Court conceded that its personal jurisdiction analysis, relying solely upon contacts imputed from Richard, "just barely" passed constitutional muster. Accordingly, for the foregoing reasons discussed more fully below, the Court should reject the R&R and decline to exercise specific personal jurisdiction over Frontenac.

## Argument

### I. Standard Of Review And Burden Of Proof.

The standard of review for an objection to a magistrate judge's report and recommendation is de novo. See 28 U.S.C. § 636(b)(1)(C). The District Court is permitted to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

In a case challenging the constitutional exercise of long-arm jurisdiction, the Plaintiff bears the burden of proving that this Court has specific personal jurisdiction over the Defendant. Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 7 (1st Cir. 2002). The Plaintiff must point to specific facts in the record that support the exercise of jurisdiction. Id. at 8. Under the prima facie standard – the burden of proof applicable in this case – the Court must accept the plaintiff's factual proffers as true, while also considering facts put forward by the defendant to the extent that they are uncontradicted. Daynard, 290 F.3d at 51 (citing to Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)).

## II. The Court Improperly Relied On Facts That Were Unrelated To The Formation Of The Alleged Contract In Its Specific Jurisdiction Analysis.

### A. For Purposes Of Determining Specific Jurisdiction, The Claim Must Arise Out Of Or Relate To The Defendant's In Forum Activities .

In determining that Richard's contacts with Rhode Island should be imputed to Frontenac, and in determining that those imputed contacts satisfied the requirements of specific jurisdiction over Frontenac, the Court erred by relying on information that is unrelated to the formation of the contract that underlies the dispute in this case. This reliance is critically important to the jurisdictional analysis in this case given that the only possible basis for exercising jurisdiction over Frontenac is specific personal jurisdiction.[2] In specific personal jurisdiction cases, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 144 (1st Cir. 1995).

As stated by the First Circuit in Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995):

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contracts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Moreover, the First Circuit has made clear that, in breach of contract cases, the focus of the specific personal jurisdiction inquiry is on the forum-based activities that are "instrumental in the formation of the contract." Mass. School of Law at Andover, Inc. v. Am. Bar Assoc., 142 F.3d 26, 35 (1st Cir. 1998) (citing Hahn v. Vermont Law Sch., 698 F.2d 48, 51 (1st Cir. 1983) (emphasis added)); see Killion v. Commonwealth Yachts, 421 F. Supp. 2d 246, 254 (D. Mass. 2006) (providing that in

[2] The parties concede that there is no basis for the assertion of general personal jurisdiction over Frontenac. See R&R at 16-17; Plaintiff's Memorandum of Law in Opposition to Amended Motion to Dismiss at 21-24.

contract cases the jurisdictional inquiry is whether the forum-based activities are instrumental to the formation of the contract).

The fact that the Plaintiff implored the Court to undertake an imputed contacts analysis to find specific personal jurisdiction in this case does not alter the strictures under which the jurisdictional inquiry must take place – the focus of the imputed contacts must still be on the formation of the contract that underlies Plaintiff's breach of contract claim. See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002). In Daynard, a specific jurisdiction case, the court held that a sufficient joint venture relationship existed between the Motley defendants and the Scruggs defendants to warrant attribution of the Motley defendants' contacts with the forum to the Scruggs defendants. However, in Daynard, the court focused on the relationship between the defendants, the forum, and the formation of the underlying contract. The Court held:

> Here a direct connection is alleged between the in-forum activities of the agent (the Motley defendants) and the agent's relationship with the principal (the Scruggs defendants). When the cause of action relates to both the association's activities giving rise to the suit and to the member's in-forum activities, the same risk of unfairness is not necessarily present. In the present case, Daynard's suit relates to the Scruggs defendants' alleged promise to pay him a share of the fees and to the Motley defendants' activities in Massachusetts, claimed to have been ratified by Scruggs.

Daynard, 290 F.3d at 55 (emphasis added).

In other words, the holding in Daynard provides for the attribution of contacts from one party to another, but the underlying requirement of "relatedness" in a specific personal jurisdiction analysis is not ignored. Id. at 54-55 (distinguishing the nature of the dispute in Daynard from general jurisdiction cases); see Killion, 421 F. Supp. 2d at 256 (holding that imputed contacts need to relate to the basis for specific personal jurisdiction). Indeed, to hold otherwise would permit the exercise of personal jurisdiction over a non-resident defendant in a specific jurisdiction case based on activities or conduct unrelated to the underlying dispute. Sawtelle, 70 F.3d at 1389 (holding that specific

jurisdiction is not appropriate "merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state") (emphasis added).

