**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| GERO MEYERSIEK,<br>Plaintiff,<br><br>v.<br><br>JEAN PAUL RICHARD, FRONTENAC COMPANY, FRONTENAC COMPANY VIII, L.L.C., FRONTENAC VIII PARTNERS, L.P., FRONTENAC VIII LIMITED PARTNERSHIP and H-E PARTS, INTERNATIONAL, INC.<br>Defendants. | : | No. C.A. 06-335-T |

**PLAINTIFF GERO MEYERSIEK'S MEMORANDUM OF LAW IN OPPOSITION TO THE FRONTENAC DEFENDANTS' OBJECTION TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This action arises from an agreement reached by Gero Meyersiek and Defendant J.P. Richard ("Richard") for Meyersiek's services in the development of a business enterprise. Meyersiek agreed, in exchange for defined compensation and participation in equity, to provide his research, analytical, and strategic skills in developing and executing a business model for the acquisition and conglomeration of independent businesses in the heavy equipment replacement parts industry. Meyersiek alleges that Richard was at all times acting as an authorized agent of Defendants Frontenac Company, Frontenac Company VIII, LLC, Frontenac VIII Partners, L.P., and Frontenac VIII Limited Partnership (together, "Frontenac")[1]. After the business model reached fruition, in the form of the company (and defendant) H-E Parts International, Inc. ("H-E

[1] The plaintiff initially sued just Frontenac Company. Following depositions taken of Frontenac in jurisdictional discovery, plaintiff was granted leave to amend his complaint to include the other Frontenac entities.

Parts"), Richard and Frontenac breached the agreement, refusing Meyersiek's compensation for his work, or equity in the new business venture.

Frontenac moved for dismissal pursuant to Rule 12 (b)(2) of the Federal Rules of Civil Procedure. Following briefing and oral argument, Magistrate Judge Martin issued a Report and Recommendation, on May 30, 2008 ("R & R"), recommending denial of Frontenac's motion. Judge Martin first rejected the claim that the various Frontenac entities should be dealt with individually in the jurisdictional analysis. Based on his finding that the Frontenac entities were treated essentially interchangeably by Frontenac itself, he recommended, in essence, that the all Frontenac entities be treated as one for the purpose of determining *in personam* jurisdiction. R & R, pp. 11 – 14. Frontenac has not objected to this recommendation, and therefore must be deemed to have accepted it. *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st. Cir. 1980). Meyersiek will not address this recommendation.

Frontenac's specific objections to the R & R are that the Court, through the Magistrate Judge 1) "relied on facts that were unrelated to the formation of the alleged contract in its specific jurisdiction analysis" (Defendants' Memorandum of Law in Support of their Objection to Report and Recommendation (Defendants' Memo") at p. 4); 2) erroneously found that Richard's actions were ratified by Frontenac (Defendants' memo at 10); and 3) erroneously found that Frontenac had purposefully availed itself of the benefits and protections of Rhode Island's laws (Defendants' Memo at p. 12). The discussion of facts and law below is limited to these specific objections.

LEGAL STANDARD

Rhode Island's long-arm statute, R.I. Gen. Laws §9-5-33 establishes jurisdiction to the maximum extent permitted by the Fourteenth Amendment; therefore, what is permitted under the

Due Process Clause is the sole inquiry in this case. *See Almeida v. Radovsky*, 506 A.2d 1373, 1374 (R.I.1986). A defendant is subject to *in personam* jurisdiction when it has certain minimum contacts with the forum such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 31, 39 (1945). In a contract case, the Court looks to the parties' negotiations, future consequences, terms of the contract, and the parties' actual course of dealing to determine whether the defendant purposefully established the necessary minimum contacts. *Daynard v. Ness Motley, Loadholt, Richardson & Poole, P.A.* 290 F.3d 42, 52 (1st Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (S. Ct. 1985).). Contacts by a particular defendant may be direct, or be imputed from another. *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 7-8 (1st Cir. 2002). The actions of an agent are sufficient to establish jurisdiction over a principal. *Daynard,* 290 F.3d at 55.