**B. The Facts Relied Upon By The Court Do Not Support A Finding That A Joint Venture Or Other Relationship Existed Between Richard And Frontenac At The Time The Alleged Contract Was Formed In Atlanta.**

In this case, in determining that Richard's contacts with Rhode Island may be imputed to Frontenac, the Court incorrectly considered facts that are unrelated to the underlying contract dispute and which pre-date and post-date the alleged formation of the contractual relationship in February 2005 in Atlanta.

**1. Facts Relating To The Earlier Pro-Mach Venture Do Not Establish That A Joint Venture Or Other Relationship Existed At The Time Of The Alleged Atlanta Agreement.**

The Court erred by considering facts relating to the Pro-Mach venture that took place as far back as 2003. The uncontradicted evidence shows that the Pro-Mach venture was a separate and independent venture that pre-dates the formation of the alleged contract in this case. For example, the Court relied on an August 18, 2003 e-mail from a Frontenac employee to Richard that discusses the Plaintiff. (R&R at 22). This e-mail, however, clearly relates to a previous venture that is entirely unrelated to the current dispute. Indeed, Plaintiff concedes in his own affidavit that any discussions between he and Richard in 2003 "did not progress further", indicating a distinct separation between interactions during the Pro-Mach time-period of 2003 and the instant dispute relating to the formation of H-E Parts. (Affidavit of Gero Meyersiek at ¶ 5). Accordingly, these facts do not "arise out of" or "relate to" the cause of action in this case, i.e., the formation of a contract to provide Plaintiff with employment at H-E Parts and an equity interest in the company. See Mass. School of Law, 142 F.3d at 34; Sawtelle, 70 F.3d at 1389.

### 2. The February 17, 2005 Email Does Not Support A Finding that A Joint Venture Or Other Agency Relationship Existed Between Richard And Frontenac At The Time Of The Formation Of The Alleged Atlanta Contract.

The R&R refers to a February 17, 2005 e-mail from Richard to Frontenac that discusses the initial meeting between Plaintiff and Richard in Atlanta relating to a plan to form a new company. Contrary to the Court's analysis, however, the content of this email is not sufficient to establish that a joint venture or other agency relationship existed between Richard and Frontenac at this time. First, the email is a communication solely from Richard to Frontenac, and does not evidence a response by Frontenac or any statement by Frontenac supporting the existence of a joint venture or agency relationship at this time. Compare Daynard, 290 F.3d at 53 (according to plaintiff, Scruggs "consistently purported to be" in a joint venture relationship with the Motley defendants at the time the Motley defendants retained Daynard in Massachusetts).

Second, the e-mail to Frontenac provides no discussion of any alleged contract or compensation for Plaintiff, and does not seek approval to enter into a specific agreement with Plaintiff. Compare id. at 46-47 (where it was alleged that both the Motley defendants and the Scruggs defendants agreed to compensate Daynard). The fact that the Court describes Richard as being "highly complimentary" of Plaintiff, or that Richard wanted Plaintiff as part of Richard's team, (see R&R at 23), does not indicate that Richard and Frontenac were in a joint venture at that time, or that Frontenac was using Richard as its agent to somehow retain Plaintiff. The email neither establishes agreement on the part of Frontenac to retain Plaintiff, nor that Frontenac had ever directed Richard to seek approval from it on such matters.

Third, the Court reaches beyond the content of the email to infer that "Katz and Richard have had previous communications regarding the new venture (and probably Meyersiek)" and that "[i]t also appears that Frontenac had already provided some assistance to Richard regarding the project."

(Id.) Those inferred communications regarding Plaintiff do not appear in the record evidence, however, and Plaintiff adduced no evidence of any such communications. Moreover, the "assistance" referred to by the Court is unspecified "help with Chad Bern", (see R&R at 22-23, n. 14), and not identified as providing a basis for a finding of a joint venture.

Fourth, that the email does not evidence a developed joint effort between the parties at this time is made plain by the second paragraph of the email. In this paragraph, Richard essentially describes the concept of the project in very basic terms to Katz: "project 'crawl' can be summarized as a strategic build-up made up of will-fitters (non-OEM replacement parts distributors) and various 'orphan' parts portfolios negotiated with OEM's (declining or discontinuing product lines)." Clearly, Richard's need to provide a very basic summary description of the project to Frontenac indicates that the concept was only in its infancy at this time, and that Richard was still at the stage of familiarizing Frontenac with the concept. The email is manifestly not an indication that the parties were engaged – at this time – in a developed joint venture or other agency relationship with respect to "project crawl."