The First Circuit uses the *prima facie* standard to determine whether personal jurisdiction exists, accepting the plaintiff's properly documented evidentiary proffers as true and construing them in the light most favorable to the plaintiff's jurisdictional claim. *See Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83 (1st Cir. 1997).

Here, Richard has admitted to being subject to the jurisdiction of this Court. The jurisdictional analysis with respect to Frontenac therefore resolves to the single question of whether the relationship between Richard and Frontenac was such that Richard's activities may be imputed to Frontenac.

## BACKGROUND FACTS

<u>The Parties</u> Meyersiek is a career business executive who has been employed in executive positions at the General Electric Company and Textron, Inc., among other employers. Meyersiek Affidavit, ¶2.[2]

Frontenac is a private equity investment firm based in Chicago Illinois. Frontenac raises capital from large institutions and uses that money to invest in or acquire companies that it hopes can be sold or taken public in the future – returning the capital and most of the profits to the large institutions. Deposition of Frontenac partner and managing director David Katz ("Katz Dep.") at 7:3 – 10. Frontenac holds itself out as having a unique relationship with the executives it selects to lead its companies. It uses the trademarked appellation "CEO1ST" to describe its executive program, and the members of its stable of executives. On its website, a page introduced by the link, "How We Partner with Executives," describes the Frontenac model of its relationship with its executives:

> Some private equity firms compete to "land the deal," and afterwards try to find the right management team. Frontenac identifies an executive or team with outstanding industry knowledge and past performance, and *then we find the right company together*.

Exh. 1; Katz Dep. at 14:10 – 15:1 (emphasis supplied).

Frontenac Company does not itself raise equity funds or make investments in companies. It forms subsidiary entities for that purpose. The other defendant Frontenac entities are part of a structure to permit Frontenac managers to participate in the investments. Deposition of Frontenac equity partner and managing director Laura Pearl ("Pearl Dep") 10:7 – 13:13.

Defendant Richard is a business executive with a career as a top executive at several large American industrial corporations. Deposition of J. P. Richard ("Richard Dep.") 5:3 – 7:14. Richard and Frontenac formed a business, ProMach, Inc., to conduct a "strategic buildup" of

---

[2] References to exhibits are, unless specifically noted otherwise, to the exhibits that were appended to the plaintiff's Memorandum of Law in Opposition to Defendants' Amended Motion to Dismiss.

acquisition of companies in the packaging industry in 1998. Richard Dep. 8:2 – 9:17. Katz was the Frontenac lead on the project. Katz Dep. at 19:18 – 21. Frontenac was the majority shareholder of ProMach; Richard was the Chief Executive Officer ("CEO"), making him a Frontenac CEO1ST executive. Katz Dep. at 21:6 – 8, 22:8 – 13; 23:15 – 8. Frontenac placed Richard's photograph on its website as one of its CEO1ST executives. Exh. 1. This representation of Richard as one of its executives remained on Frontenac's website throughout 2005, during the time that Richard was ostensibly not in any relationship with Frontenac. *See* Frontenac response to Request for Admissions, appended hereto.

Frontenac Introduces Meyersiek to Richard In 2003, Meyersiek was an executive, senior manager, and an owner of "Parts-Zone," a manufacturer and distributor of replacement parts for heavy equipment that was no longer in production by its original manufacturer. Meyersiek Aff. ¶2. In an effort to obtain equity funding for expansion of Parts-Zone, Meyersiek called a former professional colleague whom he knew to be a Frontenac partner. *Id.* ¶3. He was referred to David Katz as being the Frontenac partner to whom he should speak. *Id.* ¶3. Katz in turn identified Richard as Frontenac's person in Meyersiek's industry. *Id.* ¶3. Katz described Richard as a Frontenac CEO1ST executive and stated that the Parts-Zone plan would need to pass muster with Richard in order for Frontenac to have any interest in the venture. *Id.* ¶3.

By coincidence, Katz and Richard had at the same time been discussing Richard's next Frontenac venture. Although he continued in his role as CEO of ProMach, Richard and Frontenac by 2003 were ready to begin planning another venture after the conclusion of the ProMach business plan. In an email to Richard explaining his referral of Meyersiek to him, Katz told Richard,

> I shared with Gero the fact that you and we have been discussing how we might get into the replacement parts and service industry through acquisition and have been evaluating together potential entry strategies.