**3. The letter of intent dated July 11, 2005.**

Finally, the Court relied on a letter of intent dated July 11, 2005 that Richard and Frontenac sent to the president of Dom-Ex, a potential acquisition target. (R&R at 25). The letter of intent, however, post-dates by many months the alleged formation of the underlying contract in February 2005 in Atlanta. Accordingly, the letter of intent cannot be factored into the imputed contacts analysis, given that it does not relate to the formation of the contract that gives rise to the underlying dispute in this case.

In short, the evidence relied upon by the Court to impute Richard's Rhode Island contacts to Frontenac do not support a finding that a joint venture or agency relationship "however one defines

it" existed between Richard and Frontenac at the time of Richard's meeting with Plaintiff in Atlanta in February of 2005. There is no basis, therefore, to impute any of Richard's contacts during this period of time to Frontenac.

**C. Even If Richard's Rhode Island Contacts Can Be Imputed To Frontenac, Those Contacts Do Not Relate To The Formation Of The Alleged Contract In Atlanta.**

Even if it can be said that Richard's contacts can be imputed to Frontenac, the critical contacts relating to the formation of the alleged agreement occurred in Atlanta, Georgia, at a face-to-face meeting between Richard and Plaintiff. As the Court acknowledged in the R&R, "[i]t is true here the contract between Plaintiff and Richard appears to have been made in Atlanta." (R&R at 29, n. 22). The Court based this observation on Plaintiff's own affidavit. (See Affidavit of Gero Meyersiek at ¶¶ 8-9). In these circumstances, therefore, the critical contacts relating to the formation of the agreement are not Rhode Island-based contacts at all, but are rather centered in Atlanta. Mass. Sch. of Law, 142 F.3d at 35 (holding that in breach of contract cases the focus of the personal jurisdiction inquiry is on the forum-based activities that are "instrumental in the formation of the contract").

Moreover, while the Court indicated that Richard first reached into Rhode Island to seek out Plaintiff's assistance in the new venture, Plaintiff's affidavit concerning a telephone discussion between Richard and Plaintiff does specify who initiated the call. (See Affidavit of Gero Meyersiek at ¶ 7).[3] Further, the affidavit fails to identify if Plaintiff was even in Rhode Island at the time he and Mr. Richard spoke regarding the new venture. (Id.) Regardless, it is clear from Plaintiff's affidavit that the specific terms of an alleged arrangement were not discussed until Richard met with Plaintiff

[3] Paragraph 6 of the Plaintiff's Affidavit refers to a different transaction involving the potential acquisition of MinnPar. According to the Plaintiff's own testimony, MinnPar was an entirely "new venture" and had no relation to the venture that ultimately became H-E Parts. Although it is alleged that Mr. Richard contacted Plaintiff, the affidavit fails to indicate that Plaintiff was in Rhode Island when he spoke with Mr. Richard. (Affidavit of Gero Meyersiek at ¶ 6).

in Atlanta. (Id. at ¶ 8). Nor is there any evidence presented by Plaintiff that Frontenac was aware that Richard made such a call to Plaintiff in Rhode Island or what was discussed.

Finally, the February 2005 email from Richard (who is located in Atlanta) to Frontenac (who is located in Chicago) following the Atlanta meeting does not mention Rhode Island at all, does not mention any specific terms of an agreement with Plaintiff, and does not specify what Plaintiff's duties would be or from where Plaintiff would perform work. Here, the contacts relied upon by the Court to establish jurisdiction over Frontenac are simply unrelated to the formation of the alleged agreement, which was not negotiated or entered into in Rhode Island. For these reasons, even if some of Richard's Rhode Island contacts are imputed to Frontenac, they are not constitutionally sufficient to support the exercise of long-arm jurisdiction over Frontenac.

**III. The Evidence Does Not Support a Finding of Ratification.**

In concluding that Frontenac ratified the contract allegedly entered into by Plaintiff and Richard, the Court relied heavily on the holding in Daynard. See R&R at 27-28 ("As was the case in Daynard, … many of the same facts which support the finding of a partner, agency, or other joint venture relationship also support the conclusion that Frontenac subsequently ratified Richard's conduct in engaging Meyersiek."). This case, however, is markedly different from the facts of Daynard in at least three important and crucial respects.