Exhibit 2.

At Katz's request, Richard met with Meyersiek and evaluated Meyersiek's presentation to determine whether Frontenac should consider investing in Parts-Zone. Richard Dep. at 27:17 – 30:1. Katz was aware that the conversation between Richard and Meyersiek took place and that some of Meyersiek's strategy and ideas were similar to some of those of Richard and Frontenac. Katz Dep. at 25:22 – 26:1. Although this project did not bear fruit, Richard concluded the discussions by stating that he would like to explore Meyersiek's ideas further when he had additional time to devote to them. Meyersiek Aff. ¶5

Richard Calls Meyersiek to Start New Venture In December, 2004, Richard called Meyersiek to inform him that Frontenac had sold ProMach, and that Richard was now ready to start a new Frontenac investment venture in the replacement parts industry. Meyersiek Aff. ¶¶ 6, 7. They met in Atlanta in February 2005, and reached agreement regarding Meyersiek's role in the company; they agreed that Meyersiek would be able to perform all of his functions from his office in Rhode Island, by telephone, internet, and mail. Meyersiek Aff. ¶8. Richard offered, and Meyersiek accepted, a compensation package, when the business was formed, of a salary of $175,000 per year, with bonus eligibility of up to an additional $175,000, and four percent equity share in the enterprise. Richard told Meyersiek that he would have to "run this by David Katz" at Frontenac, to get his approval of the agreement with Meyersiek. Meyersiek Aff. ¶ 8; Richard Dep. at 50:6 – 14. Meyersiek specifically relied on Richard's affiliation in agreeing to accept the offer. He would never have committed himself to the venture without the knowledge that Richard was acting on Frontenac's behalf. Meyersiek Aff. ¶ 10.

The following day, Richard emailed Katz to apprise him of his meeting with Meyersiek. He described Meyersiek in laudatory terms:

> I have had an excellent meeting with Gero yesterday (a full half a day) and a lot was accomplished. I have decided I would get much more mileage out of working with Gero then Harvey. But I want you to be comfortable with him (he would constitute my new team with a new CFO still to be hired). Gero is very bright, listens well, and, I believe, has excellent personal skills. A person with his intellect who has spent the last two years covering all aspects of the parts distribution business has a lot to bring to the party.

Exh. 3.

A few days later, Richard called Meyersiek and told him that David Katz had approved Meyersiek's involvement and compensation. Meyersiek Aff. ¶9.

Meyersiek immediately began working essentially full time on the venture, and continued to do so until August, 2005. *Id.*

Development of the H-E Parts Business Venture The first step in the development of H-E Parts was exploring and analyzing potential target firms for acquisition. Before meeting with Meyersiek, Richard had prepared an initial draft of a letter of inquiry to potential targets, stating in the introductory paragraph,

> I have partnered with the Frontenac Company (www.frontenac.com), a Chicago-based private equity group with revenues in excess of $5 billion, to execute a major build-up in the industrial parts distribution sector.

Exh. 4. Meyersiek and Richard sent this letter, in modified form (but with identical language regarding the partnership with Frontenac) to dozens of companies around the country over the next several months. Richard Dep. at 72:19 – 73:6; Exh. 5.

Frontenac was aware and approved of Richard's representation of himself as partnered with it. Katz Dep. at 36:10 – 37:4. Frontenac felt that this representation enhanced Richard's credibility, showing Richard had access to Frontenac's capital. Katz Dep. at 46:14 – 47:5.

Frontenac provided resources and support to Richard in pursuit of the venture, including use of databases, hiring a third party to evaluate the market, and providing access to Frontenac administrative support. Richard Dep. at 58:15 – 59:3, 111:10 – 112:1. Frontenac personnel were in direct contact with representatives of acquisition targets and participated in site visits. Richard Dep. at 106:9 – 22, 58:17 – 18. Frontenac consultants provided analytical studies, and ran Richard's projections on its financial models. Richard Dep. at 89:20 – 91:12, 109:9 – 13.