First, unlike Daynard, the record in this case is devoid of any evidence whatsoever showing that Frontenac ever communicated with the Plaintiff on the subject of compensation, or ever agreed to compensate the Plaintiff for work it knew was occurring in Rhode Island. In Daynard, there was evidence that Scruggs himself had promised Daynard a fee, that Scruggs was further aware that Ness, Motley traveled to Massachusetts to retain Daynard there. According to Magistrate Judge Martin, in this case, "[i]t is true that, unlike Daynard . . . there is no evidence that Frontenac ever told Meyersiek

that he would be compensated for his services." (R&R at 30). The Court itself conceded that this distinction between this case and Daynard gave "the Court considerable pause." Id.

Second, the Daynard court emphasized the Scruggs defendants' knowledge of the Motley defendants' connections to the forum when determining the ratification issue. The court stressed that the Scruggs defendants had knowledge that the underlying transaction had been initiated in Massachusetts. Daynard, 290 F.3d at 60 ("By knowingly accepting the benefits of the transaction initiated in Massachusetts, the Scruggs defendants ratified Patrick's act of hiring and retaining Daynard on behalf of both firms, which ultimately gave rise to this law suit.") (emphasis added). Moreover, the Daynard court further relied on the fact that the Motley and Scruggs defendants agreed to compensate Daynard for work they knew he had performed in Massachusetts. Id.

In this case, there is no evidence in the record that Frontenac was aware that Plaintiff performed work in Rhode Island, and the alleged contract itself was not "initiated" in Rhode Island, but rather in Atlanta. Indeed, unlike Daynard, no representative of a joint venture traveled to Rhode Island to form a contract with Plaintiff for work to be conducted in this state, nor is there any evidence that Frontenac was aware of a contract being created in Rhode Island.

Third, unlike Daynard, the other evidence recited by the Court as the "totality of evidence" supporting ratification is not evidence of ratification by Frontenac of an agreement to employ Plaintiff in Rhode Island. In Daynard, evidence of ratification featured Daynard "***provid[ing] both firms with legal advice, including advice to members of the Scruggs firm physically present in Boston***, as well as assistance provided from Boston by phone and fax." 290 F.3d at 59 (emphasis added). Evidence of ratification in that case also included Daynard's assertion that "he began providing information directly to the Scruggs defendants," that he began "communicating regularly" with the Scruggs defendants, and that the Scruggs defendants came to Boston to receive his advice . . . ." Id.

In contrast to Daynard, the "totality of evidence" supporting ratification in this case consists of the Court's reference to the Frontenac website and Katz's 2003 referral of Plaintiff to Richard. (R&R at 31). Both of these facts, however, pre-date the Atlanta meeting and is not evidence of a subsequent ratification by Frontenac of an agreement to retain Plaintiff's services in Rhode Island. Further, the letters to prospective investors cited by the Court is not evidence that Frontenac had ratified an agreement to retain Plaintiff in Rhode Island. In fact, the letters have nothing to do with the terms of Plaintiff's services at all, nor do they indicate that Frontenac had "cloaked" Richard with any authority to retain Plaintiff in Rhode Island.

Finally, there is no evidence that Plaintiff communicated regularly with Frontenac from Rhode Island, that Plaintiff provided services directly to Frontenac (as opposed to Richard) by phone and fax from Rhode Island, or that Frontenac accepted services directly from Plaintiff that Frontenac knew had been carried out in Rhode Island. See Beckwith v. Rhode Island Sch. of Design, 404 A.2d 480, 485 (R.I. 1979) (holding that before a principal can ratify the acts of an agent, the principal "must have full knowledge of all material facts"); Kesselman v. Mid-States Freight Lines, Inc., 82 A.2d 881, 882 (R.I. 1951 ("It is generally held that to constitute a valid ratification . . . the principal ordinarily must have full knowledge of all the material facts and circumstances relating to the unauthorized act at the time of confirmation."). This case, therefore, is far removed from Daynard with respect to any knowing ratification on the part of Frontenac to retain Plaintiff in Rhode Island, and it is respectfully submitted that the Court erred in finding ratification on this record.