Frontenac partner Laura Pearl conducted industry research and financial modeling for the project, and provided detailed guidance and instruction to Richard on how to respond to specific inquiries from target companies based upon Frontenac's approach and procedures. Pearl Dep. at 20:18 – 21:2; 21:19 – 22:18; 25:20 – 27:2.

Frontenac undertook many of the upfront costs of the venture during the investigation phase. This included the financial due diligence process, retention of a headhunting firm, and use of its law firm to draft and review legal documentation. Richard Dep. at 112:5 – 21; 122:25 – 123:9; 123:20 – 124:6. Pearl Dep. at 30:17 – 19.

Selection of the lender for the venture was Frontenac's decision. Pearl Dep. at 35:9 – 18. Richard's compensation was determined by Frontenac. Pearl Dep. at 40:17 – 41:12. In short, Frontenac was in ultimate control of the venture moving forward. Richard Dep. at 146:20 – 22

Both Katz and Pearl met with Meyersiek while Meyersiek was performing his work for the venture (Katz two or three times); Katz and Meyersiek also exchanged e-mails concerning his work. Katz Dep. at 51:22 – 52:2; Pearl Dep. at 17:2 – 8. Frontenac grudgingly acknowledged its awareness that Meyersiek was directly involved in the development process. Katz Dep. at 36:5 – 9 ("I knew that J.P. and Gero discussed targets, pros, cons, positives,

negatives; but I don't know what the level of research or primary work or independent thinking Gero was or was not doing in his work for and with J.P.").

Frontenac and H-E Parts executed a letter of intent with Dom-Ex, Inc., ("Dom-Ex") on July 11, 2005. Dom-Ex had been identified as a target and analyzed by Meyersiek. Meyersiek Aff. ¶ 9. The letter of intent is on Frontenac Company letterhead; its parties include H E Parts, and the "Frontenac VIII" defendants. Exh. 6.

In its efforts to attract a lender to the venture, Frontenac prepared a PowerPoint slide presentation identifying "The Partnership" that was seeking funds for the acquisition of Dom-Ex:

- J-P Richard
- Frontenac Company

Exh. 7. This representation, with further elaboration, was carried through on a PowerPoint slide for presentation October 5, 2005 to "M & I Bank," several other banks, and to the Frontenac partners in November, 2005. Exh. 8. Richard Dep. at 138:10 – 140:9.

Frontenac closed on the acquisition of Dom-Ex by H-E Parts in February, 2006.

Frontenac Refuses to Honor Its Obligation In August, 2005, after Richard and Meyersiek made a presentation to Frontenac partners in Chicago, Katz informed Richard that Frontenac would not approve of Meyersiek being a part of the management team. Katz Dep. at 55:3 – 18. Richard then informed Meyersiek via a voicemail message that he was out, although he promised that he would try to get Frontenac to pay him for all of his efforts. Richard Dep. at 146:9 – 13. Richard says that he made "hinted" communication to Katz about some kind of payment to Meyersiek, but never followed through with an actual request. Richard Dep. at 147:11 – 15, 148:12 – 21.

## ARGUMENT

## I. THE COURT MUST LOOK TO THE TOTALITY OF THE RELATIONSHIP BETWEEN RICHARD AND FRONTENAC TO DETERMINE IF RICHARD'S ACTIONS CAN BE IMPUTED TO FRONTENAC.

In analyzing the assertion of jurisdiction through imputed contacts, the First Circuit looks to a broad range of agency relationships including partnership by estoppel and joint venture. *Daynard v. Ness, Motley, supra*, 290 F.3d 42. Imputation does not hinge on establishing any particular legal relationship between the defendants. "[E]ven if a defendant's relationship were to fall slightly outside of the confines of these specific doctrines, the question...is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists." *Id.* at 56-7.

The First Circuit further elaborated in *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 7-8 (1st Cir. 2002), stating, "[t]he contacts need not be actions directly taken by [defendant]. Instead, [plaintiff] may rely in whole or in part on actions imputed to [defendant] through its agents-as indeed it must, because any action legally attributed to a corporation is that of one agent or another. The exact type of agency relationship used to impute contacts is not crucial to our inquiry regarding traditional notions of fair play and substantial justice, nor are the technical differences between the states' different rules of agency vital" (citing *Daynard*, 290 F.3d at 56-57) ("[T]he question before us is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists.").