## IV. Frontenac Never Purposefully Availed Itself Of The Benefits And Protections Of Rhode Island's Laws.

Even if it was appropriate for the Court to impute Richard's contacts to Frontenac for purposes of the specific jurisdiction analysis, Frontenac objects to the finding that those imputed contacts alone are sufficient to establish the purposeful availment prong of the specific jurisdiction

analysis. (See R&R at 34). Frontenac submits that Richard's contacts with Rhode Island, standing alone, are constitutionally insufficient to support jurisdiction, absent some additional action by Frontenac to purposefully avail itself of Rhode Island's laws. Indeed, the Court itself here expressed that the contacts imputed to Frontenac were "just barely" sufficient to pass constitutional muster under the purposeful availment analysis. (R&R at 34). Upon close inspection, it appears that these imputed contacts are not at all sufficient to render suit in this jurisdiction foreseeable to Frontenac, and the Court should have granted Frontenac's motion to dismiss.

"The cornerstones upon which the concept of purposeful availment rest[s] are voluntariness and foreseeability." Daynard, 290 F.3d at 61 (citing Sawtelle, 70 F.3d at 1391). It is crucial to the showing of purposeful availment that minimum contacts exist sufficient that a defendant, by its voluntary and knowing conduct, "should reasonably anticipate being haled into court [in the forum State]." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985). Moreover, because this is a specific jurisdiction case, the purposeful availment must necessarily relate to the claim underlying the litigation. Daynard, 290 F.3d at 61.

In concluding that Frontenac purposefully availed itself of the benefits and protections of Rhode Island law, the Court relied heavily on Daynard. However, this is a markedly different factual situation than what was present in Daynard, where the contract was entered into in the forum, both the Motley and Scruggs defendants made trips into the forum, there was evidence that both the Motley and Scruggs defendants made oral promises to the plaintiff with respect to compensation for his work, and there was evidence that the Scruggs defendants knowingly accepted work sent by Daynard directly to them from Massachusetts. Daynard, 290 F.3d at 62-63.

By contrast, the Court's finding of purposeful availment in the R&R is based solely on the contacts imputed to Frontenac, and not on the basis of any direct actions by Frontenac to avail itself

of the protections of Rhode Island law. The record here is devoid of any evidence showing that Frontenac was aware that Plaintiff was in Rhode Island or that any assistance allegedly provided by Plaintiff to Richard relating to the H-E Parts venture was being performed in Rhode Island. Further, there is no evidence that the Frontenac defendants made any trips into Rhode Island, or that Plaintiff began communicating regularly with the Frontenac defendants, or that Plaintiff began providing work product and advice directly to Frontenac. Finally, unlike Daynard, there is no evidence in the record that Frontenac promised Plaintiff any compensation, or that it had authorized Richard to retain Plaintiff in Rhode Island, further removing Frontenac from any connection to Rhode Island. Cf. Id. at 62.

Frontenac therefore submits that the Court expanded the holding in Daynard beyond its constitutional limits when it found that Frontenac had purposefully availed itself of the benefits and protections of Rhode Island law. There is insufficient evidence in the record to show that Frontenac, an out-of-state defendant with no direct contacts of its own, purposefully availed itself of Rhode Island laws so that its involuntary presence in this Court would be foreseeable. This is particularly so in circumstances where the imputed Rhode Island contacts relied upon by the Court are unrelated to the formation of the underlying contract in Atlanta, and fail to evidence that Frontenac knowingly participated in a transaction that was formed in Rhode Island.

## **Conclusion**

For the foregoing reasons, the Court should decline to adopt the Report and Recommendation and grant Frontenac's Amended Motion to Dismiss for Lack of Personal Jurisdiction.

FRONTENAC COMPANY, FRONTENAC COMPANY VIII, LLC, FRONTENAC COMPANY VIII PARTNERS, LP, and FRONTENAC COMPANY VIII LIMITED PARTNERSHIP

By their Attorneys,

/s/ Stephen M. Prignano
/s/ Raymond M. Ripple

Stephen M. Prignano (#3649)
Raymond M. Ripple (#6489)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)
sprignano@eapdlaw.com
rripple@eapdlaw.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document has been filed electronically on this 13th day of June, 2008 and is available for viewing and downloading to the ECF registered counsel of record:

R. Daniel Prentiss, Esq.
R. Daniel Prentiss, P.C.
One Turks Head Place, Suite 380
Providence, RI 02903
dan@prentisslaw.com

/s/ Raymond M. Ripple
Raymond M. Ripple