Frontenac's assertion that the Court's review must be limited to facts and events related to the formation of the contract overlooks the critical fact that Richard has admitted to being subject to the jurisdiction of the courts of Rhode Island. If the issue before the Court were the

amenability of *Richard* to suit in this State, then Frontenac's arguments regarding the nature and time of the contacts would have some weight. The decisions on which it places primary reliance for this argument, *Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n.*, 142 F.3d 26, 34 (1st Cir.1998) and *Sawtelle v. Farrell*, 70 F.3d 1381 (1st Cir. 1995), address that circumstance. Both dealt with the determination of the court's jurisdiction over first-tier defendants who had no putative agents for which jurisdiction had been established.

This case, however, is different from *Mass. School of Law, supra,* and *Sawtelle, supra.* There is no question that the individual with whom the plaintiff reached an agreement was the defendant J. P. Richard, and no question that Richard is subject to the jurisdiction of this Court. Therefore the sole question as to the Court's jurisdiction over Frontenac is whether the relationship that existed between Richard and Frontenac at the time the contract was formed was one that will allow the imputation of Richard's actions to Frontenac. Frontenac is correct that the determinative time as of which the relationship must exist is the time of formation of the contract. Frontenac is incorrect in asserting that only evidence contemporaneous with formation of the contract is admissible to prove that relationship. Any evidence that is relevant to the nature of the relationship that existed as of February, 2005 is properly considered in determining the nature of that relationship. Relevant evidence here spans a wide period; Richard testified that his relationship with Frontenac was of a constant nature throughout the year 2005, and did not change until February, 2006. Richard Dep. at 129:4 – 132:20 (appended hereto).

The decision of the First Circuit in *Daynard, supra*, illustrates this point. At issue in *Daynard* was an alleged contract for retention of legal services reached at a meeting in Boston in the fall of 1993. *Id.* at 46. The court's discussion of the facts on which it based its decision that the in-forum contacts of the person who participated in the meeting (for which jurisdiction was

admitted) were imputed to Mississippi defendants (who were contesting jurisdiction) covered events and actions from 1993 through 1997. *See id.* at 46 – 48.

Frontenac's argument that it and Richard were not in a "developed joint venture or other relationship with respect to [H-E Parts]" (Defendants' Memo at 8) misses a central point of *Daynard, supra.* It is not at all necessary, in order for Richard's contacts to be imputed to Frontenac, that he and Frontenac have consummated the ultimate business venture through the formation of H-E Parts and acquisition of Dom-Ex. Certainly, Frontenac can make a promise to Meyersiek to compensate him for his efforts in putting a deal together by providing him an equity participation upon consummation of the deal. If the requisite elements of a contract exist surrounding that promise, it is enforceable. That promise is no less binding merely because at the time of the offer and acceptance, the ultimate deal documents had not been executed.

The First Circuit clearly articulated that, in determining whether imputation is proper, the issue is not "whether, in a dispute between the two firms, a joint venture agreement could be enforced." *Id.* at 56-7. Rather, the inquiry is both broader and less structured than a determination of the actual legal relationship between the two. The focus is not on the rights of Richard and Frontenac with respect to each other, but whether their combined conduct is such that it would be reasonable to expect a third party to believe they were acting in concert. To paraphrase the *Daynard* court, as applied to this case, "we think it consistent with the Due Process Clause to attribute to the [Frontenac] defendants retention of, and certain interactions with, [Meyersiek] where, as [Meyersiek] alleges, they have led [Meyersiek] and the public to believe that they were joint venturers." *Id.*

The relationship between Richard and Frontenac was agent and principal. Under Rhode Island law, agency requires a showing of "1) a manifestation by the principal that the agent will

act for him, 2) acceptance by the agent of the undertaking, and 3) an agreement between the parties that the principal will be in control of the undertaking." *Powers v. Coccia*, 861 A.2d 466, 470 (R.I .2004); *Lawrence v. Anheuser-Busch, Inc.* 523 A.2d 864 (R.I. 1987).

Frontenac first manifested to Meyersiek that Richard would act for it in 2003, when Katz referred Meyersiek to Richard to vet Meyersiek's proposed equity funding. Richard's follow-up to Meyersiek in 2004, announcing that he was ready to form another Frontenac investment (in the same industry as Meyersiek's Parts-Zone), was a direct continuation of the same role. From the beginning of 2005 through the end of Meyersiek's involvement, Richard advanced Frontenac's interests in the development and execution of a business plan in the replacement parts industry. Frontenac and Richard closely collaborated in all stages of the investigation and analysis phase, with Frontenac providing Richard with a multitude of resources and services. It is totally irrelevant to this analysis that the contemplated business venture had not been completed, and was subject to multiple contingencies at the time that Richard enlisted Meyersiek's services. The only question is whether Frontenac and Richard intended Richard to conduct an exploration of the industry and bring to Frontenac a proposal for a venture in that industry to be funded by Frontenac. The answer is indisputably that they did so intend.

The third element of agency, the right of control by the principal, is also easily shown. Richard, Katz, and Pearl all candidly acknowledged that Frontenac was the controlling authority on all decisions of any significance, including specifically the retention of Meyersiek. Richard's e-mail of February 17, 2005 expressly asked for Frontenac's approval ("Please call me to discuss (before Friday noon if possible) what you would like to do with Gero"). Frontenac had approval authority of the forms to be used for non-disclosure agreements and the letter of intent. It was the decision-maker as to the terms of any deal, the lender to selected, and the financing to be

obtained. There was no aspect of the venture on which Richard was free to act on his own; every term and detail was subject to the approval of Frontenac. As Richard stated, "They control the game. If they don't want to finance you, they don't want to do that, there's not much I can do." Richard Dep. at 146. That the parties agreed that the principal would control the agent may be shown by the agent's following the principal's instructions. *Baker v. ICA Mortgage Corp.*, 588 A.2d 616, 617 (R.I. 1991).

Alternatively, agency may be established under the doctrine of apparent authority. Under Rhode Island law, the elements of apparent authority are 1) the principal manifestly consented to or knowingly permitted the agent to exercise the principal's authority, 2) a third person knew of this fact and, acting in good faith had reason to believe and actually did believe that the agent possessed such authority and 3) in reliance on this appearance of authority, the third person changed his position and will be injured or suffer a loss if the act or transaction does not bind the principal. *Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 278 (D.R.I. 2004) (Citing Restatement (Third) of Agency, section 3.03). The third party need not have direct communication with the principal for the third party to justifiably rely on the agent's apparent authority – just a reasonable belief that the agent possessed the authority. *Schock v. U.S.,* 56 F. Supp. 2d (D.R.I. 1999), *Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp. 58 (D.R.I. 1996), *731 Airport Associates v. H & M Realty Associates, LLC ex rel. Leef*, 799 A.2d 279 (R.I. 2002).

Here, Frontenac's first act in cloaking Richard with authority was its direction of Meyersiek to Richard as its person for evaluation of the business plan for which Meyersiek sought equity funds in 2003. Katz described Richard as one of Frontenac's CEO1ST executives, a description that was documented in Frontenac's website. The website's description of the relationship between Frontenac and its CEO1ST executives further elaborates on the air of

apparent authority such executives enjoy. Frontenac augmented its manifestation of authority in Richard by approving his representation that he had partnered with Frontenac in the H E Parts venture. The first iteration of that representation is in the draft letter dated February 11, 2005, which was *before* the meeting at which Richard offered terms of employment to Meyersiek. There is certainly a plethora of "indicia of authority given by the principal to the agent," *Fraioli v. Lemcke*, *supra*, 328 F. Supp. 2d 278, to satisfy this prong of apparent authority.

Apparent authority is a species of estoppel, designed to protect those who reasonably rely on a principal's manifestations of authority to its agent from being injured as a result of that reliance. "The doctrine of apparent authority exists to promote business and protect a third party's reasonable reliance on an agency relationship." *Id.* 328 F. Supp 2d 278-9.[3] *See* Restatement (Third) of Agency, §2.03 ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has the authority to act on behalf of the principal and that belief is traceable to the principal's manifestations").

Regardless of the analysis, there is sufficient evidence to support a finding of Richard's apparent authority to bind Frontenac in offering terms of employment to Richard. The sweep of Richard's ability to bind Frontenac is broader, however, than apparent authority. Frontenac is also bound by acts of Richard which are within his implied authority. Implied authority of an agent may be characterized as "actual authority, circumstantially proven, which the principal is deemed to have actually intended the agent to possess." *McBurney v. Roszkowski,* 875 A.2d 428, 437 n.8 (R.I 2004)(citing 3 Am.Jur.2d *Agency* § 75 (1986)). "Implied authority embraces

[3] *See* R.I. Gen. Laws §7-12-27, "Partnership by Estoppel," subpart (2)(b) "When a person is represented to be a partner in an existing partnership, or with one or more persons not actual partners, he or she is an agent of the persons consenting to the representation to bind them to the same extent and in the same manner as though he or she were a partner in fact, with respect to persons who rely on the representation."

authority to do whatever acts * * * are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.*

It may readily be inferred that Richard had the actual authority of Frontenac to resume in 2004 the discussion with Meyersiek that he took up in 2003 at David Katz's request. The Richard e-mail of February 17, 2005 strongly supports this inference. The further authority to offer the terms of Meyersiek's engagement in the venture is necessarily implied from these facts. Richard expressly stated that authority to Meyersiek when he told him that the terms he offered were subject to David Katz's (Frontenac's) approval. This is more than sufficient evidence to support a finding that Richard was acting with the actual authority of Frontenac in his offer of terms of employment, and in all of his other dealings with Meyersiek.

## II. THERE IS AMPLE EVIDENCE TO SUPPORT THE FINDING OF FRONTENAC'S RATIFICATION OF RICHARD'S INTERACTIONS WITH MEYERSIEK.

Magistrate Judge Martin correctly stated that the same facts that support the agency relationship of Richard to Frontenac establish Frontenac's ratification of his retention of Meyersiek. It was Frontenac that published Richard's status as one of its CEO1ST executives and authorized and approved Richard's promotion of himself as in partnership with Frontenac. Richard's effusive February 17, 2005 e-mail to Katz regarding his expectations for Meyersiek as a member of his team could not possibly have left any doubt for Frontenac regarding Richard's intentions for Meyersiek. In the months following that communication, Frontenac had direct contact with Meyersiek, and was admittedly aware that Meyersiek was performing significant work in furtherance of the Frontenac project. Magistrate Judge Martin correctly concluded that Frontenac's willingness to accept the benefits of Meyersiek's work satisfied the *Daynard* standard for ratification.

In its argument that Meyersiek provided his services to Richard and not to Frontenac (Defendants' Memo at 12), Frontenac again ignores the relationship that existed between these two. From the plaintiff's standpoint, Richard and Frontenac were one and the same. Richard introduced the venture to Meyersiek as a Frontenac project. Meyersiek communicated with Frontenac in carrying out his work. Frontenac was aware of and enjoyed the benefits of his work. It is entirely artificial and at odds with the real relationships that existed to assert that Meyersiek provided services solely to Richard.

Moreover, ratification is not an essential element of the plaintiff's assertion of jurisdiction over Frontenac. Ratification becomes an issue when an agent is not initially authorized to act on behalf of the principal. In that case, a subsequent ratification of the agent's actions by the principal will permit the agent's prior actions to be attributed to the principal. *Daynard,* 290 F.3d at 55. Here, the evidence strongly supports the finding that Richard was authorized from the outset to act on behalf of Frontenac in his exploration of the replacement parts business enterprise. Frontenac's representation of Richard as one of its CEO1ST executives, and Richard's representation of his partnership with Frontenac on the H-E Parts venture, both pre-dated the meeting at which Richard offered the participation agreement to Meyersiek. These facts make it unnecessary to show subsequent ratification of the agreement by Frontenac (though there is also plenty of evidence of such ratification).

## III. THERE IS AMPLE SUPPORT FOR THE FINDING OF FRONTENAC'S PURPOSEFUL AVAILMENT OF THE PRIVILEGES OF DOING BUSINESS IN RHODE ISLAND.

The facts that establish purposeful availment are these: in December, 2004, Richard made contact with Meyersiek by telephoning him at his home in Rhode Island,[4] and proposing that

[4] Frontenac correctly notes that the plaintiff's affidavit was not specific in stating that he was at home in Rhode Island when Richard called him in December, 2004. Defendant's Memo at 9. The plaintiff's supplemental affidavit

they resume their prior discussions about a Frontenac project in the replacement parts industry. They spoke again by telephone (with Meyersiek in Rhode Island) in 2005, to arrange for a meeting in Atlanta. The actual negotiation that led to the agreement took place in Atlanta; however, the agreement they reached was that Meyersiek would perform essentially all of his services under the agreement from his home and office in Rhode Island. From that point until the breach, Meyersiek indeed performed all of his services, working effectively on a full-time basis, from his home and office in Rhode Island, communicating frequently with Richard by telephone, fax, and e-mail, and, though less regularly, also with Frontenac by e-mail. Supplemental Affidavit of Gero Meyersiek, ¶ 4 (appended hereto).

These facts, which closely mirror the facts in *Brian Jackson & Co. v. Eximious Pharmaceutical Corp.*, 248 F. Supp. 2d 31 (D.R.I. 2003), certainly meet the standards of purposeful availment. In *Jackson*, as here, the defendant agreed to retain plaintiff to perform consulting services in Rhode Island, and thereafter was in regular, voluminous contact with him while he performed those services. The only distinction between *Jackson* and this case is that the *Jackson* court described the contract as having been "negotiated and formed, at least on [plaintiff's] end, in Rhode Island." *Id.*, 248 F. Supp. 2d at 35. That distinction does not make any difference in the jurisdictional analysis. The place of making the contract is but one of several factors to be considered in determining purposeful availment, and not even the most important one. "In a contract case, we evaluate the parties' 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' to determine whether the defendants purposefully established minimum contacts." *Daynard, supra*, 290 F.3d at 52, quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).

---

submitted with this memorandum clarifies the point. Richard initiated contact with the plaintiff by placing a telephone call to him in Rhode Island. Supplemental Affidavit of Gero Meyersiek, appended hereto.

Richard's injection of himself into Rhode Island to secure the plaintiff's services is sufficient to establish his purposeful availment of the privileges of doing business in Rhode Island to make him subject to her jurisdiction. He has admitted to that in agreeing to this Court's jurisdiction over him. The tone and content of Richard's February 17, 2005 e-mail to David Katz shows that Frontenac had foreknowledge that Richard would be making his contact with Meyersiek. Frontenac's foreknowledge and subsequent acceptance of the benefits of Meyersiek's work performed in Rhode Island make all of Richard's actions of purposeful availment imputable to Frontenac.

## CONCLUSION

The Report and Recommendation canvassed both the facts and the applicable law with admirable thoroughness. Frontenac has failed to show any error in the analysis or conclusions of Magistrate Judge Martin. The record before the Court shows to an extraordinary degree that the putative principal, Frontenac, went out of its way to cloak its agent with the mantle of authority to act on its behalf. Meyersiek relied on that authority in dealing with Richard. It would be wholly inequitable to allow Frontenac to escape its responsibility for Richard's actions.

Respectfully submitted,
GERO MEYERSIEK
By his attorney

**R. DANIEL PRENTISS, P.C.**

/s/ R. Daniel Prentiss
R. Daniel Prentiss (#0783)
One Turks Head Place, Suite 380
Providence, RI 02903
Tel: 401-824-5150
Fax: 401-824-5181

Dated: June 26, 2008

**CERTIFICATION**

I hereby certify that on this 26th day of June, 2008, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

Stephen M. Prignano, Esq.
Raymond M. Ripple, Esq.
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
sprignano@eapdlaw.com
rripple@eapdlaw.com

/s/ R. Daniel Prentiss